1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLORADO

3       Case No. 13-cv-01471-CMA-BNB

4       _____

5       BRAIN SYNERGY INSTITUTE, LLC,

6            Plaintiff,

7       vs.

8       ULTRATHERA TECHNOLOGIES, INC., KEVIN MAHER,

9            Defendants.

10      _____

11            Proceedings before BOYD N. BOLAND, United States

12      Magistrate Judge, United States District Court for the

13      District of Colorado, commencing at 10:01 a.m., August 8,

14      2014, in the United States Courthouse, Denver, Colorado.

15      _____

16            WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

17      ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

18      _____

19                          APPEARANCES

20            TIMOTHY P. GETZOFF, Attorney at Law, appearing for

21      the plaintiff.

22            MICHAEL P. DULIN and DAVID S. MORELAND, Attorneys

23      at Law, appearing for the defendants.

24      _____

25                        MARKMAN HEARING

AVERY WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
303-825-6119          FAX 303-893-8305

```
 1                    P R O C E E D I N G S

 2              (Whereupon, the within electronically recorded

 3       proceedings are herein transcribed, pursuant to order of

 4       counsel.)

 5              THE CLERK:  All rise.  Court is in session.

 6              THE COURT:  Thank you.  Please be seated.  We're

 7       here this morning in case 13-cv-1471, Brain Synergy Institute

 8       against Ultrathera Technologies in connection with

 9       construction of patent claims in a patent case.  May I have

10       appearances, please?

11              MR. GETZOFF:  Good morning, Your Honor, Timothy

12       Getzoff of Holland & Hart on behalf of the plaintiff Brain

13       Synergy Institute.

14              THE COURT:  Thank you.

15              MR. DULIN:  Good morning, Your Honor.  Michael

16       Dulin on behalf of the defendants, Ultrathera and Kevin

17       Maher.  I have to my left David Moreland.  He's my cocounsel.

18       I have behind us here Roxy Motta.  She's my paralegal.  You

19       may see her sitting at the table.  And my client, Kevin

20       Maher, also wanted to come.  Unfortunately his client -- I

21       mean, his daughter, rather, went into surgery this morning

22       and so he's at the hospital, but if he can break away he may

23       show up as well.

24              THE COURT:  That's fine.  And your parallel is

25       welcome to sit at counsel's table.
```

1          MR. DULIN:  Thank you, Your Honor.  I have
2   reviewed the joint claim construction statement, the claim
3   construction briefs.  I've read the patent.  It appears to
4   me, if my arithmetic is correct, that there are 15 terms that
5   you seek to have construed and they're set out individually.
6   I wondered if it makes sense to take them one at a time or --
7   or perhaps sometimes they could be grouped into a couple,
8   hear argument, and then move onto the next term.  What do you
9   think about that, Mr. Getzoff?
10          MR. GETZOFF:  We agree with that.  Mr. Dulin and I
11   discussed that very procedure and think that made sense, Your
12   Honor.
13          THE COURT:  Okay.  Well, let's do that then.
14          MR. GETZOFF:  Okay.
15          THE COURT:  Mr. Getzoff?
16          MR. DULIN:  Your Honor --
17          THE COURT:  Yes, sir.
18          MR. DULIN:  -- I'm sorry to interrupt.  One thing
19   we talked about is doing just a little introduction.  So
20   perhaps what we could do is Mr. Getzoff could start with an
21   introduction and then I -- I'd like to present a little bit
22   of the prosecution history as part of my introduction just as
23   a backdrop so I don't have to keep referring to it as we go
24   forward.  If that's permissible I'd like to do that.
25          THE COURT:  That's fine.  Thank you.

1          MR. GETZOFF:  That makes sense for me as well,

2     Your Honor.  I have a little introduction overview on the

3     technology and what -- what the technology pertains to from

4     the medical standpoint and some comments about claim

5     construction principles in general, although, of course, I

6     know the Court is familiar with the <u>Phillips</u> case and the

7     claim construction rules.  And then I'll stop, let Mr. Dulin

8     do his introduction.  I'll come back and start in on Claim --

9     well, the first element of Claim 2.

10          MR. DULIN:  Your Honor, just one other detail.  As

11     we're talking about technology, we had presented -- brought a

12     Trial Director presentation that would accompany my

13     presentation.  Unfortunately for some reason it's not

14     working.  So what they're going to do is they're going to --

15     my office is bringing over a thumb drive that has pdfs that

16     would be the snapshots of what I would have referred to in

17     Trial Director.  We're going to put them on this computer and

18     put them here.  I don't want to delay these proceedings so

19     I'm just going to proceed with the Elmo until that gets here,

20     but I just wanted to let you know that at some point somebody

21     is going to walk in here with a little thumb drive and we're

22     going to switch that out.  Thank you.

23          THE COURT:  Fine.

24          MR. GETZOFF:  And along those lines, Your Honor,

25     my presentation when I get to it is going to be via

```
 1      PowerPoint slides which I filed on Monday.  I have a color
 2      copy bound for the Court if it would be convenient to have
 3      them.
 4              THE COURT:  I thought I had those.
 5              MR. GETZOFF:  If I may, Your Honor, the copy I
 6      have in my hand is a subset.  I cut a few slides and -- and
 7      merged a few slides.  I'll tender a copy if I may approach.
 8              THE COURT:  You may.
 9              MR. GETZOFF:  I've tendered a copy to counsel.
10              THE COURT:  Thank you.
11              MR. GETZOFF:  With that, Your Honor, let me start
12      with a brief introduction about the '062 patent, the Epley
13      patent, and what it covers generally in the field of the art
14      in which it was issued.  The Epley patent describes a new
15      device that they call a spatial maneuvering device or
16      maneuvering device which is used for the diagnosis and
17      treatment of various brain conditions or brain injuries.
18      Now, when a person suffers a brain injury or when a person
19      has a certain kind of brain condition there's often symptoms
20      of that injury or condition that manifest themselves through
21      what's called a vestibular system.  The vestibular system is
22      -- everyone has one.  It's the system of your inner ear and
23      the components of your inner ear combined with your brain and
24      it gives you your sense of balance.  It gives you your sense
25      of direction, space, which way is up.  If you go under water
```

1    and turn out the lights you'll -- you'll know which way is --

2    is up.  It gives you your sense of motion, acceleration,

3    deceleration as well.  All of that is called the vestibular

4    system.  And, again, it's a very complicated system within

5    your body that's both your brain receiving signals from the

6    inner ear and other components around the inner ear.  That's

7    all called the vestibular system.  Now, when someone has a

8    brain injury, say, a concussion, that vestibular system can

9    go out of -- out of whack.  The person can suffer vertigo,

10   can suffer dizziness.  And doctors can diagnose a brain

11   injury or brain condition by looking at the vestibular

12   system.  That's where the '062 patent comes in.

13          It was known in the art that doctors could

14   manually maneuver a patient to stimulate their vestibular

15   system, so put them in a chair, put them on a table,

16   introduce them through some known maneuvers like spinning

17   them around for 30 seconds and then look at certain what the

18   patent calls outwardly expressed behaviors.  It's usually

19   looking at your eyes.  It's usually looking at your eye

20   movement.  When you go for -- a normal person with a normal

21   functioning vestibular system, if I were to put you in a

22   chair and spin you around for 30 seconds, and it doesn't have

23   to be that fast, and then look at your eyes, your eyes will

24   reflexively do something that they call nystagmus.  And you

25   saw nystagmus in the patent.  And what nystagmus is is the

1        eyes are actually -- they're jittering back and forth.

2        You're not controlling that.  But that's a normal reaction to

3        someone who's had their vestibular system stimulated.  For

4        someone with a brain injury what they'll do is they'll --

5        they'll run them through this -- this set of movements and

6        then look at their eyes or look at their eyes as it's -- as

7        it's going and their eyes are not moving the way that they

8        should.  So the -- the device not only diagnoses these

9        conditions, it can also treat.

10             What the doctors also found is once they figured

11        out what portion of your brain is being affected based on the

12        symptoms then they bring you in and they do what they call

13        vestibular therapy where they put you through a battery of

14        known maneuvers all designed to stimulate a certain part of

15        the person's brain.  And it's basically akin to, say,

16        physical therapy.  It's physical therapy for your brain.  So

17        a lot of these patients are professional athletes who have

18        undergone concussions.  A lot of them are war veterans who

19        have suffered concussions as well.  So it's both a diagnostic

20        and treatment.

21             What the Epley patent has done is created a device

22        where the person is -- in this specific embodiment it's a

23        chair and they're strapped to the chair and the chair can

24        move on up to three axes.  So it can move on the X, Y, and Z

25        axes.  And they put them through some known motions and then

1    using what -- typically what's most common to use is these

2    goggles.  They're called VNG goggles.  And they've got little

3    cameras on them and they measure your eye movement.  So as

4    you're going through these maneuvers they check your eye

5    movement.

6              The Epley patent at its highest level covers a

7    device and a process where a person is seated, goes through

8    these -- these maneuvers.  The information on -- on the

9    motion is sent to a computer.  The feedback -- what I'll call

10   biofeedback, the patent calls it outwardly expressed

11   behavior, is also being fed to a computer so that the doctor

12   can correlate the two and can correlate the reaction by the

13   patient to the maneuvers that they just put the patient

14   through.  That's essentially what the Epley patent is

15   directed towards.  It was -- it was new at the time.  It

16   allowed doctors greater control of the movements and greater

17   ability to correlate those two pieces of data, what's called

18   in the patent first-category data which we'll get to,

19   second-category data; those are both fed to a computer so

20   that the doctor can do various things, basically correlating

21   the two, and then make certain decisions and make certain

22   recommendations and treatment recommendations based on that

23   information.  In a -- in a nutshell that's -- that's the

24   technology.  That's where the Epley patent comes into play.

25              Let me switch gears and talk briefly about some

1    claim construction principles.  And, again, I know Your Honor

2    has read the briefs.  I know Your Honor has done claim

3    construction before.  You've read the same cases that we

4    have.  There's one, though, principle of claim construction

5    that I think comes up again and again in this particular case

6    and it's probably the driving force between the majority of

7    the disputes that the parties have on the various claim

8    terms.  The issue is in performing claim construction it's --

9    it's fundamentally improper to cull through the description

10   the specifications.  So as the Court knows the specification,

11   I'll sometimes call IT the spec for short, is everything in

12   the patent including the drawings that comes before the

13   claims.  So you've got the description of the preferred

14   embodiment.  You've got the written description of the best

15   mode which is a requirement that the inventor described the

16   best way he knows how to build the -- the patent, and then

17   you have the claims at the end.  And it's, of course, the

18   claims that we're here to construe and that the Court will

19   construe, but in performing the process of claim construction

20   it's fundamentally improper to simply go through the

21   description and say well, that's how the inventor described

22   it here so that's what the claims mean.  That's been called

23   the cardinal sin of claim construction.  There's a saying

24   that the federal circuit uses on occasion.  It says claims

25   claim and specifications teach.  And what they mean is those

1    -- those two parts of the patents serve two different

2    functions.  The claim defines the metes and bounds of the

3    invention.  It's like a legal description of property.  It's

4    written in fairly arcane language, but that is the specific

5    language that describes the metes and bounds.  Specification

6    on the other hand is a teaching tool.  It's to teach those

7    skilled in the art how to make this thing or how to practice

8    the invention.  It's -- for that reason it's much more

9    explanatory.  It's much more descriptive.  But they serve two

10   different functions.

11           Now, it's true, of course, that the specification

12   is an important part of claim construction, and in some cases

13   the specification can be extremely important in giving

14   context to the claim language.  There's times when claim

15   language -- just reading the claim language on its own is so

16   vague or so obtuse that you have to go to the specification

17   for context and say what are they talking about?  I read this

18   claim language and I need some context to know what they're

19   talking about.  Under those cases you'll see the Courts talk

20   about going to the specification to breathe life into the

21   claim.  I think that's one of the phrases from a popular

22   federal circuit case.  So there's times where the claim

23   language on its face is somewhat indecipherable and it's

24   proper to go to the specification to breathe life or give

25   some context.  But, again, that doesn't mean you use the

1    description of the preferred embodiment in the specification

2    and read those into the claims.  That is not proper.

3              THE COURT:  Let me stop you there.

4              MR. GETZOFF:  Please.

5              THE COURT:  Device comes up over and over again

6    here.  The paper clip is a device I suppose.  No one would

7    suppose that a paper clip is the device being described in

8    the Epley patent.  So Mr. Dulin says to me the only form the

9    device takes in the specification is an accelerometer.  What

10   about, okay, if the only description of the device ever given

11   anywhere is accelerometer why don't I move that into the

12   claims then?

13             MR. GETZOFF:  Because it's contrary to federal

14   circuit law, Your Honor --

15             THE COURT:  Well, but it's not --

16             MR. GETZOFF:  -- and -- and here's why.

17             THE COURT:  -- it's not a paper clip.  We know

18   it's not a paper clip.

19             MR. GETZOFF:  No, no, no.  We know that because,

20   first of all, the -- the claim term at issue that they want

21   to construe is accelerometer isn't device.  It's sensor

22   device.  So we know it's not a paper clip.  We know it has to

23   be a sensor.  The -- and -- and now I'm cheating into the --

24   into the merits of the first claim -- claim term.  If the

25   specification had said -- now, there's absolutely times when

1    the specification says when we use this term here's what we

2    mean or it may say when we use this term here's what we don't

3    mean or using this -- this term not to be confused with and

4    so they disclaim or disavow.  That's the kind of language

5    that would -- would be appropriate for the Court to latch

6    onto and say wait a minute, someone reading this patent and

7    these claims, you said you didn't mean that so you -- in

8    later litigation you can't say you mean that now.

9          But going to sensor device, there's lots of sensor

10   devices.  There's lots of different kinds; that they come in

11   lots of different shapes, sizes, functionalities, and so

12   forth.  But the claims didn't use the word accelerometer.

13   They used sensor device.  Now, in the preferred embodiment

14   they use an accelerometer, but there's no language in the

15   specification when they talk about the accelerometer is this

16   is the only type of sensor that will work.  This is all that

17   -- that we mean.  There is some language for some of the

18   other claim terms and it comes up on spatial orientation

19   where they say when we use spatial orientation here's what we

20   mean.  Boom, that's a definition.  That's where the patentee

21   can serve as his own lexicographer as they say.  And a

22   patentee inventor can define his own terms.  But in the

23   claims when he uses a general term like sensor device which

24   is simply -- it's a device that senses, that's -- there's no

25   ambiguity there.  There's lots of different sensors in the

1    mechanical engineering world that can perform this -- this

2    function.  It doesn't have to be an accelerometer.  If it had

3    to be an accelerometer he would have said accelerometer in

4    the claims, but he didn't.  He used -- if -- if that were the

5    standard, Your Honor, then -- then you would read everything

6    from the preferred embodiment as, well, this is what you're

7    talking about.  You could just sweep everything from the

8    specification into the claims and say well, I'm going to

9    limit these claims to the specific way that you, inventor,

10   created your embodiment or reduced it to practice.  Again,

11   that's not the -- the law.  The specification, the

12   requirements of the specification are not for the inventor to

13   list and describe every single conceivable type of -- of

14   structure and device and machine and apparatus for each of

15   the various components that might fit within the claims.

16   That's not what's required.  What's required is he puts forth

17   the best way he knows how, but it's just one way; that that's

18   -- the whole meaning of preferred embodiment is -- is this is

19   his preferred way to practice his claims and he's required to

20   disclose that to the public as part of getting his -- his

21   patent, but it's the claim that defines the metes and bounds,

22   not the way they've described it.  I've got more to say on

23   the sensor device issue, and I know that Mr. Dulin has cited

24   portions from the specification where it talks about the

25   accelerometer.  There's also portions in the specification

1    that talk about sensor without talking about it being an
2    accelerometer.  So it's not exclusively tied to
3    accelerometer, but I think more importantly, there's nothing
4    in the specification that says the accelerometer is what we
5    mean.  This would only work with an accelerometer and we're
6    not talking about other kinds of sensors.  That's the kind of
7    language that would -- is necessary to limit the claim to the
8    preferred embodiment.  But the federal circuit has been clear
9    simply because the -- the specification only describes one
10   embodiment.  You don't limit the claim to that embodiment.
11   Again, most specifications only describe one embodiment.
12   That's the whole point is you have to describe your best
13   mode.  You don't have to describe every possible way to
14   practice the -- the metes and bounds of the claims.
15          Now, with that, again, I've got more to say on
16   sensor device, but I think my introduction is done.  I'll let
17   Mr. Dulin say his piece.  I'll come back and maybe clean up
18   more and get into some slides on sensor device if it pleases
19   the Court.
20          THE COURT:  Thank you.
21          MR. GETZOFF:  Thank you.
22          THE COURT:  Mr. Dulin?
23          MR. DULIN:  Thank you, Your Honor just a
24   preliminary matter.  If I may, the slides and/or the Elmo
25   slides that I'm going to refer to today are here.  May I give

1    those to you?

2            THE COURT:  You may.

3            MR. DULIN:  And I also have a copy of the exhibits

4    that we filed with the Court.

5            THE COURT:  Okay.  Thank you.

6            MR. DULIN:  Your Honor, I'm going to refer to the

7    patent US Number 6,800,062 as merely the Epley patent.

8    That's the patent at issue in this case.  And that patent

9    contemplates a computer-based method and apparatus for

10   obtaining medically-informative data for the diagnosis and

11   treatment of human vestibular orders -- disorders.  And I'm

12   going to talk just a little bit about my understanding of

13   what this invention is and what a human vestibular disorder

14   is while I'll try not to reeducate you on the things that

15   Mr. Getzoff talked about.  But these disorders manifest

16   themselves in things like vertigo, imbalance, and dizziness.

17   And it is -- the process of diagnosing and treating these

18   disorders is dependent on the ability to observe and to

19   quantity the reflex output of certain vestibular sensors.  An

20   example of a vestibular sensor are the semicircular canals

21   that are in your ear.  And those semicircular canals are

22   orthotically located with respect to each other and they're

23   orientated in various planes of motion.  And they -- they act

24   as sensors of angular acceleration.  And so they essentially

25   are transducers of rotation in planes of movement.  And so

1   they contain fluid.  And due to inertia that fluid sometimes

2   lags the movement of the head.  So if you move your head

3   forward that -- that movement of the fluid lags a little bit.

4   And when that happens and it happens in the plane of motion

5   then there is signal, a piece of data that is sent from that

6   semicircular canal through the thorough pathways to the stem

7   of the brain.  Then there's a reflex -- reflex arc is sent to

8   the muscle of the eye.  To move forward, there's a fluid

9   displacement that causes a signal to go ultimately to the eye

10   and then there's a vestibular oculatory reflex.  So there's

11   an eye reflex that relates to the movement in any one plane

12   of direction -- it relates to that plane of direction.  So if

13   somebody moves themselves in a pitch plane, then a yaw plane,

14   then a roll plane, and there's a nystagmus when that pitch

15   happens, right, there's a -- there's a twitch of that eye,

16   then we know that that semicircular canal is working, and

17   then you go into a yaw and the same thing, then maybe you go

18   into a roll and there is an abnormality.  It's very critical

19   that a doctor or somebody trying to treat a vestibular

20   disorder is able to understand what semicircular canal is

21   dysfunctional and the only way you can do that is by

22   correlating the movement of a person through space and their

23   vestibular manifestations.  And we talk about this inner

24   oculatory reflex.  The patent also talks about a vestibular

25   -- not just a vestibular oculatory reflex, but a vestibular

1    spinal reflex, and that happens through a similar process

2    with the otoliths that have particulates that move in

3    different directions and they're connected to hair molecules

4    that also send a signal to the brain.  For the purposes of

5    this patent I think that semicircular canals are a good

6    example of how motion and a person's vestibular outward

7    manifestation being correlated is very, very important.  So

8    understanding the importance of -- of looking at these two

9    pieces of data together in real-time, Mr. Epley came up with

10   his patent, and it's a method and apparatus for being able to

11   -- and he envisioned a device moving somebody spatially,

12   orienting -- you know, the example in the patent is orienting

13   somebody on three different orthogonal axes through space.

14   But it's -- you move somebody through space and create two

15   data streams.  One relates to a person's exact spatial

16   orientation.  The other relates to the vestibular activity of

17   this person as they move through that spatial orientation.

18   Then that data is sent to a computer and it's processed.  And

19   there's a pictorial representation of what that information

20   is and that is the information that's medically informative.

21   That's the information that these claims have both right

22   there in the preambles as medically-informative data.  That's

23   the purpose of these claims.

24            But there's some things that are very critical.

25   Certainly there is prior art and prior inventions before this

1    patent was ever filed.  There's been spinning chairs and

2    there's been monitoring people's nystagmus as they move.

3    Sometimes -- you know, back in the old days you set somebody

4    on a table and you'd move them or -- or you'd have them have

5    some kind of movement that they would engage in and then

6    you'd -- you'd see whether or not there was a nystagmus that

7    occurred.  But in this case Mr. Epley distinguished it --

8    distinguished it from the prior art, and we'll talk about

9    that.  And he came up with a little bit more sophisticated

10    invention.  But what's critical about that invention is it's

11    critical that somebody move through three-dimensional space.

12    And that that person -- as that happens there is a data

13    stream that's generated from the movement of that person.  So

14    it's critical that there's a sensor that moves through space

15    with that person so you're able to get an accurate reading of

16    what the motion is that those semicircular canals are

17    experiencing.  And that's the key.  You have to make sure

18    those semicircular canals are essentially generating -- the

19    information ties into their movement and then that has to be

20    sent by a data stream to a computer.  And then the exact

21    vestibular information that's generated from that person as

22    they move through that in real-time and sequence at the same

23    time as the motion is happening is a second data stream that

24    goes to the same computer that has that vestibular

25    information.  Then the computer can take it and look at those

1    and compare and see where the person was at any point in time

2    and when -- and what that vestibular system was doing.  And

3    then that's -- that's something that is very helpful.

4            It's also critical that it's pictorially

5    displayed.  This is something that's very clear in the

6    specification and it's required by this invention.  There's

7    certainly been arguments made.  Mr. Getzoff talked about --

8    about the specification and what the importance is of the

9    specification and the significance here.  And one thing that

10   we have done is tried to guard against the construction of

11   these claims that would basically circumvent what this real

12   invention was.  This invention and this patent is here

13   because it was distinguished from the prior art.  This patent

14   is here because it's a unique invention with very unique

15   requirements.  And sometimes the only way you can derive what

16   those requirements are are from the specification.  And while

17   there's terms that are referenced in the -- in the claims,

18   those terms somebody of ordinary skill would know what they

19   mean because, you know, because they know this art quite

20   well, but they also explain in the specification.  And that

21   specification is something that -- you know, we're going to

22   have a jury that looks at this case ultimately and that jury

23   is going to see terms and they need to understand what they

24   mean.  And the only reason -- the only way to keep them from

25   being confused and to keep them from being misled is to tell

1    them what it means and what those limitations are and to

2    construct them to make sure that they adequately understand

3    what this invention is.

4            Now, Courts have for a long time struggled with a

5    line -- with defining the line between importing limitations

6    into those claims and constructing the terms as -- as -- as

7    appropriate in terms -- you know, in consideration of the

8    specification.  And the Phillips case actually talks about

9    this and I think there's a good quote in the Phillips case.

10   And that's Phillips v. AWH Corp. At 415 F 3d 1303 at Page

11   1323 to 1324.  And what this section talks about and what the

12   Court is talking about here is that that line between

13   construing the patents and importing limitations can be

14   discerned with certainty and predictability if the Court

15   considers what somebody of ordinary skill in the art would

16   think this invention is.  So when we look at these claims

17   what would somebody of ordinary skill in the art think they

18   mean?  And that can help guide the construction without

19   unnecessarily importing limitations.  Now, Mr. Getzoff talked

20   about the fact that things that are in the specification are

21   in the specification, things that are in the claims are in

22   the claims, and the claims stand on their own.  But clearly

23   the terms in those -- we're not -- we're not adding language

24   to the claims.  We're defining the terms in those claims and

25   we can look at the specification to determine how they should

1    be defined.  We're always going to add new language into

2    whatever those definitions are.  We have to move outside the

3    pure language of what the claim is to do so.  And there are

4    circumstances where the claims may look broad, but when you

5    read the specification clearly the intent was that it was

6    narrower and that it shouldn't be construed so broad.

7         A case that I think highlights this very nicely is

8    a case called Microsoft v. Multi-Tech Solutions.  The

9    citation is 357 F 3d 1340.  It's a federal circuit case in

10   2003.  And what this case talks about is -- and I think at

11   Page 1348 would get you to the section of that opinion that

12   talks about this.  But what was at issue in that case is a

13   way that local and remote systems communicate.  And one side,

14   well, the claims should be limited to only communicating over

15   a telephone line.  The other side, wait a minute.  It doesn't

16   say telephone line in those claims.  There can be all kinds

17   of different lines including a packet switch network such as

18   the internet.  That's a perfectly good way of communicating

19   among -- from a local to a remote system.  The other side

20   said well, the specification talks about a telephone line

21   consistently.  In that case multiple times there was

22   reference to a telephone line and every time they talk about

23   these systems communicating they talked about a telephone

24   line.  So what the Court said is there is no alternative that

25   was presented and it was clear that a telephone line is what

 1    was considered -- what the intent was.  So while the claim

 2    may be broad enough to include, you know, a packet switch

 3    data network or something else, clearly the intent was to

 4    limit it to a telephone line.  And so they construed the

 5    claims that way and the federal circuit upheld it.

 6         So I think in this case we've got a specification

 7    that teaches and enables this invention and what we ask is

 8    that the constructions adequately instruct this jury what

 9    those terms mean in light of what somebody of ordinary skill

10    in the art would know them to mean.  And I think as you'll

11    see as we go through it there is support for the

12    constructions.  And if the constructions aren't made -- and

13    as we go through this I'll point out areas that I believe

14    this to be true.  But if the construction isn't made in the

15    manner that the specification has required then the jury

16    could be misled into thinking that it's broader, and like you

17    said, may think some other device or some other method could

18    read on the claims of this patent when indeed that is not the

19    intent and that is not the invention and, quite frankly, that

20    isn't how this patent came into being.

21         One thing -- one second.  Mr. Epley when he came

22    up with this patent filed an application, and initially that

23    application was rejected and the Patent and Trademark Office

24    said -- cited a variety of prior art in support of its

25    rejection.  One piece of prior art is what's called the Watt

1    reference.  And the Watt reference was essentially a person

2    who is strapped onto a board and then moved in a pivotal

3    motion along a single axis and there is, like, a sensor or

4    something attached to that person.  And there's a variety of

5    other prior art, and I -- and, you know -- and certainly

6    Mr. Epley knew that there was a lot of things that were out

7    there prior to the time that he came up with his invention,

8    but he knew that his invention was unique and he made

9    argument in order to obtain this patent in order to steer

10   clear of prior art because it was unique.

11          I want to key you into what is Slide 1 in the

12   slides that I gave you.  And I believe this is also Exhibit

13   -- this is from the prosecution history which is Exhibit B.

14   I'm referring to what is I believe Page 16 -- 16, 17, and 18

15   of that history.  And so just a little bit on Page 16 he

16   starts with a remark.  With respect to the substantive use of

17   Watt, et al, it is singularly under Section 102 as a lead

18   reference.  He talks about that Watt does not disclose or

19   suggest a system or methodology -- let me see if I can --

20   Watt does not disclose a system or methodology which is

21   capable of producing a visually-correlatable presentation of

22   a human subject -- subject's spatial orientation.  So right

23   there it shows that he's distinguishing from the prior art by

24   -- by showing that his patent requires there to be a

25   visually-correlatable presentation of a human subject's

1    spatial orientation along with a pictorial representation of

2    a behavioral response generated in that subject by vestibular

3    activity which is related to the subject's spatial

4    orientation.  So clearly that vestibular activity has to be

5    related to the spatial orientation.  Indeed, that's the way

6    this particular invention is beneficial and useful.  He says

7    nor does Watt disclose or suggest a system or a methodology

8    which furnishes first and second data streams, one of which

9    describes a pattern and current condition of a subject's

10   spatial orientation.  Watt, at all -- Watt, et al, in terms

11   of data gathering completely ignores the matter of subject

12   spatial orientation.  And clearly this person has to be moved

13   in different spatial orientations to be able to understand

14   which semicircular canals aren't working.  I mean, that's the

15   whole purpose of this is to understand how to treat and

16   diagnose vestibular disorders.  And because of this, Watt at

17   all -- the Watt, et al, system is simply incapable of

18   producing the kind of data which applicant's claimed

19   invention utilizes, wherein the following of a subject's

20   spatial orientation is important.

21          It then goes on to say in the next highlighted

22   section with the use of the apparatus and methodology of the

23   present claimed invention, and in terms of the mentioned

24   visual correlation, one can conveniently co-observe,

25   essentially along a common line of sight directed towards a

 1     display screen, the relationship existing between a subject's

 2     spatial orientation -- or orientation in space and the

 3     subject's currently related vestibular behavior in the form

 4     of nystagmus eye movements.  And then lastly on the next page

 5     which I believe is Page 18 of this office response,

 6     accordingly, not only does Watt, et al, by itself, therefore,

 7     fail to anticipate applicant's claimed invention, it also

 8     fails to provide a system and methodology which presents a

 9     system user with pictorial, visually correlatable events such

10     as those set forth in the applicant's claims.  So what we're

11     seeing here is this requirement for it to be visually

12     pictorial.  And if you look at Claim 2 it's not specifically

13     set out in that claim, but clearly that's the way he's

14     getting around this prior art.  It's the reason we have this

15     patent.  And if it isn't there and if the jury doesn't see it

16     they're going to be misled into thinking that it isn't part

17     of the invention which it is and that's the only reason that

18     this patent exists.

19          This is the affidavit of John Epley which

20     accompanied the response to the office action.  And I think

21     it's helpful because it describes his invention from his

22     standpoint at the time that not only he filed the invention,

23     but he's also assisting and steering this thing clear of the

24     prior art, so he is doing this in support of educating the

25     examiner on why his invention is different than the prior

```
 1    art.  So he talks -- talks about how two pictures that he
 2    submitted are -- contain all the features of his invention.
 3    And then he says -- I'm going to that second highlighted
 4    paragraph -- in these photographs a volunteer is shown seated
 5    and stabilized -- stabilized in a three-dimensional spatial
 6    orientation chair.  On the left side of these photographs is
 7    a monitor screen.  It's shown as a picture.  For 17 it's
 8    viewing in a real-time co-presentation of two categories of
 9    correlated visual information including both an image showing
10    current spatial disposition of that volunteer.  So the first
11    category of data along with an image displaying the related
12    nystagmus motion activity of one of the volunteer's eyes.  So
13    that's the second category of information.  So one thing that
14    he's saying here is he's emphasizing the real-time
15    importance, the importance of getting this data in real-time.
16    And if you think intuitively about this invention real-time
17    is something that's critically important.  You can't have
18    data that's not correlated and not taken in real-time because
19    you're not -- you wouldn't be able to understand what the
20    vestibular activities -- and what the motion is that's
21    causing the vestibular activity that is being recorded.
22            It also talks about this visual information
23    display.  Again, it's important to be able to visually see
24    this information and that's something that is critical to
25    these claims and that's the reason this patent exists as it
```

1    does.

2          So I'll end simply by saying that as we go through

3    this I'd ask the Court to consider what this invention is as

4    a whole and whether or not it's properly articulated in those

5    claims in light of the specification and in light of

6    prosecution history which resulted in this patent being

7    granted.  Clearly the patent was not issued in a vacuum,

8    rather, the examiner issued it based on the expressed

9    representations of Epley when he was prosecuting this as we

10   just saw.  Thank you, Your Honor.

11         THE COURT:  Thank you.  So the first -- well, I

12   guess maybe you've organized them in some way.  I'll let you

13   tell me, Mr. Getzoff, in what -- what claim you'll take up or

14   what claim term you'll take up first.

15         MR. GETZOFF:  Your Honor, I think -- at least I'm

16   planning to go in the same order that they're set forth which

17   is chron -- well, not chronological.  It's the order that

18   they come up in the claims themselves.

19         I -- I did just want to make one point -- two

20   points actually regarding some of the things that -- that

21   Mr. Dulin showed.  First of all, this -- this declaration by

22   Mr. Epley had nothing to do with defining his invention or

23   defining terms in his invention.  Mr. Dulin didn't show you

24   the first page of that declaration which talks about what the

25   purpose of this declaration is for.  I have to back up a

1    little bit.  He's -- he's submitting this declaration to

2    establish the -- the date that he was in possession of the

3    invention.  So it was a prior art issue for what -- what art

4    would qualify as prior art.  And it's not uncommon for an

5    inventor to do what's called swearing behind prior art where

6    he says I was actually -- I had come up with a working

7    embodiment on this date.  That's what this invention is for.

8    Now, Mr. Dulin showed you this page which -- which starts off

9    at the top with the word invention, but he cut off on the

10   prior page.  This directly is -- it's talking about the

11   embodiment that he came up with.  And what he has to show

12   under the patent rules is that he was in possession, that he

13   had reduced to practice and embodiment.  So, of course, this

14   description looks a lot like what's in the description -- in

15   the specification because this is the actual embodiment that

16   he came up with, but it's only an embodiment.  And it would

17   be extremely misleading to suggest that this declaration by

18   Mr. Epley has something to do with the meaning or scope of

19   his claims or this patent.

20          The -- the only point I -- I want to make just

21   briefly, Your Honor, is this line that Mr. Dulin talked about

22   which I agree with; that the Courts talk about this fine line

23   between reading limitations from the specification into the

24   claim which is improper and reading claims in light of the

25   specification.  There is actually fortunately a legal

1    standard for us to follow and for the Court to follow that

2    puts a finer point on this.   I mean, first of all, <u>Phillips</u>

3    says that one of the cardinal sins is to read a limitation

4    from the written description into the claims.   And further

5    says that the federal circuit has repeatedly warned that --

6    this is, again, <u>Phillips</u> -- repeatedly warned against

7    confining the claims to those embodiments shown in the

8    specification.   The -- the legal standard is where the

9    specification makes clear that the invention does not include

10   a particular feature, then that feature is deemed to be

11   outside the reach of the claims of the patent.   That's a

12   quote from the <u>Liebel-Flarsheim</u> federal circuit decision.

13   This is Page 2 of our reply brief which I think lays -- lays

14   this out quite clearly.   And, again, <u>Phillips</u> says there must

15   be an intentional disclaimer or disavowal in the

16   specification of other embodiments in order to import that

17   into the claims.   That's the legal standard.   The legal

18   standard is not this is how you described it in the

19   specifications so we're going to go with that.   That's just

20   plain wrong.   The standard is did you say something in the

21   specification that disavowed intentionally we don't mean this

22   or when we say this here's what we mean?   That's what you

23   need to have to import the preferred embodiment into a claim.

24   Frankly, it's fairly rare and it's a common mistake to simply

25   look at the specifications and say well, this is how you

1    described it, this is what you came up with.  That's not

2    patent law.  That's contrary to federal circuit authority and

3    there's -- and there's not a debate on what that standard is.

4              Let me move then into with that into the sensor

5    device issue, see if I can get the slides.  Okay.  So taking

6    these claim terms one at a time the first claim term at issue

7    is -- it's actually a longer phrase.  It's a sensor device

8    which produces a data stream that relates to spatial

9    orientation.  So, Your Honor, you asked me well, how -- how

10   do we know that a paper clip can't satisfy if it's just a

11   device?  How do I know or how does the jury know that it's

12   not a paper clip?  We know it's not a paper clip because the

13   claim tells you it's not.  The claim provides the metes and

14   bounds for what that device has to be.  So it's -- it has to

15   be a sensor device, Number 1, but it also has to be a sensor

16   device which produces a data stream that relates to spatial

17   orientation.  That's a factual issue.  If they have a sensor

18   device on their accused product that the defendants are

19   selling and that sensor device produces a data stream that

20   relates to spatial orientation they -- they infringe.  It

21   doesn't matter what kind of sensor device they actually have

22   or who they buy it from.  The fact is they have two sensor

23   devices.  They've got something called a proximity sensor.

24   They have something called a resolver sensor.  These are

25   well-known sensors.  You could Google them and see -- see

1    what they are.  But they're kinds of sensors that are

2    commonly used to track motion or -- or speed or -- or

3    revolutions.  So they have sensors.

4         This -- the claim term at issue is kind of broken

5    down into two things.  Let me take them one at a time.  A

6    sensor device, I said this earlier, that really does not need

7    any construction by the Court.  A sensor device is a sensor

8    device.  It's a device that senses.  People will know.

9    Persons skilled in the art know what sensors are.  Sensors

10   are used -- they're ubiquitous in electrical engineering.

11   There are sensors in all kinds of things that sense all kinds

12   of things.  This sensor device has to do something pretty

13   specific though.  Again, you don't need to leave the claim to

14   know what this sensor device needs to be.  It has to be a

15   sensor device which produces a data stream.  We know what

16   that is.  The Court doesn't need to construe data stream.

17   That relates to spatial orientation.

18        Okay.  Spatial orientation.  That's -- that's a

19   term that the ordinary meaning seems to mean just where you

20   are in space.  That might be a pretty good definition.  In

21   this case the patent itself talks about -- the inventor

22   defines spatial orientation.  This is my Slide 7 which is a

23   callout of column 3 of the patent around line -- from 28 to

24   34.  He says incidentally when -- when I make reference to

25   spatial orientation that means a subject's static disposition

1    in three-dimensional space and/or a subject's dynamic

2    movement in any direction or plane of -- of motion.  So he --

3    he is saying, you know, essentially when I mean -- when I say

4    position or positionings or spatial orientations I mean that

5    in the broadest sense of the word.  I mean any positioning,

6    any movement in any direction.  So we actually have a

7    definition.  And this is -- this is the sort of linchpin or

8    -- or hook that when -- when an inventor defines what he

9    means then it's proper and it's appropriate to take him at

10   his word.

11          So what we have done, the plaintiff in this case,

12   in defining this term is we've just taken the -- the language

13   from column 3, disposition in three-dimensional space and/or

14   dynamic movement in any direction or -- I should say plane --

15   that's a typo -- plane of motion.  So our definition for

16   sensor device is simply a device that -- that senses and

17   produces a data stream relating to disposition in

18   three-dimensional space and/or dynamic movement.  It's --

19   it's not that much more complicated than that.

20          Let me -- let me talk about this accelerometer

21   issue and just put this to rest.  There's nothing in the

22   patent that -- that talks about accelerometer as we are

23   disclaiming other kinds of sensors.  In fact, sometimes the

24   patent uses sensors without talking about a specific kind of

25   sensor.  Sometimes it talks about accelerometers, but when it

1    does it talks about them in the context of being examples or

2    being a description of the preferred embodiment.   In this

3    particular passage -- this is on column 28.   This is Slide 4.

4    Through the use of various appropriate sensors such as linear

5    and angular accelerometers.   This is the typical kind of

6    language that comes up in patent specifications of examples

7    of how to practice the patent.   But this is essentially the

8    opposite of what you would need to find to import this

9    limitation to the word sensor because it's clearly using it

10   as exemplary and not definitional.   This is another passage

11   that the defendant cited in their brief and this is in

12   reference to the description.   Appropriate regions are

13   equipped with gravitational and rotational accelerometers

14   which supply data streams.   So this is the passage they

15   cited.   What they didn't cite is this section is introduced

16   with this paragraph which says preferably and for the purpose

17   of illustration herein device 18 takes a form like that which

18   is pictured in Figures 2 and 3.   So, again, this is common

19   language that patent attorneys and inventors use to describe

20   with specificity exactly how they came up with it.   But it's

21   simply that.   It's for purposes of illustration.   They're

22   required to put forth the best way they -- they know how.

23   And they have to -- they -- they often use figures and then

24   refer to the figures.   That's what they do here.   So for

25   their figures, for his embodiment he used an accelerometer

1    and he's required to say I use an accelerometer.  That's the

2    best mode requirement.  He can't hold back what kind did you

3    use.  He has to give a description of the embodiment he came

4    up with.  That's part of the quid pro quo.  You get your

5    20-year monopoly, but you have to tell everybody specifically

6    how you did -- how you did it.  But that's the written

7    description requirement of the specification.  Again,

8    different function and purpose in the claim.  The claims

9    establish the metes and bounds of the invention because the

10   claims here don't talk about accelerometers.  The claim uses

11   the word sensor device.  Any -- any device that qualifies as

12   a sensor device satisfies that claim.  Now, again, it has to

13   do other things.

14          Now, I don't want to lose sight that these claims

15   have lots of elements in there, lots of requirements in the

16   claim themselves.  So that's how we know it's not a paper

17   clip or something too broad because the claim defines what

18   has to happen.  But it's -- it's -- it crosses the line and

19   it's impermissible to go from the claim to the specific

20   embodiment and say it also has to happen in the way you

21   describe in the specification.  That's -- that's simply

22   incorrect.

23          THE COURT:  Suppose the -- and I don't think this

24   drives my determination, but I'm just curious.  Suppose the

25   particular sensor device used in an allegedly infringing

1    apparatus was invented after the date of the patent.

2              MR. GETZOFF:  It doesn't matter.  That's clear --

3    clear Black letter law.  It doesn't matter.

4              THE COURT:  Okay.  Thank you.

5              MR. GETZOFF:  Thank you.  Although I can say in

6    this particular case that's not the case, but if it -- if it

7    were.

8              THE COURT:  Gentlemen?  I see that a couple of

9    gentlemen have entered the Court.  If one is your client and

10   he wants to sit at counsel's table he's free to do so.

11             MR. DULIN:  Thank you.  Those were the technology

12   people that were helping me, although if it's okay with the

13   Court maybe I'll just keep using the Elmo since we're doing

14   it and it would be less disruptive just to keep proceeding

15   that way.  Would that be okay?

16             THE COURT:  That's fine.

17             MR. DULIN:  Okay.  Thank you.  Your Honor, would

18   it be helpful for you to have a copy of the speedy

19   constructions that we filed with the Court so you just have

20   it in front of you as we refer to these?

21             THE COURT:  I have it.

22             MR. DULIN:  I thought you might, but I figured I'd

23   bring them anyway.

24             There's just a couple things I'd like to clarify

25   before I go into this.  As it relates to the Epley affidavit,

1    I think that key portions of that benefited my point in

2    showing that affidavit to you.  And you could look at it and

3    see that it was presented during the prosecution of this

4    patent.  And he does talk about what his invention is and he

5    says all the features of my invention include and then he

6    talks about it.  And those are representations he made to the

7    Patent and Trademark Office during prosecution.  So I agree

8    with what Mr. Getzoff -- Getzoff said.  You know, certainly

9    he was trying to swear behind the art, but he also made some

10   very good admissions in there that -- that define for the

11   examiner what the scope of his invention is.

12          There is a concept in patent law certainly, a

13   very, very well-found -- well-grounded concept that a

14   preferred embodiment can't be read into the claims.  There is

15   a -- something as defined as a preferred embodiment is one

16   example.  You can't say okay, well, that example now is part

17   of the claims.  So, again, the Court has to struggle with

18   this -- this analysis of are these things that are explained

19   in the specification just examples of preferred embodiment or

20   are they a description of what this invention is?  And I'll

21   submit that the constructions here are aimed at making

22   constructions comply with what the invention is.  And you'll

23   see some language and we'll go through some language that

24   shows that it isn't a description of a preferred embodiment,

25   but, rather, it's the way this inventor described what the

 1    invention is.

 2            If I may proceed to Claim 2.  These are the

 3    definitions that we're talking about.  The first limitation

 4    is a sensor device which produces a data stream that relates

 5    to spatial orientation.  It cites proposed constructions on

 6    the left.  Our proposed construction is on the right.  And

 7    that is an accelerometer that moves orientationally with the

 8    subject and is connected by a communication line to the

 9    computer and which produces a continuous flow of

10    computer-processible data responsive to the subject's static

11    disposition in three-dimensional space.  Now, I'm going to

12    work through each of the components of that construction, but

13    if you read that I think you'll get the sense that these

14    things are -- are key features of this invention.  If they're

15    not part of the definitions of Claim 2 then the jury may not

16    understand what Claim 2 means, and, in fact, this invention

17    may not be adequately defined for the trier of fact.

18            The first -- I think it might be helpful as sort

19    of background before we proceed too much further is to talk

20    about Figure 1.  Now, Figure 1 is something that we're going

21    to talk about as we go forward, but I can give you sort of a

22    -- a little tour of Figure 1.  Now, Figure 1 was defined in

23    the patent as -- in column 9, line seven.  It's a block

24    schematic diagram showing a preferred embodiment and a manner

25    of practicing the invention.  I think that's important

1      language.  It's a manner of practicing the invention.  Now,

2      in this figure which is referred to heavily in the

3      specification you see -- and you look at these things and you

4      wonder -- unless you're used looking at these things they

5      seem to be kind of like gibberish, but what you have is a

6      representation here of a person.  This box right here, Number

7      12, represents the subject.  The N is the nystagmus and the O

8      is the otolith.  The otolith is the other vestibular sensor.

9      Underneath that is the apparatus, this Number 18.  This box

10     is the apparatus that the person is affixed to.  Then box

11     Number 20 is the computer and then you have screens for the

12     computer here.  And then we have a line that goes from the

13     person to the computer which is Number 22.  We have a line

14     from the device to the computer which is line 24.  And with

15     respect to Claim 14 there's also a line back which we can

16     talk about later going from the computer to the device.  So

17     there is communication both ways.  Number 33 is a symbol

18     which represents this orthogonal movement in this embodiment

19     and it shows how not only the device but the person is

20     affected by this movement.

21              I want to talk first about the accelerometer

22     argument.  There is -- every description that talks about

23     this sensor talks about an accelerometer.  There is no

24     alternative to accelerometer that's described in here.  If

25     you read this patent you get a sense pretty quick that this

```
 1    inventor knew that an accelerometer and conveyed that an
 2    accelerometer is, in fact, the device that -- that
 3    constitutes the sensor in this.  Somebody of ordinary skill
 4    in the art reading this patent would know that the sensor is
 5    an accelerometer.  If we look at --
 6              THE COURT:  Well, I didn't mark it down, but
 7    Mr. Getzoff showed me a place where it said a device, comma,
 8    for example, an accelerometer.  Isn't that -- doesn't that
 9    mean that it's not only an accelerometer?
10              MR. DULIN:  Well, I think I've got that citation
11    for you, Your Honor.  Let's take a look at it.  One citation
12    that was made -- he made two citations to the record.  One
13    was Claim 28 -- I mean column 28 --
14              THE COURT:  Column 28.
15              MR. DULIN:  -- lines 15 and 16.  Right here.  For
16    the use of various appropriate sensors, such as linear and
17    angular accelerometers, video cameras whose outputs are
18    directly viewed and are also monitored as data streams by the
19    computer, controllable and monitorable subjective inputs.  If
20    you read this whole section they're talking about this
21    computer-based methodology and investigation.  And this
22    certainly doesn't say that it's a preferred embodiment or
23    it's -- you know, it could be something other than sensors,
24    but it's slightly unclear to me, candidly, Your Honor.  And
25    I've looked at this language to know whether or not that's
```

1    talking about the same accelerometers that would produce the

2    first data stream or some other type of accelerometer.  I

3    don't -- I don't know that for sure, but it does talk about

4    this twirl gathering of information.  But I think the other

5    example that was made is on Page 10 and I think this may be

6    the one that you're referring to.

7              THE COURT:  Column 10?

8              MR. DULIN:  Column 10, rather.  I'm sorry.  Column

9    10.  There was a reference to preferably.  And for the

10   purposes of illustration herein the device takes the form of

11   Figures 2 and 3.  Now, that's not Figure 1.  It's Figures 2

12   and 3.  And then we get back down to column 10, lines 32 on

13   -- and it talks about appropriate gravitational and

14   rotational accelerometers.  It's not -- there's a lot of

15   things here that are discussed that -- such as Figures 2 and

16   3 which I'll show you.  Those are just the -- this machine

17   which is a multiaxial rotational device.  So elsewhere in

18   this patent it does talk about a different type of device.

19   Maybe it only has two axes.  There's a different way to

20   achieve spatial orientation.  But here this -- this --

21   Mr. Epley is talking about this example right here.  So he

22   talks about that and then a couple paragraphs down he says

23   appropriate regions in the device are equipped with

24   gravitational and rotational accelerometers.  So this example

25   of a device has and is appropriately fitted with rotational

1    accelerometers which supply data streams indicative of the

2    exact orientations.  Again, there's no other device that's

3    described here.  It's an accelerometer.  And it's not saying

4    that it's, for example, an accelerometer.  It's a little

5    misleading.  The example relates to something else.  It's the

6    device that those accelerometers are on.  Now, there are

7    other places here though where the inventor -- and he was

8    much more definitive that, in fact, it is not a preferred

9    embodiment, but, rather, a requirement to this claim.  I'm

10   going to direct your attention to column 11, lines 4 through

11   9 and I've got a little blowup so we can go through it.

12          It says here -- and this is a description of the

13   preferred embodiment, but also it's in the detailed

14   description of the invention section.  So he's talking about

15   what this invention is.  And he says, for example, in the

16   system arrangement and setup now being described, subject --

17   and so that's kind of his same three-dimensional orthogonal

18   orientation device -- it is specifically equipped with the

19   attached headgear which includes in accordance with the

20   invention appropriate accelerometers which are not

21   specifically illustrated, but are designed to feed spatial

22   orientation and angular disposition motion data to the

23   computer.  That language is not equivocal.  In accordance

24   with this invention it has accelerometers.  There's a whole

25   lot of other places in this patent where accelerometers are

1    required.  And, Your Honor, I don't know if you want me to

2    just for the record cite what I believe those sections to be

3    into the record.  I can show them to you as well, although

4    that would -- if we go through this whole patent that would

5    mean there's 103 different examples that I'm showing you and

6    that may take us a long time, so --

7              THE COURT:  I don't need that.  I get your point.

8              MR. DULIN:  Okay.  And -- and so I'll just leave

9    that point with saying that there are multiple citations

10   where it talks about this requirement.

11             The next portion of our proposed construction

12   requires that the accelerometer move orientationally with the

13   subject.  And, again, it seems it's so basic when you read

14   this patent that the person has to move orientationally and

15   that this sensor has to move orientationally because if they

16   didn't move orientationally then you couldn't get the -- an

17   accurate reading on where the semicircular canals are

18   spatially which is the first issue.  The patent just wouldn't

19   work.  If we had a device sitting here the jury was looking

20   at that didn't move orientationally with the person it

21   couldn't generate the first data stream and that jury would

22   be misled into thinking that, in fact, this is still a

23   first-category data when it's not.  But there is support for

24   that in the patent and the claims.  So let's take a look at

25   -- take a look at that as well.

1          THE COURT:  Well, let me see if I understand what

2     you're saying.  Let's say that this is an accelerometer.

3          MR. DULIN:  Mm-hmm.

4          THE COURT:  I understand you to say it must be

5     attached to the chair -- the rotational -- the chair, right?

6          MR. DULIN:  No.  Close.  What I'm saying is that

7     it has to move orientationally with the subject.  So if

8     you're sitting in that chair and that's an accelerometer it

9     could be attached to you or you could be attached to the

10    chair and that accelerometer could be attached to the chair,

11    but -- in fact, I can cite to you provisions of this patent

12    where they talk about this problem where you have to get the

13    data on the semicircular canals, and you either have to

14    attach it to the chair or the person, but if it's the chair

15    then you have to fix the person's head to the chair.  The --

16    the point of this is that it has to -- that sensor has to

17    move orientationally with the person's head in order to

18    understand the spatial positionings of those semicircular

19    canals.

20         THE COURT:  So my confusion is suppose you have --

21    I don't know how it works or I might have invented it and be

22    much wealthier.  But you have an accelerometer.  Could there

23    be electrode off the accelerometer attached to the guy -- to

24    the victim -- to the patient's head so that the accelerometer

25    itself sits on a table, but there's some electronic

1    connection to the patient?

2         MR. DULIN:   I think then the accelerometer would

3    have to be on the connection up here and then it would

4    presumably go to a computer.   It wouldn't work.

5         THE COURT:   Okay.   So the sensor is the equivalent

6    of a -- an accelerometer is the equivalent of a sensor and it

7    has to be attached to the chair or preferably to the head?

8         MR. DULIN:   Or some other way they could come up

9    with so it moves orientationally with the subject.

10         THE COURT:   Okay.

11         MR. DULIN:   I think saying it's attached to the

12    person is a little bit of a stretch.

13         THE COURT:   Okay.

14         MR. DULIN:   I'd like it to say that.   I just don't

15    believe that that's consistent with the wording of the

16    patent.

17         THE COURT:   I've got you.

18         MR. DULIN:   And so if you look at just Claim 2

19    we've got a requirement that this first category -- category

20    of data contains information.   It describes the de facto

21    pattern and current condition of the chosen subject's spatial

22    orientation.   So you can't get that information if it doesn't

23    move orientally, spatially with the person.   And I think

24    that's something that has to be clarified for the jury so

25    they understand that, you know, that's a key portion of this

1    invention.  Also you've got in this section here -- this is

2    column 8, lines 45 to 52.  This is in the description of the

3    convention section.  And what the inventor says is that in

4    broad terms the practice of the present invention in relate

5    -- in relation to investigation and diagnosis involves

6    inducing the vestibular activity in a subject by selectively

7    orienting or positioning that subject in different spatial

8    orientations and then by collecting absolute positional data.

9    Again, you can't get absolute positional data if you don't

10   move orientationally with the subject.

11             THE COURT:  What column is that?

12             MR. DULIN:  It's column 8, lines 45 to 52.  Did

13   you want me to put this back up?

14             THE COURT:  No.  Thank you.

15             MR. DULIN:  And if you look at the patent they

16   talk about -- in the -- in the background section they talk

17   about a need for a positioning apparatus that can move the

18   person 360 degrees through all degrees of angular freedom and

19   then obtaining data that shows that.  And I think if you look

20   at the background -- and there's a lot of other citations I

21   could give you where this concept of having -- you know, this

22   exact spatial orientation is very, very important.  The

23   sensor device also has to be connected by a communication

24   line to the data processor.  It's critical.  I mean, it seems

25   so basic, but at the same time it's not something that's in

1    these claims and it's something that is critical for this

2    invention to be practiced.  If we look at this we've got a

3    couple things that I'm showing you here.  One is Figure 1 and

4    then there's descriptions of what we're seeing here in Figure

5    1.  And I believe that the first one up at the top here we're

6    seeing is column 10, lines 47 through 50.  And what it

7    describes -- again, this is the person and the apparatus and

8    the computer.  And it says also included in the system 10 is

9    an appropriate algorithm-equipped digital computer which we

10   see in Number 20 which is illustrated effectively

11   interconnected with the subject 12 and device 18.  Your two

12   communication lines paths are generally shown as lines 22 and

13   24.  Then the next section here which is lines 11, 19 through

14   24 -- column 11, lines 19 through 24 further explain that.

15   And what it talks about is these -- that line 24 here is a

16   channel that may be employed with respect to appropriate

17   accelerometers provided on the device which is 18 per se, the

18   communicates computer which is 20, the actual spatial

19   orientation and position in which the device 18 is nominally

20   establishing for the subject which is Number 12.  And the

21   point of this is that there's clear descriptions in this

22   patent that the device has to be connected by a communication

23   line to the data processor, and I don't think there's any

24   other alternative to that, therefore, it's appropriate in

25   order to clarify what this definition is to explain what this

1    sensor device is.  And a number of other places where I could

2    cite to you where they talk about a communication line from

3    the person to the computer.  And if you -- would you like

4    those citations as I move forward?

5              THE COURT:  Okay.  But let me -- so it's true that

6    the specification talks about a connection line.  The claim

7    says the sensor which produces a data stream that relates to

8    spatial orientation.  Might it be -- it doesn't seem -- it

9    could be wireless, couldn't it?  Isn't that -- that's sort of

10   Mr. Getzoff's point.  The claim doesn't say it's connected.

11   It just says it gathers data and so that -- it could be

12   wireless.

13             MR. DULIN:  Yeah.  The claim -- yeah.  The claim

14   language says specifically that supplying the first and

15   second data stream is required.  There's nothing that

16   indicates that it could be wireless.  The only things that

17   are mentioned in this claim are the fact that it's

18   communicated via a communication line as shown.  So we have

19   the Figure 1.  In lines -- column 14, line 67 through lines

20   15, column 6 -- I mean, column 15, line six it, again, talks

21   about this accelerometer being attached via communication

22   line to the computer.  And so while in theory that may be

23   true, there's no teaching that suggests that that could

24   happen.  I mean, I kind of liken it to the case that we saw

25   in the Microsoft v. Multi-Tech Systems case.  I mean,

```
 1      certainly there could have been a packet data switch network
 2      that could have worked.  The claim is broad enough to include
 3      that, but -- but it wasn't something that was described.  It
 4      wasn't something that was left open.  It didn't say other,
 5      you know, other types of communications lines could be
 6      possible.  It talked about a communication line that was
 7      shown.
 8              So I think another case that may be helpful here
 9      is the SciMed Life Systems v. Advanced Card Systems case.
10      That can be found at 242 F 3d 1337.  That's a --
11              THE COURT:  F 3d what?  13?
12              MR. DULIN:  Yeah.  1337.
13              THE COURT:  Thank you.
14              MR. DULIN:  And I'm going to refer to Page 1341.
15      And that's a federal circuit case from 2001.  And it says
16      where the specification makes clear that the then invention
17      does not include a particular feature then that feature is
18      deemed out of reach of the patent.  Even though the claim
19      language read without reference to the specification it might
20      be considered broad enough to encompass that feature in
21      question.  In this case the specification never -- never
22      talked about anything other than this particular -- this
23      particular feature.  So I think we've got to -- we've got a
24      claim that could be read broadly like you say to include
25      something else, but the specification over and over talks
```

1    about a data line, a communication line.  And there's no

2    suggestion otherwise and there's no language that I'm aware

3    of that opens it up to other types of communication lines.

4    It doesn't say a communication, you know, line plus, you

5    know, or some other equivalent structure.

6              THE COURT:  That communicates by line or

7    otherwise?

8              MR. DULIN:  Right.  The other -- the claims also

9    required that there be this continuous flow of data.  And I

10   think that this is one of those examples that is something

11   that's in this construction and also I think seems to be very

12   -- you know, it seems intrinsic.  I mean, that's -- that's

13   necessary to enable this invention.  Claim 2 talks about the

14   current condition of the chosen subject's spatial

15   orientation.  You can't have a current condition unless it's

16   a continuous monitoring of that.  What is the current

17   condition?  And that information continuously reports on what

18   the current condition is of that spatial orientation.  So it

19   has to be a continuous flow of data.

20             At lines -- at column 10, lines 37 through 38 the

21   patent talks about -- in the detailed description the

22   invention says these data streams will always accurately

23   report on the condition of the device.  I think that's

24   important because if it's not a continuous flow of data it

25   can't always accurately report on the condition of the advice

1    (sic).  Again -- on the device.  Again, this is something

2    that's just intrinsic to this -- this invention and it's

3    something that should properly be part of the definition in

4    order to make sure that it's properly articulated in these

5    constructions.

6         If we look at an example here, again, we go back

7    to this Figure 1 and it's a description of the preferred

8    invention as well as in the detailed description section of

9    this patent.  It says we -- with respect to the appropriate

10   accelerometers provided on the device per se to communicate

11   to the computer the actual spatial orientation and position

12   which the device is then nominally establishing for the

13   subject.  And this is just another example that it's

14   pervasive through this entire patent and the patent

15   prosecution history where it is a requirement that this

16   constant flow of communication flow explaining where this

17   person is in space so you can correlate to the vestibular

18   activity.  Without that constant flow of communication this

19   invention doesn't work.

20        And so under the first Phillips quote that I

21   talked about you're not breathing a limitation improperly

22   into these claims, but, rather, you're constructing these

23   claims in -- consistent with its -- with specification and

24   prosecution history.

25        And it's also part of our definition -- the next

1    component of our definition is a requirement that the

2    first-category data be computer-processible.  And I think

3    this is something that's clear from the claim, the preamble

4    of the claim.  This is Claim 2.  It talks about

5    computer-processible data.  And then at the end it talks

6    about supplying the first and second required data categories

7    to data processing structure which includes an appropriate

8    computer processor.  So -- and I don't think there's any real

9    debate that it has to be computer-processible data.  Also in

10   the detailed description of this invention -- what I'm

11   looking at now is column 7, lines 47 through 61.  If I go

12   to --

13           THE COURT:  I'm sorry.  What -- what column?  I'm

14   -- what column?

15           MR. DULIN:  7, lines 47 through 61.  And, Your

16   Honor, this is a paragraph that's been cited a lot in the

17   briefs and we'll talk about one or two I think pretty

18   critical paragraphs in the description of this invention

19   section.  And it says as disclosed here in its preferred

20   form, the system of the present invention includes, and it

21   talks about in B a digital computer, and a display screen

22   structure, various transducers for generating the first and

23   second-category data that are supplied to and processible by

24   the appropriate control algorithm structures in the computer

25   processor.  So there aren't multiple computers here.  I think

```
 1    the claims as well as the specification are very clear that
 2    it has to be you have this first category data that's sent to
 3    this computer and that it's computer processible.
 4            The next -- the last components of this
 5    construction is that the sensor device has to produce a
 6    continuous flow of computer-processible data that's
 7    responsive to the subject static disposition in
 8    three-dimensional space.  Now, the plaintiffs add -- they
 9    have similar language that says that the device -- and it
10    says and produces data relating to disposition in
11    three-dimensional space, but in their construction they add
12    the additional language, and where dynamic movement in any
13    direction or plane of motion.  And I'll submit that as that's
14    stated and as that construction is written it's very
15    misleading and would be misleading to a jury.  One thing they
16    cite in support of that construction is an excerpt from
17    column 3 of the patent, and it's column 3, lines 28 to 34.  I
18    think this is something that was quoted by Mr. Getzoff.  And
19    it says incidentally, where references are made herein to
20    positions, positionings, orientations, and spatial
21    orientations, those references are intended to involve either
22    a subject's static disposition in three-dimensional space,
23    and/or a subject's dynamic movement, in any direction or
24    plane of motion, toward, through, and/or beyond one, or
25    several, of such dispositions.  And I'll submit that's
```

1       dispositions in three-dimensional space.  I don't think
2       there's any question that this definition is tying the term
3       spatial orientations to three-dimensional space.  Our
4       definition stops there.  Three-dimensional space.  We don't
5       talk about these other aspects of three-dimensional space.
6       We just stop right there.  And I think that's the appropriate
7       construction.  In light of the additional language that
8       follows, that portion of the claim that talks about
9       information, it effectively describes the de facto pattern
10      and current condition of the chosen subject's spatial
11      orientation.  I think that -- and that's something we define
12      in a later term.  But that's where we get these different
13      types of spatial orientation into play.  I think that's the
14      appropriate place to do it.  Here I think not only is it out
15      of place, but this particular construction is misleading
16      because -- and I'm referring to the plaintiff's addition of
17      -- or construction of the sensor device because, 1, it talks
18      about a disposition in three-dimensional space, but it
19      doesn't talk about a static disposition in three-dimensional
20      space which is what if they wanted to be true to the
21      description in the specification they would include the term
22      static disposition.  If this is what the lexicography
23      requires then let's be true to it.  Secondly, it leaves off
24      the remainder that talks about toward, through, and/or beyond
25      one, or several, such dispositions in 3-D space.  So what it

```
 1    does is it misleads the trier of fact into thinking that you

 2    could have a device that senses and produces data relating to

 3    dynamic movement in any direction or plane of motion with no

 4    -- with no reference to space which is clearly required under

 5    column 3.  It's clearly something that this patent -- it's

 6    the most fundamental aspect of this patent that it relates to

 7    three-dimensional space.  And they don't even have

 8    three-dimensional space here, but they have an and/or there,

 9    so now you can circumvent the three-dimensional space aspect

10    of it, and it's not what's described in column 3 and it's not

11    what's described as the invention in this patent as a whole.

12    Now --

13            THE COURT:  You're -- you're going to think me a

14    Euclidean point, somebody with position, but no amplitude,

15    but I'm going to ask it anyway.  Space is three-dimensional,

16    right, unless you add time.  We're not talking about time

17    here.

18            MR. DULIN:  Time and space continuum.  I believe

19    that's true, Your Honor.

20            THE COURT:  So your point is it's got to be

21    stacked -- stopped, whereas Mr. Getzoff's point is you can be

22    moving towards something.  Is that -- is that the distinction

23    that's being drawn?

24            MR. DULIN:  Yes.  You have a static disposition in

25    space and then you can have dynamic movement in plane, you
```

 1     know, in all these different -- toward, through, beyond, one,

 2     or several, such static dispositions in space.  So it moves

 3     through space in three-dimension.

 4          THE COURT:  So the inclusion of the word "static"

 5     in your proposed construction is crucial.  And if -- if I

 6     left that off to say computer-processible data responsive to

 7     the subject's disposition in three-dimensional space that

 8     doesn't satisfy you.  You say the static is crucial to you;

 9     is that right?

10          MR. DULIN:  Well, I think static helps describe

11     this invention.  So if I look at it I understand that you

12     have this static disposition.  Okay.  And if you think about

13     this invention you've got these -- these -- this nystagmus

14     activity that's being monitored.  So you see a nystagmus.

15     And at that point in time you need to know what's happening

16     in the semicircular canal.  You need to know where this

17     person is oriented.  So somebody's oriented in this position.

18     All of a sudden there's a nystagmus.  They go into the pitch

19     plane and there's not -- now, you have medically-informative

20     data that indicates that there could be an abnormality in the

21     semicircular canal that's aligned with the pitch axis.  So

22     that is a static moment in time.  Okay.  And it's -- the data

23     is correlated.  And it's important to understand what the

24     next step is and the next step and you have to be able to

25     move through time.  But these static dispositions is what

1    column 3 talks about.  And I think it's appropriate in

2    constructing the claims of this patent to be true to the

3    descriptions of how this space is viewed.  In here they talk

4    about static dispositions and then they talk about moving

5    through these dispositions, and it's, again, through

6    three-dimensional space.

7            Then when we go to the next -- and I don't think

8    we want to jump ahead unless Mr. Getzoff thinks it would be

9    helpful or the Court, of course, then we go to the definition

10   of information.  It effectively describes the de facto

11   pattern and current condition of the chosen subject's spatial

12   orientation.  Now, at that point in time our -- and, again,

13   there's a pattern and a current condition which are both

14   required by this claim.  So that's something that we've got

15   to -- it isn't one or the other.  There is no or there like

16   there is in the construction of the plaintiff.  There is de

17   facto pattern and current condition.  So that current

18   condition is a static disposition in three-dimensional space.

19   The de facto pattern as required by the patent is a pattern

20   of dynamic movement through those spatial orientations.  And

21   that's something that is described here in this subsequent

22   section of that claim, therefore, I think it's better

23   described there than doing -- you know, fixing up the

24   inclusion of that language in -- in the sensor device

25   definition and then going back to this -- it just doesn't

 1    make sense within the context of the patent.  It has to be

 2    described in this subsequent description of the pattern and

 3    the current condition.  Does that make sense?

 4              THE COURT:  I understand.

 5              MR. DULIN:  Okay.  Thank you.  And that's -- and

 6    that is all I have on that particular limitation, Your Honor.

 7              THE COURT:  So is your thought to rebut or to move

 8    directly to the second point, Mr. Getzoff?

 9              MR. GETZOFF:  I was going to do both, Your Honor,

10    and they dovetail because the rest of this -- this issue

11    about spatial orientation comes up twice and it comes up

12    where it defines the first-category data that has to be

13    created by the sensor device.  So I think -- I think I can

14    cover that all at once --

15              THE COURT:  Okay.

16              MR. GETZOFF:  -- and be efficient about it.

17              MR. DULIN:  So are you suggesting that we talk

18    just about that particular portion of the next definition?

19    I'll let you --

20              MR. GETZOFF:  Yeah.  I'm -- Your Honor, I think it

21    is important to read -- to read the specification to see

22    whether it's justified to read these descriptions into the

23    claim and I think Mr. Dulin read the same quote that I read

24    from the SciMed case which was actually further explained in

25    the Liebel-Flarsheim case that -- that I cited earlier; that

 1    the <u>Liebel-Flarsheim</u> case -- again, this is Page 2 of our

 2    reply brief.  It's 358 F 3d 898.  The quote is -- and, again,

 3    this is the legal standard -- is it's -- it's not because

 4    that's how it's described in the specification.  It's not

 5    that that's the only way it's described in the specification.

 6    That's -- that's not a reason for reading that description of

 7    the specification into the claim even if it's the only way

 8    described.  Oftentimes in most patents it is the only way

 9    described because that's all a patentee is required to do.

10    The legal standard is where the specification makes clear.

11    So not, you know, I can infer it might be there.  It has to

12    make clear that the invention does not include alternatives.

13    That's the quote from <u>SciMed</u>.  You need language in the

14    specification that says we are not talking about other

15    embodiments.  We are not talking about sensors other than

16    accelerometers.  Not only is there no language in the patent

17    that contains that kind of language that would be necessary

18    under -- under <u>Phillips</u> and <u>SciMed</u> and <u>Liebel-Flarsheim</u> and

19    all the other federal circuit cases, but the portions of the

20    patent that were described, all of the portions that -- that

21    Mr. Dulin pointed out all stated the opposite.

22            So this is column 10.  You looked at this before.

23    At the top it says preferably and for purposes of

24    illustration we're going to talk about device 18 which is

25    pictured in Figure 2 and 3, and then down here it talks about

1    the -- with relation to device 18, accelerometer.  This is

2    for purposes of illustration.  Mr. Dulin said okay, well,

3    that might be fine with respect to Figures 2 and 3, but it

4    doesn't say that with respect to Figure 1.  Well, first of

5    all, I'm -- I want to take an aside and say so is he

6    suggesting that the patent claims are limited to Figure 1?

7    Because that would be an astounding assertion to say that

8    claims are limited to the figures.  But the patent talks

9    specifically, again, in this same section with a reference

10   first, therefore, to Figures 1, 2, and 3 indicated generally

11   at 10 in Figure 1 is a system constructed as a preferred

12   embodiment in accordance with the present invention.  So the

13   patentee -- and this comes up again and again and again.  He

14   -- Mr. Dulin cited this passage for the -- and he highlighted

15   in accordance with the invention.  He omitted the fact that

16   the sentence starts for example.  In accordance with the

17   invention simply means covered by -- covered by the claims,

18   covered by my claims.  But to put that on its head and say

19   that's all my claims cover is incorrect and misreads the

20   specification.

21          Here's another example.  Let's look on the same

22   page over on column 12.  He's talking about a very specific

23   embodiment.  Camera 36 is, according to the invention, a very

24   small infrared camera, and then he goes on talking about the

25   very specific embodiment that's pictured in 2 and 3.  Using

1       Mr. Dulin's logic is he claiming that -- that all of the

2       claims of the patent are limited to use of a camera or a very

3       specific infrared video camera?  Of course he's not because

4       that would be -- but that takes his -- his view of claim

5       construction to its logical conclusion.  There's nothing in

6       the specification that has the kind of language necessary to

7       -- to exclude other embodiments.  In fact, if anything, the

8       patent at the very end, before you get to the claims, the

9       specification ends with this passage regarding variations and

10      modifications saying look, there's lots of other ways to do

11      this and lots of variations and modifications which are all

12      embrace had.  There's -- there's a complete absence of the

13      type of language that Mr. Dulin would like to see that would

14      limit -- that would limit sensor device to an accelerometer.

15      The rest of his proposed definition of sensor device which is

16      the remaining language, communication line, again,

17      communication line is a preferred embodiment description.

18      It's not in the claims.  Moving orientationally.  That's an

19      interesting one because moving orientationally isn't even in

20      the specification.  I mean, up to now we've been arguing

21      you're reading stuff in the specification and improperly

22      importing them into the claims.  Moving orientationally isn't

23      even in the specification.  That -- that's a concept that

24      defendants just made up and said we'd like that to be in

25      there and the argument in support of that is well, we think

1    that's the only way you could practice this -- this invention

2    is if the sensor moves orientationally with either the chair

3    or the person's head.  Says who?  There's no facts of that in

4    the record.  There's -- there -- there's nothing to suggest

5    that -- that what this patent has to have, quote, unquote, in

6    order to satisfy the claims.  If it satisfies the claims it

7    satisfies the claims or it doesn't.  But there's nothing

8    about moving orientationally that's even in the specification

9    that they can pull into the claims.  They're just making --

10   making that up.  And then they're furthing -- they're further

11   making up facts to say oh, and -- and that has to be there to

12   satisfy these claim elements, but we'll get to infringement

13   and the factual issues through expert reports and witness

14   testimony as to whether they satisfy the claim or not, but

15   for purposes of claim construction we're just wholesale

16   pulling concepts, some of them are in the specification, some

17   aren't even there.

18           One -- one point I do want to make that I think

19   it's gotten lost is the specification has to support all the

20   different claims, not just Claim 2.  So you've got

21   descriptions in the specification that, for example, support

22   Claim 1.  Claim 1 is not at issue in this case.  And they

23   want to -- when we get to that claim term they want to pull

24   elements from Claim 1 into Claim 2, and what they're doing is

25   well, look, this specification talks about that.  Well, sure.

```
 1    It talks about that because it's supporting a bunch of
 2    different claims including Claim 1.  But -- but that doesn't
 3    get you anywhere in deciding what Claim 2 -- how the elements
 4    of Claim 2 should be interpreted, and it's incorrect to pull
 5    language that is supporting Claim 1 and say oh, because it's
 6    in the specification it must support all the claims.  That's
 7    not the case.  There's lots of different claims in the
 8    patent, only some of them are at issue.  The specification
 9    has to be broad enough and specific enough to -- to provide a
10    working embodiment -- one working embodiment for all the
11    claims.
12            I want to -- I want to -- and this is now moving
13    forward talking about this spatial orientation issue and that
14    language in column 3 which is -- which both of us talked
15    about.  I'm -- frankly, it's not clear to me what -- what
16    defendants' real argument is on parsing this language.  We
17    didn't mean to -- to carve out static and we would be fine
18    with adding static to the definition.  I think -- I think the
19    meaning of this -- of this phrase that the inventor put in
20    there to define spatial orientation is spatial orientation
21    includes where are you in space.  So 15 degrees yaw or
22    something like that.  But it also includes motion.  It
23    includes both.  So disposition in space.  If they want to --
24    if you want to say static disposition that's fine.  And I
25    think the point of the data stream that the sensors are --
```

1   are providing that relate to spatial orientations is it can

2   provide either; that the data provided by the sensors can

3   either be where are you in space as a -- as a snapshot.   I

4   would call that static or what's your movement?   You know,

5   the movement -- we didn't mean to cut this off as a

6   substantive cutoff, toward, through, or beyond one or more --

7   one, or several, of such dispositions we don't think adds

8   much.   And we're trying to make this not more wordy than it

9   needs to be.   I think the point of this is that the

10  information from the sensor is either where are you as a

11  snapshot or what motion -- what dynamic motion in any

12  direction, any -- any plane are you going through?   That's

13  the information.   That's what it says explicitly in column 3.

14  That comes up when we talk about first-category data.

15          And I'll just move into this because I don't have

16  a lot more to say.   This is an issue -- and I think Mr. Dulin

17  touched on this already.   Their argument is that

18  first-category data means absolute positional data and he

19  cited the specification where it says absolute positional

20  data.   The issue here though, Your Honor, is that

21  first-category data is already defined in the claim.   The

22  claim says what has to be in the first-category data.   The

23  first-category data needs to have, and then it's the

24  remainder of that claim element, information that effectively

25  describes the de facto pattern and current condition.   And

1        that's a separate dispute that we've mostly touched on, but

2        the issue with respect to first-category data is does that

3        need its own special definition or isn't that simply defined

4        in the claim itself with the remaining language?  We believe

5        it's the latter and adding -- adding a language -- separately

6        defining first-category data apart from what the claim itself

7        says that it is is unnecessary, but it is confusing.

8        Absolute -- the word absolute, it's not clear exactly in the

9        specification what that means, but it appears to mean not

10       relative or -- or not -- not subjective.  So it's

11       distinguishing it from the subject's response to the

12       movements.  That's subjective.  And it's distinguishing it

13       from motion I think or relative to something else.  Certainly

14       absolute positional data, if that just means static

15       positioning that's part of the definition, we don't quarrel

16       with that.  We think that the definition -- because we're

17       talking about spatial orientation and column 3 says here's

18       what I mean by spatial orientation, yes, it's static

19       position, but it can also mean alternatively your motion.  So

20       it can -- it can mean both.  There's no need to separately

21       define first-category data from the specification when the

22       claim itself defines it.

23            And then that just leads to this point which is

24       the remainder of the claim element.  We've talked about it.

25       We don't think that needs any special construction other than

1     the spatial orientation issue.  We know what spatial
2     orientation means in column 3.  It means your static
3     positioning in space or -- or your motion.  That's
4     first-category data.  That's what the sensor has to supply.
5     And that's what this phrase should be interpreted to mean.
6     We're not -- we're not trying to -- to cut off any part of
7     this language.  We think it should stay as is, de facto
8     pattern and current condition after chosen subject's spatial
9     orientation.  It's just that spatial orientation we should
10    plug in the definition from column 3 that we've already
11    talked about.  Thank you.
12          THE COURT:  Thank you.  Mr. Dulin?
13          MR. DULIN:  Thank you, Your Honor.  I just want to
14    simply note going back to the first point relating to this
15    language that was proposed by the -- going back to the
16    definition where they inserted the language and/or dynamic
17    movement, any direction or plane of motion, I think as you
18    consider this, Your Honor, you need to -- I think it's just
19    very important to understand that Claim 29 -- I mean, sorry,
20    Claim 2, it starts on -- requires that first-category data
21    which contains information that effectively describes the de
22    facto pattern and current condition of the chosen subject's
23    spatial orientation.  So it's -- it's required that both of
24    those things exist.  And what the plaintiff is suggesting is
25    that you can have one or the other and that's just not the

1    case.  In regard to first-category data and the definition, I

2    think it was cited in the plaintiff's brief that -- and I

3    don't think it's disputed, that an inventor can be his or her

4    lexicographer and can define terms very explicitly in the

5    specification.  Here it's very clear and I don't think

6    there's any ambiguity.  And this is -- what I'm referring to

7    is column 8, lines 45 to 53.  It says thus, in broad terms,

8    the practice of the present invention in relation to

9    investigation and diagnosis involves inducing vestibular

10   activity in a subject by selectively orienting, positioning

11   the subject in different spatial orientations and then by --

12   and then by collecting both absolute positional data

13   preferably from different sources and referred herein as

14   first-category data.  So right there the inventor is setting

15   the stage that first-category data is absolute positional

16   data.  Counsel for plaintiff makes a point that it's already

17   defined in the claims so why would you define it twice?  And

18   it's really not.  If you look at the actual claim, what it

19   says is that -- and if we take absolute positional data and

20   insert it in to where that claim term is that we're defining

21   it says utilizing a sensor device which produces a data

22   stream that relates to spatial orientation.  So acquiring

23   during such period absolute positional data which contains

24   information that effectively describes a de facto pattern and

25   current condition of the chosen subject's spatial

1    orientation.  So in this claim what the inventor is doing is

2    going back to that column 3 language and talking about the

3    spatial orientations and he's qualifying that language in

4    describing what that absolute positional data is.  So it all

5    fits together well like a little puzzle.

6         So if we delve back into the language of that

7    second limitation what we see in the defendants' construction

8    is again a reference to three-dimensional space, and

9    similarly to the definition of the sensor device, plaintiffs

10   add to that additional language and/or dynamic movement in

11   any direction or plane of motion.  Again, I think that's

12   contrary to what the claim says.  And I think it's -- I think

13   if we look at claim -- both Claims 13 and 12 they define

14   spatial orientation of the subject to require both the

15   current condition which is the subject's static disposition

16   and the subject's de facto pattern which is the subject's

17   dynamic movement.  So what our construction tends to do is

18   reconcile those two requirements of the claim; that there's a

19   pattern -- the two requirements of the claim with the

20   language of column 3.  It talks about the static disposition

21   and three-dimensional space or dynamic movement through,

22   towards or beyond several such dispositions.  And so in our

23   proposed definition what we talk about is real-time

24   computer-processible information describing the subject's

25   absolute pattern of movement -- of dynamic movement.  Okay.

1    So now we're talking about that first requirement under the

2    claim, a pattern of dynamic movement and a current static

3    disposition in three-dimensional space.  So there's something

4    that I don't quite understand about the plaintiff's

5    definition.  Again, it allows you to have this -- it allows

6    for the proposition -- or for the possibility that you would

7    defy the requirements in the claim for both a de facto

8    pattern and the current condition because it's an and/or.

9    You can have the pattern or the current condition.  You've

10   got to have both.  But also if we look at their definition

11   it's possible that you could have information that describes

12   the pattern of the subject's current condition or it could

13   describe the current -- the pattern of subject's -- you know,

14   I guess there's a disjunctive there that I don't quite

15   understand.  You could have the pattern and current condition

16   of the subject's disposition in three-dimensional space or

17   dynamic movement.  Does that mean it's the current condition

18   of dynamic movement?  If that's the case we've now contorted

19   not only the requirements of the claim, but the description

20   that we saw in column 3.  Is it the pattern of the subject's

21   disposition in three-dimensional space?  Was it that

22   snapshot?  You can have a pattern of that snapshot.  I think

23   our definition is much clearer and doesn't mislead, and it

24   directly addresses the requirement of the claim that there's

25   a pattern of dynamic movement.

1            So if we look back at column 3 there's a

2      requirement.  It talks about the static -- the definition of

3      spatial orientations and it's either the subject's static

4      disposition.  Okay.  So that relates to the claim language

5      that -- that's the current condition and/or the subject's

6      dynamic movement in any plane -- direction or plane of motion

7      towards, through, and/or beyond one, or several, such

8      dispositions.  So that's the pattern that's referred to in

9      the claim.  So our construction talks about a pattern of

10     dynamic movement and the current static disposition in

11     three-dimensional space.  So it reconciles the requirements

12     of the claim with what we see as the definition of spatial

13     orientations in column 3.  And, again, it leaves out the

14     static disposition language.

15            Now, column -- our proposed definition of

16     information that effectively describes the pattern and

17     current condition of the chosen subject's spatial orientation

18     also has other components to it which I think are required by

19     this invention that are necessary for the proper construction

20     of these claims.  For instance, there's a requirement that it

21     be in real-time.  And if you read this patent there is no

22     alternatives suggested for real-time.  This patent makes it

23     very clear that it is -- it is a requirement of this

24     invention that it be done in real-time.  If we look at --

25     what I'm referring to here is column 1, line 40 through 45,

1    and it says the system and method of the invention offer an

2    opportunity to be performed, in the unified setting, a very

3    wide range of tasks relating to vestibular issues, including

4    several novel tasks, such as real-time event-following

5    correlation, not heretofore available.  So you have these two

6    data streams and they have to be -- they have to be captured

7    in real-time and then they're correlated and sent to this

8    data processing structure and so that real-time correlation

9    is very critical.  And there's other places in this -- as you

10   walk through this patent you'll see a lot of references to

11   that.  You'll see in the background section where the

12   inventor talks about a need and desire for sophisticated

13   real-time correlation.  You talk about in the preferred

14   embodiment -- I mean in the preferred embodiments you have

15   real-time correlation that's described.  But in the

16   description of the invention I think it becomes clear that

17   there's all kinds of references to real-time correlation and

18   there's no other suggestion.  It has to be real-time.  So if

19   this jury thinks it doesn't have to be real-time then I think

20   they're misled and it doesn't capture this invention and it's

21   not what somebody of ordinary skill in the art would believe

22   that those -- that that term means.

23              THE COURT:  What's the alternative to real-time?

24              MR. DULIN:  I don't believe there is an

25   alternative to real-time.

1           THE COURT:  No.  I mean --

2           MR. DULIN:  I think it has to happen in real-time.

3           THE COURT:  What would they -- what could possibly

4      be presented that isn't real-time?

5           MR. DULIN:  I mean, you've got these two data

6      streams that are -- that are happening at once and they're

7      correlated.

8           THE COURT:  Right.

9           MR. DULIN:  And so the real-time feature of these

10     two data streams, not only in singularity, but they relate to

11     each other and they have to be in real-time as they correlate

12     to each other as well as you time it -- I don't -- I can't

13     imagine that there's any alternative to that.  Did you have

14     any follow-up questions?

15          THE COURT:  Well, I'm just confused by this

16     real-time business.  I -- there's this guy named Mike Brown.

17     He's an astronomer and he discovered that there are many

18     objects the size of Pluto with a similar elliptical orbit.

19     And he said now you might think that I got up at night and

20     went and sat in an observatory and looked through a telescope

21     and you'd be wrong.  All of my work is from 8:00 to 5:00.  I

22     just review computer -- computer recordations.  So I -- so is

23     he not observing in real-time?  In other words, suppose this

24     just gets recorded and the doctor looks at it six days later.

25          MR. DULIN:  It was recorded in real-time.

1           THE COURT:  Everything is recorded in real-time.

2    It couldn't be record -- I mean, it doesn't have -- well,

3    unless there's a parallel universe.

4           MR. DULIN:  Right.  But the information that

5    describes the pattern and current condition -- so you have a

6    pattern and you have a current condition of that motion, and

7    that information -- okay.  It may be recorded and spit out

8    sometime later, but that information has to be gathered in

9    real-time as -- as that person is moving spatially.  And, you

10   know, I think we could argue, you know, what does real-time

11   mean?  The bottom line is that real-time is a term that is

12   mentioned with respect to the way this information is

13   gathered pervasively through the patent.  We see it in the --

14   in the prosecution history.  Right.  They steered clear of

15   prior art based on this concept of real-time.  It is

16   mentioned 14 times in the patent.  So clearly the concept of

17   real-time is something that is important.  It's a real-time

18   presentation of these two categories of data.  And so you

19   have this data that comes through the computer the same time

20   as another real-time correlation.

21          THE COURT:  Okay.

22          MR. DULIN:  So, I mean, if we get really

23   theoretical, I mean, we have a term that's been thrown out

24   there, a term that's known to this inventor, a term that's

25   used consistently with this inventor, and it's not a term

1     that is in the actual claim.  It's not a term that we're

2     defining.  I mean, we're not -- we're not here at the *Markman*

3     defining terms that are used in the specification.  But

4     real-time is an important term.  And I think it is

5     descriptive of the circumstance of gathering the information

6     that is the fundamental basis of this -- of this particular

7     invention.

8              THE COURT:  Okay.

9              MR. DULIN:  And the inventor talks about things

10    such as at line 17, columns -- I mean, column 17, lines 2

11    through 6.  He says -- in describing the system and the

12    methodology of this invention the inventor notes that the

13    correlative-data presentation linking the special orientation

14    -- the spatial orientation of a subject with a subject's

15    involuntarily created condition of nystagmus activity

16    provides a powerful tool in real-time to (inaudible) diagnose

17    vestibular problematic behavior.  And I think if -- if a

18    medical professional is using this device to try to diagnose

19    and treat a vestibular problem the real-time component is

20    something that is important to that person.

21             And then the other thing that we've -- other

22    component of this particular construction is computer

23    processible.  We've already talked about the fact that it has

24    to be computer processible.  I don't think there's anything

25    more I can say on that particular point.

1          THE COURT:  Thank you.  You want to wrap-up with

2     these remaining two claim terms and then we'll break for

3     lunch, Mr. Getzoff?

4          MR. GETZOFF:  Perfect, Your Honor.  And I will

5     make my presentation in real-time, so -- so look out.

6     Real-time.  There's no question that a benefit of this patent

7     that was emphasized and talked about throughout the patent is

8     that you can have what the specification calls real-time

9     correlation.  So as one thing is happening, the movement of

10    this -- the person, you can within that time period of the --

11    they call it vestibular-related response, you can -- you can

12    see those two things happening.  So as you stimulate the part

13    of the brain you can see what the eyes are supposed to be

14    doing.  The issue here though is that the claim already says

15    current condition.  It has to be the current condition.  So I

16    don't know what real-time adds or really what real-time

17    means.

18          Now, Mr. Dulin made a revealing point when you --

19    when he said -- I think he volunteered I'm not sure what

20    real-time means.  I'm not sure what it means either other

21    than the current condition of the chosen subject's spatial

22    orientation which is already in the claim.  So what -- why

23    are we even arguing about inserting this -- this extraneous

24    word real-time when it's not clear if it makes any difference

25    to this case and the claim already requires that the

1    condition has to be the current condition relating to spatial

2    orientation?  So in that context it's -- it's superfluous at

3    best and it's confusing at worst to the extent we start

4    saying well, what's -- what's real-time?  If it's a

5    millisecond delay to get supply to the computer is that not

6    real-time?  It's -- it's just not -- not necessary and

7    superfluous with what's already in the claim.

8         I want to talk about this relationship between the

9    de facto pattern and current condition, those -- those

10   phrases.  Pattern and condition of the chosen subject's

11   spatial orientation.  So we know that spatial orientation

12   means both static disposition and movement.  And I think

13   Mr. Dulin's argument is that he's associating pattern with

14   movement and condition with -- with a static snapshot.  And I

15   don't think that's warranted and I don't think that's --

16   that's correct.  You can have -- you can be in a state of

17   motion and that's your current condition.  What's your

18   condition?  I'm -- I'm rotating clockwise on the yaw axis.

19   That's a -- that's a condition.  What's a pattern?  The

20   pattern could refer to the motion or it could refer also to a

21   location.  So pattern could be I'm rotating at 10 revolutions

22   per minute or I'm rotating 10 times.  So I don't think it's

23   correct or warranted to equate pattern with movement and

24   condition with a non-movement or static disposition.  There

25   has to be a disclosure.  And our -- our interpretation leaves

1    this language in there.  So we're not cutting out pattern and

2    current condition.  Those both have to be satisfied, but it's

3    a pattern and current condition of spatial orientation.

4    That's what -- that's what this is of.  And the patent is

5    clear that when we're talking about spatial orientation we're

6    talking about either a snapshot location or we're talking

7    about motion.  We could be talking about both, and you could

8    describe that whether it's motion or static disposition.

9    Both of those could be a pattern or it could be a condition.

10    I don't think those are coterminous and I think that's --

11    that's a stretch to say that and, moreover, there's nothing

12    in the patent that says that.  There's -- there's nothing in

13    the patent that equates pattern with -- with one kind of

14    spatial orientation and condition with another kind.  So

15    there's just simply no support for making that leap.

16         The last thing I want to say -- it talks about

17    first-category data which, again, we think it doesn't need a

18    separate definition.  Defendants want it to mean absolute

19    positional data.  If you -- if you were to plug that into

20    this claim so when the jury gets a jury instruction and the

21    jury instruction has the Court's *Markman*'s constructions and

22    the jury has to decide if the defendants' device satisfies

23    these instructions -- the constructions by the Court it's

24    going to say under defendants' proposal absolute positional

25    data which contains information that effectively describes a

1 de facto pattern and current condition, etcetera, etcetera.

2 So what does absolute positional data add or how is that

3 reconciled with the remainder of -- of that claim

4 particularly when -- so the word absolute positional data,

5 the patent says when we use position we -- we equate that

6 with spatial orientation which means static disposition or

7 movement.  So absolute positional data, it's used once in the

8 patent.  It's used as a shorthand phrase to mean exactly what

9 the claim says.  In fact, the claim says it in much fuller,

10 more robust language.  I don't know why we'd go to a

11 shorthand reference from the specification that's less

12 precise than what the claim says itself in defining

13 first-category data.  So we don't think first-category data

14 needs a separate definition when the remainder of the claim

15 defines it.  The remainder of the claim reads fine.  The only

16 thing that needs a little bit of parsing is spatial

17 orientation and that's supplied by column 3.  Thank you.

18   THE COURT:  Thank you.  Before we break for lunch

19 I have -- again, you'll think me a Euclidean point when I ask

20 this question, but isn't it so that the purpose of claim

21 construction is to say what someone skilled in the art would

22 understand?

23   MR. GETZOFF:  Absolutely, your Honor.

24   THE COURT:  Right?  Do you agree with that,

25 Mr. Dulin?

1          MR. DULIN:  Yes, Your Honor.

2          THE COURT:  Then why are judges who have no skill

3     in the art at all construing claims and why is extrinsic

4     evidence in the form of experts' opinions about -- who are

5     skilled in the art frowned upon?

6          MR. GETZOFF:  You know, Your Honor, that's a great

7     question and that question has been the subject of

8     significant commentary by the patent bar which is claim

9     construction -- and it's subject to different opinions.

10    Claim construction is something of a fiction.  It is -- and

11    it's a fiction for a number of reasons.  The federal circuit

12    says it's not factual.  Well, it seems --

13         THE COURT:  How can it be a matter of law if it's

14    what someone skilled in the art thinks?

15         MR. GETZOFF:  Right.

16         MR. DULIN:  Yes.

17         MR. GETZOFF:  So it's inherently factual, but --

18    but we adopt this fiction which the fed circuit wants so they

19    can take de novo review of all these things, and that's the

20    *Markman* case.  That's -- that's what *Markman* said.  So

21    *Markman* really set us on this path of we don't want juries

22    deciding this based on the evidence expert testimony.  We

23    don't trust that.  We want judges to do this.  Of course

24    judges aren't skilled in the art.  Mr. Dulin and I aren't

25    skilled in this art.  Phillips says you're not supposed to

1    look -- or you're supposed to look with great skepticism at

2    extrinsic evidence and yet -- so, yes, it's circular.  It's

3    not consistent.  And we could have a lengthy discussion about

4    why the state of the law is the way it is.  And, I'm sorry,

5    that's not helpful, Your Honor.

6              THE COURT:  Right.  I just wondered if I was

7    crazy, if I was (inaudible).

8              MR. GETZOFF:  No.  It's -- it's -- you're not

9    crazy.  You share our -- the craziness of the IP bar and the

10   judges that have to deal with this.

11             MR. DULIN:  Yeah.  I think it's limited the

12   process, you know, the federal circuit.  Who knows why they

13   do what they do.  It's what they say we have to do.  And, you

14   know, some judges won't even listen to extrinsic evidence and

15   there's cases that support their ability to do that.  But

16   then, again, it prevents us from having experts here and

17   having a battle of the experts and these factual findings.

18   It shows the importance of -- of the intrinsic evidence.  I

19   mean, it just -- I think it goes back to the fundamentals of

20   patent law.  This is what the patent is.  This is what's

21   important and what other people say while, yeah, there is

22   some bites of case law out there that say that what one --

23   including Phillips.  But we have to look at this through the

24   eyes of what someone already skilled in the art would think.

25   That's something that should be able to be derived from the

```
 1     specification of the prosecution history, at least that's
 2     what the federal circuit thinks.
 3                MR. GETZOFF:  And the claims.
 4                MR. DULIN:  And we can't forget about the claims.
 5     That's something (inaudible).
 6                THE COURT:  It's a quarter past noon.  Is -- is an
 7     hour more than -- is an hour sufficient time for lunch?
 8                MR. GETZOFF:  Yes, Your Honor.
 9                MR. DULIN:  Yes.
10                THE COURT:  All right.  Let's come back at quarter
11     past 1:00.  Thank you very much.
12                THE CLERK:  All rise.
13                (Whereupon, the noon recess was taken from
14     12:15 p.m. to 1:19 p.m.)
15                THE CLERK:  All rise.  Court is in session.
16                THE COURT:  Thank you.  Please be seated.  We're
17     back this afternoon in 13-cv-1471, Brain Synergy Institute
18     against Ultrathera on a continuing claim construction
19     hearing.  Mr. Getzoff is here for the plaintiff, Messrs.
20     Dulin and Moreland for the defendant.  It's about 20 minutes
21     after 1:00.  I thought we'd break at -- for planning purposes
22     I thought we'd break at 3:00 for lunch -- or, I'm sorry, for
23     a break if we're still going.
24                MR. GETZOFF:  Very good, Your Honor.
25                THE COURT:  Mr. Getzoff -- Mr. Dulin?
```

1             MR. DULIN:  Your Honor, at some point when it's

2      convenient I'd like to just make a couple clarifications

3      about some things that were said in regard to these points on

4      Claim 2 before we move on.  I don't have to make them now.  I

5      can make them later, whatever is convenient for you, but I

6      have that request.

7             THE COURT:  Well, let's wrap-up on that then.

8             MR. DULIN:  Okay.

9             THE COURT:  So let's -- let's go there, Mr. Dulin.

10             MR. DULIN:  It's just two points I want to address

11      and I'll do them quickly, Your Honor, so we can move on.

12             There was a point that was made relating to the

13      sensor, and I think Mr. Getzoff said that a sensor could do a

14      number of different things.  It could track speed or

15      revolution.  It could be just any type of sensor.  And I

16      think it's really important to emphasize that the sensor has

17      to do more.  And I already talked about the prosecution

18      history, but I think there's a point here that we -- I want

19      to make sure is very clear.  This inventor when he was

20      prosecuting this patent -- this patent was rejected because

21      of a couple of different references, one is the Watt

22      reference that was referenced, that was mentioned, and there

23      was also a Ledley reference.  Now, the Ledley reference is

24      something that the examiner talked about.  For the record

25      that patent number is 4,474,186.  And these had very basic

1        types of sensors.  They could track -- I'll show you.  And I

2        have copies of Watt if that would be helpful to you.  But

3        what you have is this -- what I'm showing you up here is this

4        patent application for Watt filed on October 17, 2002.  And

5        this is the reference that's cited in -- as prior art in the

6        Epley patent and it's the subject of discussions in the

7        response to the office action that we see in Exhibit B

8        submitted today.  And what this is is an invention.  Somebody

9        straps themselves into this device, then they are spun around

10       basically on one axis, and this person has on their head a

11       sensor.  And so the person is spun around and there's a

12       sensor on the head and they get speed and rotation.  And

13       speed and rotation is something that is described in here as

14       the two types of data that are gathered.  So to try and

15       distinguish this prior art and get his patent put through

16       Mr. Epley made the following argument.  What he said is --

17       what he said is -- and I'm pointing to right here

18       (indicating).  Nor does Watt, et al, disclose or suggest a

19       system or a methodology which furnishes first and second data

20       streams, one of which describes a pattern and current

21       condition of a subject's spatial orientation.  Watt, et al,

22       in terms of gathering -- data gathering completely ignores

23       the matter of subject's spatial orientation.

24              So while Watt does have this system where somebody

25       can be strapped to a device and spun around and you can get

1   speed and rotation data, it doesn't address this concept of

2   spatial orientation.  Again, an accelerometer is the

3   appropriate device to be able to capture that information.

4   It's more than just speed and rotation, but it has this idea

5   of spatial orientation.

6          The examiner also considered this Ledley prior art

7   that I previously made reference to, the '186 patent.  And,

8   again, this chair just senses the position and speed and

9   nothing more.  And I think column 10 through 21 -- or column

10  10, line 21 of that patent -- see, what column was it?

11  Column --

12          MR. GETZOFF:  10.

13          MR. DULIN:  -- column 10, line 10 through 21

14  describe that.  And so what he's saying is look, this is

15  different kind of data.  This is spatial orientation data.

16  It's a different type of data that this -- that my

17  application relates to and it's distinguished from Watt on

18  that particular basis.  Your Honor, may I provide you with a

19  copy of the Watt reference?

20          THE COURT:  Sure.  Thank you.

21          MR. DULIN:  The only thing I'll -- the other thing

22  I'll say about an accelerometer is that it's clear I don't

23  think it's something that's disputed that this -- the data

24  that the accelerometer -- or that this sensor has to obtain

25  relates to static disposition.  And the only type of sensor

 1      that's described that does that is an accelerometer.  And in

 2      column 10, line 32 through 35 is a good example of where that

 3      type of data is being gathered by an accelerometer and there

 4      is no other structure device that's recited.

 5              THE COURT:  Thank you.

 6              MR. DULIN:  Thank you.

 7              THE COURT:  So the Watt patent is different than

 8      I'm accustomed to seeing.  Where's the number?

 9              MR. DULIN:  It's an application and the

10      application --

11              THE COURT:  Oh, application.  I'm sorry.  Thank

12      you.

13              MR. DULIN:  Yeah.

14              THE COURT:  Mr. Getzoff?

15              MR. GETZOFF:  Now I have to talk about Watt.  Your

16      Honor, the distinguishing feature -- so let's back up a step

17      and talk about what the rule is for when you look to

18      prosecution history and how prosecution history can narrow or

19      impact claim construction because it can.  The rule is that

20      if a patentee makes, and this is a quote, "a clear and

21      unmistakable disavowal of subject matter" or -- or of -- of

22      scope in the prosecution history to distinguish prior art

23      then he's -- he's bound by what he said.  He can't say one

24      thing to get the patent issued and then say something later

25      in later litigation.  That's a fund -- a fundamental rule.

1    In the prosecution history though of this case, in the

2    decision of Watt, there's no statement whatsoever talking

3    about the sensor.  There -- Mr. Dulin showed you a passage.

4    I'll put it back up on the screen.  There's no mention here

5    about the type of sensor in Watt, meaning a general sensor

6    versus an accelerometer.  Now, if he had said that -- if --

7    if he had said well, now, Watt discloses certain sensors, but

8    I mean accelerometer, that would be a clear and unmistakable

9    disavowal and Mr. Dulin would be absolutely right.  Watt --

10   all Watt discloses is gathering of what could be called

11   second-category data, the response -- response of the patient

12   in the chair.

13        And if you look -- this is -- this is Watt.  And

14   here's Claim 1.  It talks about constraining a person,

15   imparting a stimulus in the form of a motion or angular

16   acceleration, and then they -- they measure the ocular

17   response.  So they were only measuring second-category data.

18   They weren't measuring first-category data using a sensor.

19   And so the distinguishment on Watt is is they were only

20   collecting half of the data.  We're collecting both where --

21   and we're correlating it.  We're feeding both data streams

22   together to a computer.

23        So this is -- this is apples and oranges to what

24   we're talking about.  There's nothing in the prosecution

25   history and Mr. Dulin hasn't shown you anything, nor have I

```
1    seen a distinguishment over sensors.  That's what we would
2    have to see.  And it comes up.  It comes up when there --
3    there is an issue with the prior art over a certain
4    embodiment or a certain claim and a patentee says that's not
5    what I meant.  You know, my -- when I say that in the claims
6    I don't mean what the prior art said.  In this case it would
7    be the difference between accelerometer sensors which they're
8    trying to limit the sensors to and other kinds of sensors.
9    There's just no discussion of that in the prior art, period,
10   so it's completely inapplicable.  But this -- this issue of
11   -- of when you look at prior -- or when you look at
12   prosecution history, again, I would just urge the Court to
13   stick to the claim construction rules.  It's a similar rule
14   for when you look to a specification.  If you're going to
15   import a limitation from the prosecution history or import a
16   limitation from the specification it has to be clear, and you
17   have to have a clear disavowal where a patentee says
18   something to the effect that's not what I mean.  If you don't
19   have that it's improper to do it.  We don't have that here.
20          Now, with that, let me -- let me talk about the
21   two new claims that we're talking about moving forward in
22   Claim -- in Claim 2.  So we're still in Claim 2.  We're now
23   into the next element in Claim 2.  So we've -- we've left the
24   first element which talks about the first-category data and
25   the sensor.  We're now into the second element which begins
```

1      additionally, during that same time period and employing

2      another device which produces a data stream.  So defendants

3      have identified this -- this particular clause out of -- out

4      of Claim 2, out of the second element of Claim 2 and said

5      that they want a specific definition for this phrase.  Now,

6      to be clear -- here, let me pull it up.  So this is how the

7      phrase -- I should have had this up before.  This is how the

8      phrase is used in this element.  So this is a fairly long

9      element with -- with some fairly specific types of things

10     that need to be in this element.  The phrase another phrase

11     which produces a data stream does not need any separate

12     construction.  What that device has to do, what that data

13     stream needs to be, that's all in -- what follows in the next

14     seven or eight lines of text in this claim.  But the -- the

15     phrase and -- which we're going to talk about in a few

16     minutes, but this particular phrase, another device which

17     produces a data stream, simply another device which produces

18     a data stream, we agree it has to be a different device than

19     the device that collected the first-category data.  I mean,

20     the claim says another device.  So it can't be the same

21     device that's collecting first-category data that's now

22     collecting second-category data.  But other -- other than

23     that this is just an introductory clause for what's about to

24     follow which is second-category data which contains, and then

25     there's all this specificity on what that second-category

```
 1      data needs to have.  Defendants want to -- and this is
 2      similar to what they said on -- on the earlier element.  They
 3      want to load into this phrase, this fairly innocuous
 4      straightforward phrase, they want to load into communication
 5      line continuous flow computer-processible data.  None of
 6      that's in the claim.  This -- like they did before, these are
 7      just phrases that they're just pulling out of the
 8      specification in the description of the preferred embodiment
 9      and they want to gloss that into this phrase.  It's
10      unnecessary.  In fact, it's more than unnecessary.  It's
11      improper because the claim doesn't require these additional
12      elements.  And this particular phrase, another device which
13      produces a data stream, it's straightforward.  It's easy to
14      understand.  No construction is necessary.
15              I'm going to cover the same -- the next term
16      because I'm going to say they're the same thing and then I'll
17      let Mr. Dulin cover these -- these same two.  Second-category
18      data.  So this -- this -- this actually comes up in Claim 2
19      and 13 so we can do some double duty here.  It's the same
20      language.  And just to back up a minute, Claim 13 is very
21      analogous to Claim 2.  It's drafted as a method claim, so
22      it's written for a process with actions to perform as opposed
23      to a structure, but the requirements are very similar.  And
24      with respect to this second category the language is the
25      same.  This issue is very similar to the argument I made on
```

1    first-category data which is to say the claim itself defines

2    what that category data needs to have.  And, again, we've got

3    seven or eight lines of text that say what that second --

4    what needs to be in that second-category data to satisfy this

5    claim element.  But -- but just the phrase second-category

6    data itself does not need any separate construction.  We will

7    construe what comes next and that will -- I'll save that till

8    after Mr. Dulin responds.  But for these two phrases, another

9    device which produces a data stream and second-category data,

10   those are essentially the setup for the rest of the claim

11   element which follows, and not just follows, but gives the

12   meat and substantive requirements for what needs to be found

13   for infringement to occur.

14          THE COURT:  Thank you.  Mr. Dulin.

15          MR. DULIN:  Thank you, Your Honor.  I'm going to

16   delve right into Claim 2, but before I do I just want to make

17   two comments about the prior art.  What we saw here -- what

18   we saw here was a very clear disavowal -- disavowal of what

19   we see in the prior art.  Now, Ledley, contrary to what

20   Mr. Getzoff said -- and I handed you a copy of Ledley.  I'm

21   referring to column 2, and it's the bottom right paragraph

22   which is identified by paragraph 0032, and this is in the

23   detailed description of the invention, says the head velocity

24   and eye response to this controlled stimulus are measured

25   using three mutually perpendicular angular velocity

1    transducers and an electro ocular gram.  I pronounced that

2    wrong, but regardless, it does -- it certainly does recite an

3    invention to measure the spatial movement of this person, but

4    it doesn't do it in a way that relates to spatial orientation

5    as being distinguished by Mr. Epley here.  Similarly in

6    Ledley -- oh, yeah, this is -- I'm sorry.  This is Watt's I

7    preferred to in the first one.  Thank you.  And then the Watt

8    reference also had similarly -- I'm sorry.  The Ledley

9    reference also had -- sorry.  I had a -- I probably should

10   have had a smaller lunch today.

11          There's a detailed description which starts in

12   column 8 of the '186 patent and then on Claim 10, lines 8

13   through 22 describe the outputs in the control.  It describes

14   the type of data that are being generated from the sensors in

15   that case.  And it includes in addition to various output

16   status signals to be discussed below for a motor pertaining

17   to, for example, chair position and speed are provided via

18   motor control panel for distribution to other portions of the

19   Ceochi (phonetics) system.

20          So clearly the idea of the movement is something

21   that was bothersome to the examiner in this prior art,

22   bothersome to the point where the patent was rejected and

23   then Mr. Epley came in and said wait a minute, the type of

24   data that they're gathering -- that we're gathering is

25   different.  This spatial orientation data is unique and you

1    can see the argument in -- on Page 17 of Exhibit B.  The term

2    another device which produces a data stream we believe needed

3    to be constructed in order, again, to clarify what this term

4    means for the trier of fact so they're able to understand

5    this invention and the proper scope of this invention as is

6    described in the specification.  Our definition of that is a

7    device attached to the subject other than a sensor that is

8    connected by a communication line to the computer producing a

9    continuous flow of computer-processible data.

10            Now, I'm not just throwing in there reading into

11   this limitation a preferred embodiment.  This definition is

12   not adding elements.  What it is is it's properly defining

13   the term in the context of the specification.  And I think

14   these things are important and well-substantiated.  Let's

15   take the first -- the first limitation -- or the first

16   component of our definition.  It says the second-category

17   data gathering device must be attached to the subject.  I

18   think we've talked about this before in regard to the spatial

19   orientation data.  You and I talked a little bit about

20   whether or not it's a corrected -- the perception is that

21   it's not spatial -- moving orientationally in space.  In this

22   case it actually is attached.  We believe that would be the

23   proper construction.

24            If we look here this is an example of support in

25   the specification for that proposition.  Again, we're looking

1    at Figure 1 and we've got the person here who's connected via

2    the data line, 22, to the computer.  And in the

3    specification, lines -- I think it is column 11, lines 1

4    through 3, it says line 22 sends visually in Figure 1 from

5    the subject, which is 12, to the computer.  It represents a

6    data flow through which various kinds of subject specific

7    data is fed to the computer.

8             There's other examples.  The patent talks about

9    these goggles which are attached to the subject.  Again, all

10   examples of this.  The patent continuously talks about things

11   that are attached to the subject including -- including

12   goggles which are attached to the subject.  It's critical to

13   be able to obtain this vestibular data.

14            And the next limitation is that the device must be

15   something other than a sensor.  I think this is a pretty easy

16   thing to throw in here.  It's something that's supported by

17   the language of the claim and I think it's something that's

18   important to clarify again for the trier of fact.  It can't

19   be the sensor.  It has to be something different.

20   Intuitively it makes sense because it's information that's

21   different.  It's not spatial orientation data.  It's this

22   vestibular response data.  So it's a different kind of data

23   so it makes sense it would be something different, and in the

24   claim it says additionally during the same period and

25   employing another device which produces a data stream that

 1    relates to subject behavior acquiring a second data -- a

 2    second-category data.  So it could have said another sensor

 3    or the sensor or something like that, but it said another

 4    device.  So I think the intent is clear that it would be

 5    something other than a sensor, and it's clearly something

 6    other than the sensor that's referred to in the prior

 7    limitation -- or the prior limitation.  It also has to be

 8    connected by a computer line to the computer producing a

 9    continuous flow of computer-processible data.  This is a --

10    this is column 7, line 47 through 61.  And this is in the

11    description of invention.  And it says as disclosed herein in

12    its preferred form the system of the present invention

13    includes.  You know -- and, again, what we're trying to do is

14    understand what this invention is.  There could be a

15    preferred embodiment, but when there's a description of what

16    this invention is then that's something that I think is very,

17    very helpful in construing claims of the patent and that's

18    something that Phillips specifically encourages the Court to

19    consider in construing the claims.

20         So the system of the present invention includes,

21    I'll drop down to B, a digital computer or computer

22    processor, a display screen structure and an image display

23    zone, various transducers, sensor devices or data stream

24    devices for generating electronic data streams referred to

25    herein as first-category and second data -- category data

1    streams that is supplied to and processible by appropriate

2    control algorithm structures and computer processor.  And I

3    think there's more support for those added components to this

4    construction.  If we look at the description of Figure 10 --

5    Figure 1 again -- and the language I'm citing here is column

6    10, line 47 through 50.  It says also included in the system

7    -- this whole thing is 10 -- is an appropriate

8    algorithm-equipped digital computer which we see Number 20

9    here, which is illustrated effectively interconnected with

10   the subject 12 and the device 18 through two connection lines

11   or paths shown in lines 24 and 22.  There's a number of other

12   places that support the fact that this has to be a computer.

13   We've talked about the fact that there has to be a computer

14   line -- data lines.  There has to be a computer.  It has to

15   be computer-processible data.  And then there's this concept

16   of continuous flow.  And I think that's true for this second

17   data stream as well as it was for the first.  And a lot of

18   that supports -- supports both data streams, and then there's

19   unique support relating to the second vestibular-related data

20   stream which is what I cited here.  But I think it's clear,

21   this inventor made clear that both of these data streams had

22   to be connected to the computer and had to both have a

23   continuous flow of information.

24        Here is an example that -- that I think supports

25   the notion of a continuous flow of information.  And this is

1    found at column 14, lines 29 through 34.  Mr. Epley says very

2    specifically, it is a feature of the present invention to

3    provide such visually correlative data which will give the

4    system user an intuitive and quick grasp of the specific

5    vestibular behavioral situation which is underway in

6    real-time, at any given moment, with respect to the subject

7    whose vestibular system is being explored and/or treated.  We

8    talked about this before.  This has to be a continuous flow

9    of information as somebody who goes through space and their

10   vestibular system is analyzed and correlated with the spatial

11   movement information.

12          The second-category data is another term that we

13   believe is -- it's important to define.  Again, there's clear

14   support in the specification.  There's clear support in the

15   prosecution history that supports this definition.  It is

16   real-time computer-processable vestibular response data

17   relating to the first-category data.  Now, there's things

18   that are in this that are important for somebody who's really

19   looking at these claims trying to determine if there's an

20   infringement they need to know.  And they're going to have

21   these definitions.  They're going to have the claims.  But

22   you don't have somebody who's going to be learned in this

23   entire invention who knows the specification and who's

24   constructed these.  The jury isn't constructing these claims,

25   we are, and then we're presenting them to the jury and the

1      jury is going to compare them to the accused device to

2      determine whether or not infringement exists.  So it's very

3      important that these terms are clear and adequately

4      articulate what this invention is as it's defined by the

5      specification.  And, again, those -- it makes it clear that

6      it's appropriate for a judge to look at the specification in

7      coming up with those constructions and to rely on it.  In

8      this definition there's things like the fact that the

9      second-category data has to relate to the first-category

10     data.  I mean, that's -- some of these things are very, very

11     basic, but they're also very important.

12          So if we look at -- you know, there's -- the fact

13     that this information has to be in real-time.  And we've

14     talked about real-time with respect to the spatial

15     orientation data and I think that those arguments still hold

16     true in -- with respect to the vestibular response data.

17     Now, there's different citations and sometimes they talk

18     about both data sets being in real-time.  Sometimes the

19     inventor talks about one or the other, you know, without the

20     other being present so there's different citations that

21     support both, but real-time is certainly something that is

22     equally a part of this, and if we look at line -- column 14,

23     lines 29 through 34, this is language we've talked about

24     before, but it talks about that very specifically it is a

25     feature of the present invention to provide such visually

1    correlative data which will give the system user an intuitive

2    and quick grasp of the specific vestibular behavioral

3    situation which is underway in real-time and at any given

4    moment.  So I think it's clear that this is intended to

5    convey the fact that it is a feature of this invention to

6    include real-time with respect to the second data stream.

7            This data also -- and there's a lot of other

8    citations that you'll find in our brief that relate to this

9    motion of real-time both in the context of -- and it may not

10    be as heavy in the briefing, but there's -- there's this

11    real-time notion that Mr. Epley talked about in the

12    background section which talks about the need for real-time

13    correlation and the need for real-time data as Mr. Epley

14    talked about during the prosecution process as well as in the

15    detailed description of the invention section of the patent

16    where he actually talks more about -- more specifically about

17    the real-time as a feature of this particular invention.

18    Again, the vestibular data also has to be something that's

19    computer -- it's computer processible and I think that's

20    pretty well described in our brief.  And then we go back to

21    the fact that it has to be related to the first-category

22    data.  I mean, that's the most fundamental thing in this

23    invention is that the second-category data relates to the

24    first-category data.

25            So if we look at the abstract on the first page of

1    the patent -- of the Epley patent Mr. Epley says this is a

2    comprehensive vertigo management system and methodology which

3    is provided, and it employs a spatial maneuvering device

4    preferably under computer control to orient the subject

5    selectively differently in space thus to create vestibular

6    activity which is directly related to spatial motion

7    including deceleration and/or (inaudible).  I think that

8    makes it pretty clear.  That sets the stage.  That doesn't

9    talk about a preferred embodiment.  That is describing this

10   invention.

11          Then if we go to column 8, line 45, in discussing

12   the invention Mr. Epley says thus, in broad terms, the

13   practice of the present invention is in relation to

14   investigation and diagnosing -- in relation to investigation

15   and diagnosis involves inducing vestibular activity in a

16   subject by selectively orienting or positioning that subject

17   in different spatial dispositions, and then by collecting

18   both absolute positional data, preferably from several

19   sources, and referred to herein as first-category data

20   relating to the patterns and conditions of subject

21   orientation, and subject-vestibular-response data relating to

22   those dispositions.  And then it defines that as

23   second-category data.  So right here it says that the

24   practice of the invention requires that they be related.  And

25   I think that it would be completely nonsensical and would

1    yield a nonsensical result if the trier of fact ever looked

2    at this patent, didn't see that language in our constructions

3    and thought well, it doesn't have to relate.  At some point,

4    some way, somehow this jury has got to understand the fact

5    that the first-category data and the second -- the

6    second-category data relates to the first-category data.  And

7    this construction is the appropriate place for that to be

8    conveyed, otherwise they'd be misled into thinking that isn't

9    part of it.

10            Now, there's a lot of other places where that's

11   talked about and we've cited them in our brief.  As you read

12   the patent you'll see that.  But those added -- added phrases

13   are something that is very, very important we believe to the

14   construction of these claims.  Thank you.  Do you have any

15   questions?

16            THE COURT:  I don't.

17            MR. DULIN:  Okay.

18            THE COURT:  Mr. Getzoff.

19            MR. GETZOFF:  Your Honor, to move this along I'll

20   respond briefly and then just go right to the next claim term

21   which is also -- it's the last disputed claim term in -- in

22   Claim 2.  So Mr. Dulin wanted to argue that another device

23   which produces a data stream; that they're not adding any --

24   any limitations onto this, but, of course, they are.  If you

25   look at his construction, the proposed construction -- the

1     additional limitations that they're adding -- so it doesn't

2     just have to be another device that produces a data stream.

3     That's what the phrase says.  They say no, it has to be those

4     -- it has to be that.  It has to be another device.  It has

5     to produce a data stream.  It has to be attached to the

6     subject.  It has to be connected by a communication line.  It

7     has to produce a continuous flow and the data has to be

8     computer-processible data.  So they've loaded in four

9     separate limitations that they get from the specification.

10    All of the references in the specification if you saw them

11    for these extra limitations that they want to build into

12    this, all of them are accompanied within our description of

13    the preferred embodiment explicitly.  It said preferably.  It

14    said in its preferred term by example every single one.

15    Again, for him to read this -- for defendants to read extra

16    limitations from the specification, you need to see something

17    in the specification that highlights that limitation as you

18    have to have this.  The invention won't work without it.  We

19    don't need anything else.  It -- it has to be as the Phillips

20    and the SciMed case say.  You need to have a clear statement

21    that we're excluding other things.  And -- and it's kind of

22    an important distinction.  It's not just well, this is how

23    you described it.  That doesn't get them there.  It has to be

24    some sort of disavowal.  We don't mean this.  That's clearly

25    lacking here.  It's improper to read these four additional

1    limitations.

2          I would point out -- I think I misspoke.  I said

3    these four limitations come from the spec.  One of them, a

4    continuous flow, a continuous flow isn't even in the

5    specification.  That's reminiscent of the -- the sensor they

6    said had to move -- I forget the phrase -- with the person.

7    That's not even in the specification.  They're just making

8    that up and saying well, we think it should be there.  We

9    think it's implicit in the specification.  It's not even in

10   the specification.  So they're -- they're adding that to the

11   claim which makes that even, you know, hardly worth

12   discussing.

13         Second-category data.  It's the same issue.  They

14   want to add the word real-time.  We talked about this before.

15   The -- the patent already -- the claim itself gives enough

16   about -- asks for the current condition.  The real-time is

17   unnecessary.  And what does real-time add?  Well, what

18   limitation does real-time add that makes any difference in

19   this case?  There's something we haven't talked about, but

20   there's -- the federal circuit has said that when construing

21   claim terms the Court should be careful to only construe

22   claim terms that need to be construed.  There's a case in

23   controversy requirement that is an overlay over all of this

24   which is the Court can't give advisory rulings and just

25   construe a bunch of claim terms because the defendants want

```
 1      them to be construed.  There should be some showing that this
 2      would make a difference so that you're not -- and it's not
 3      just a time and work saving effort for your benefit, Your
 4      Honor, although I think that alone would be enough to adopt
 5      it.  It's a -- it's a case or controversy -- justiciable
 6      controversy.  Courts don't give advisory rulings.  What does
 7      real-time add to this case?  From what I know of the accused
 8      device it has sensors.  It produces both types of information
 9      and it reports them both in real-time.  But if there's some
10      hidden meaning that provides defendants a non-infringement
11      position we should get that on the table so the Court can
12      understand.  If you're going to add the word real-time in
13      what difference does it make in this case, otherwise they're
14      just introducing a term that's not in the claims that injects
15      potentially a new issue.  What does real-time mean?  And it's
16      simply not necessary.  It's not necessary to give meaning or
17      substance to these claims to add the word real-time.
18             The last thing I'll talk about is where Mr. Dulin
19      ended which is relating to the first-category data.  He said
20      this was really important that the second-category data must
21      be relating to the first-category data.  Again, this -- this
22      is an unnecessary gloss that they want to impose on the claim
23      term.  The -- the claim makes clear that the collection of
24      second-category data and first-category data has to occur
25      within the same time period.  That's the relation between the
```

1    two that the claim itself requires.  So what does it add,

2    Number 1, to say it has to relate to the first-category data,

3    and, Number 2, perhaps more problematic, what does it mean to

4    say that the second-category data relates to the

5    first-category data?  As a point of fact the second-category

6    data is completely separate.  It's a completely separate type

7    of data.  That's -- that's a data that's measuring, for

8    example, eye movement, and by the VNG goggles where you've

9    got the nystagmus.  It reflects a reaction that's sending eye

10   movement data to the computer.  That has no relation,

11   depending on what you mean by relation, to the spatial

12   orientation data that's collected by sensors.  So those --

13   those -- those types of data aren't related in the sense that

14   they're different -- they're completely different types of

15   data.  I -- the only meaning that they can give to this is

16   they're related in time.  They're both coming from the same

17   person during the same time period.  That's what I think they

18   mean by relating the data together.  And the claim already

19   says that.  The claim already requires that the collection

20   and supplying of the two categories of data are during the

21   same period.  That's the introductory phrase which the

22   parties didn't ask to be construed because we -- we don't

23   think there's any issue with that at the beginning of the

24   second element of Claim 2.

25                THE COURT:  I think that Mr. Dulin's point is that

1    if you measure where the patient is in space at moment one,

2    and then you compare that to the eye movement at moment six

3    that's not what this invention is about.  This invention is

4    about comparing spatial time and vestibular movement at

5    moment one and then later on moment two and then later at

6    moment three, and this doesn't seem to say that.

7          MR. GETZOFF:  Well, the way it works -- let's step

8    back for a bit.  So when you -- when you induce a movement in

9    somebody and you stimulate their vestibular, as Mr. Dulin

10   said earlier and I agree with his -- his explanation, is

11   you'll get a reflexive response.  So it's not -- it's not

12   like during the course of the maneuver you're seeing

13   different types of eye movements at different times.  And the

14   example -- the specification -- I mean, it does get pretty

15   down in the weeds on the specific maneuvers and then what the

16   doctor should look for.  In some cases it's at the same time.

17   In some cases it's right after.  So you've got to -- so I put

18   you in a spin.  Your eyes are going to do their thing, then I

19   need to measure it then.  That's the time period.

20         THE COURT:  I see.  Yeah.

21         MR. GETZOFF:  So I would -- I would agree that the

22   movement induces the response.  That's -- that's clear.  But

23   I think that's -- and if that's what he means by relating I

24   don't dispute that conceptually, but it's unnecessary.  And I

25   think relating is far too vague a word.  But the patent

1    already says because it correlates them in time you've got

2    the relationship.  The relationship is set.  So that's --

3    that's how I think that issue should be understood.

4           THE COURT:  So I have your point firmly in mind,

5    that it's improper to import limitations from the preferred

6    -- from the specifications to the claims.  It's there.  It --

7    it has sunk in.  But -- but then I do think that Mr. Dulin is

8    right that the invention contemplates, maybe the claims don't

9    say it, but the invention appears to contemplate

10   computer-processible data, so he wants me to bring that in.

11   So far you've been saying no, no, no, don't bring it in.

12   It's not -- it's not in the claim.  What -- when do I bring

13   something in?  And isn't he right about computer-processible

14   data?

15          MR. GETZOFF:  Computer-processible -- processible

16   data actually comes in in -- in the preamble.  And if you

17   look, the preamble of Claim 2 says a method employable in

18   relation to a chosen human subject.  I'll skip the next one.

19   For acquiring medically-informative data including

20   computer-processible data.  So the preamble -- and we haven't

21   talked about or argued -- nobody's argued that the preamble

22   is limiting.  So that's a separate sort of issue as to what

23   extent you even look to the preamble to -- but it at least

24   says that this data that you're getting, at least some of it

25   has to be computer processible.  I mean, including

1    computer-processible data.  It doesn't say which of the data

2    streams need to be.  And in point of fact, both have to be

3    supplied to a computer.  So I don't -- I don't have a problem

4    with computer-processible data in the sense that the last

5    claim element of Claim 2 says that you supply both data

6    categories to a computer processor.  So, sure, the data --

7    the first and second-category data need to be computer

8    processible, but what is that because you're supplying it to

9    a computer, to a computer processor, but then by definition

10   it is computer processible.  I mean, I don't understand what

11   the issue is because it -- if you're supplying it to a

12   computer processor it is computer processible, otherwise why

13   are you supplying it to a computer processor?  So, again,

14   this is another issue is what difference does it make in this

15   case?  Are they going to come up -- along and say oh, well,

16   our sensor data isn't computer processible because it has to

17   go through a conversion step before the computer can really

18   make sense of it?  You know, is there something like that

19   lying in the weeds that hasn't been brought to the table?

20   But on its own, yes, the last element requires the data to be

21   both supplied to a computer processor.  That's a requirement.

22   That has to happen for infringement.  To be able to

23   understand that, it either happens or it doesn't.  That's

24   pretty straightforward.  So what's the issue with saying oh,

25   well, the data itself has to be computer processible?  I just

1       -- I just don't know.  I'm sure Mr. Dulin will tell us

2       though.

3              Let me talk about the next one and then do the

4       rebuttal and rebut me on the next one as well.

5              MR. DULIN:  Unless it would be more efficient for

6       me just to address the quick issue relating to the

7       importation of claims.

8              THE COURT:  Let's -- let's go ahead and you can

9       pick that up later.

10             MR. GETZOFF:  Okay.  So the next element is -- is

11      kind of a big one, although we don't think so.  So this is

12      the last element in the claim.  It's the thing -- it's the

13      structure that gets the first and second category of data and

14      the claim says that it's a data-processing structure that has

15      a computer processor.  That's pretty straightforward.  The

16      Court could call it a computer.  The Court could say -- we

17      say it's a device with a computer processor capable of

18      processing data.  That doesn't really add much to what the

19      claim already says.  That just moves the words around a

20      little bit in maybe a slightly more accessible way, but we're

21      talking about a computer, a box or some structure that has a

22      computer processor in it.  That's it.  In -- in response the

23      defendants have a definition that's their longest definition

24      of the entire case.  It's seven or eight lines long with two

25      different subparts.  And what this all boils down to is that

 1      the -- the defendants are trying to import a specific

 2      limitation of Claim 1 into Claim 2.  So Claim 1 has a

 3      requirement.  And Claim 1 I should note is not being asserted

 4      in this case so it's not at issue and there's no need to

 5      construe Claim 1.  Claim 2 is a separate stand-alone claim or

 6      independent claim as we call it.  Claim 2 is --

 7              THE COURT:  I knew that.  I knew that,

 8      independent, dependent, independent.

 9              MR. GETZOFF:  And so -- so Claim 1 has this

10      explicit requirement for a viewable pictorially represent --

11      representational visual correlation.  That is a requirement

12      of Claim 1.  And this whole argument for Claim 2 is they want

13      that read from Claim 1 into Claim 2.  They try to get there a

14      couple of ways.  One is they look to the specification.

15      Well, of course the specification talks about this because

16      Claim 1 is in the patent.  The specification has to address

17      all the claims.  So it doesn't get them anywhere to just

18      point to stuff in the patent that relates to Claim 1 and say

19      well, it should also relate to Claim 2.

20              The second problem that they have is a document

21      called claim differentiation which means different claim

22      scopes are presumed to have -- different -- different wording

23      used in different claims are presumed to have different

24      scopes.  And so if the inventor used language and in this

25      case very specific language for one claim it's presumed that

 1    that language is not to be inferred or glossed into another

 2    claim.  The final way -- so -- so they're -- they're running

 3    -- apart from the fact that this language is -- is nowhere in

 4    Claim 1, it's in Claim -- I'm sorry, in Claim 2, it's in

 5    Claim 1 which makes it even more certain that you're not

 6    supposed to read it into Claim 2 because it's explicit in

 7    Claim 1.

 8         The last argument that they make is the

 9    prosecution history.  And they talked -- Mr. Dulin already

10    showed you the passages today.  I'm going to use (inaudible)

11    so I can show you the same passages.  So what Mr. Dulin -- he

12    -- he argued it first thing this morning and he went back to

13    it at least once is he said he noted in the prosecution

14    history that Watt -- the Watt reference was distinguished and

15    he's absolutely right.  This -- this document, by the way --

16    so in the back and forth between the patent attorney and --

17    and the patent office, you've got office action and then

18    you've got response to the office action.  So in the office

19    action the patent examiner says I don't think this is

20    patentable because of this prior art.  It looks obvious or

21    anticipated.  So long as that's not final, in this case it

22    wasn't final, the patent office -- the patent attorney gets a

23    chance to argue back and submit a brief.  And what Mr. Dulin

24    is pointing to is -- is this passage where he says that --

25    starting at the top, Watt does not disclose a system that has

1     a visually-correlatable presentation with a pictorial

2     representation.  So he says so there.  You distinguished Watt

3     on the basis of that limitation in Claim 1 so we have to read

4     that into Claim 2.  The problem with his argument is he's

5     forgetting the very next line where this does relate to Claim

6     1 and shows why Claim 1 is not rendered obvious under Watt.

7     And he goes on to say nor -- and this is the patent attorney.

8     This is Epley's patent attorney.  Nor does Watt disclose or

9     suggest a system that furnished a first and second data

10    stream, one of which describes a pattern and current

11    condition of a subject's spatial orientation.  That's Claim

12    2.  So he's saying Claim 1 is valid and that's the first

13    sentence.  He says Claim 2 is valid.  That's the second

14    sentence.  That -- that's confirmed down here where he talks

15    about all of the claims present.  The prior art doesn't have

16    -- and this is the Claim 1 -- or -- and this is the Claim 2.

17    So he's tracking the argument and arguing Watt doesn't show

18    what's in Claim 1, this pictorial representation of

19    correlated, and it doesn't have what's in Claim 2.  He's

20    keeping that separate.  One reason we know that's true is not

21    just by what he said, but when a patent is issued -- this is

22    Exhibit D to our reply brief in the case -- you get what's

23    called a notice of allowed billing.  In these days usually

24    the examiner gives his reasons.  Here's why I think you get a

25    patent.  And here the examiner very clearly spells out this

1      Claim 1, Claim 2 distinction.  So for Claim 1 this is the

2      depicted representational visual correlation of form of

3      (inaudible).  This is the Claim 1 limitation, and he says no

4      prior art discloses as claimed in Claim 1, and then he talks

5      about Claim 2.  No prior art talks about this.  And this is

6      the Claim 2 language.  So this argument that the patentee

7      disclaimed or should be -- should be found to have read the

8      limitation of Claim 1 into Claim 2 based on the prosecution

9      history is just -- is just wrong.  And it's not ambiguous.

10     It's not -- for you to read prosecution history as a

11     limitation it has to be clear and unmistakable that that's

12     what they're doing.  This is clear and unmistakable the other

13     way.  This is clear and unmistakable that that's not what

14     they're doing.

15             That's all I've got on that last element, Your

16     Honor.

17             THE COURT:  Thank you.  Mr. Dulin.

18             MR. DULIN:  I'm going to talk about the substance

19     of the next limitation that we talked about in just one

20     minute.

21             One thing I want to clarify, and I think our brief

22     covered some of the key notions relating to this struggle

23     that a Court enters into and whether or not you -- you know,

24     walking this line of importing -- improperly importing claims

25     and limit -- or limitations into the claims versus properly

1    construing the claims of the patent.  There is long-standing

2    federal circuit precedent that instructs a Court to look at

3    the -- the prosecution history, but also even more

4    importantly, look at the specification to determine what the

5    meaning of terms are.  For many, many, many years Courts have

6    construed and come up with definitions of claims in order to

7    instruct the jury.  Now, things may be -- it may not be known

8    why certain things are in the specification or why Mr. Epley

9    talked about real-time or why he talked about anything that's

10    in the specification, but what we do know is that it was

11    important and it was part of this invention.  And he

12    described things sometimes in the form of a preferred

13    embodiment or sometimes he may say -- but -- but he also

14    described the invention.  And if you look at this patent and

15    you look at the language that I cited and you look at it

16    within the context I think you'll start to get a sense of the

17    fact that he's describing his invention and clear limitations

18    of that invention, and, therefore, it's appropriate for this

19    Court to consider those and to incorporate those into

20    definitions of the claim.  We're not -- we're not adding

21    things into the claims.  We're not bringing them in.  What

22    we're doing is defining those claims.

23         Now, let's talk about how this is -- is going to

24    work mechanically.  We're going to have a jury sitting here

25    and those -- that jury is going to have these claims and it's

1     going to have the definitions, and then they're going to have

2     an accused device and this jury is going to have to decide is

3     there infringement.  And what we can't have are definitions

4     or lack of definitions that allows this jury to be misled

5     into believing that something infringes when, in fact, it

6     misses the boat and it isn't part of this invention.

7            Now, I want to read to you just a couple quotes

8     from a couple of important cases.  In Phillips it states that

9     the specification must describe the claimed invention in

10    full, clear, concise, and exact terms, not just a preferred

11    embodiment.  It has to -- it has to talk about this

12    invention.  It informs the proper construction of those

13    claims.  So if we look at the wording in the specification we

14    are informed about what the constructions should be.  So

15    obviously the wording in that specification is something that

16    we need to consider and incorporate into the constructions of

17    those claims.

18           The case goes on to say -- and I'm not Page 1316

19    of Phillips.  Claims -- claims are part of the fully -- or

20    the claims are part of a fully integrated instrument.  The

21    terms and phrases in the claims must be clear -- must find

22    clear support or antecedent basis in the description so that

23    the meaning of the terms in the claims must be ascertained by

24    reference to the description, therefore, it is entirely

25    appropriate for the Court to rely on the written description

```
 1    for guidance as to the meaning of the claims.

 2              I think there's another good quote I just want to

 3    throw out there.  It's from the Multi -- it's -- Microsoft v.

 4    Multi Tech case.  If you recall, this is the case we talked

 5    about earlier.

 6              THE COURT:  The phone lines.

 7              MR. DULIN:  The phone -- the phone lines.  And it

 8    talks about the notion on Page 1348 that statements that

 9    describe the invention as a whole are more likely to be found

10    in the summary of the invention.  And -- and if you read that

11    case the important lesson there is that if you look at the

12    summary of the invention which is where my citations

13    predominantly come from it is more indicative of -- that

14    place is more indicative of where an inventor is going to

15    describe what the invention is and, therefore, it's good --

16    it's good fertile ground to be able to take language and

17    construct claims, and that's what we're asking you to do

18    here.  We're asking you to look at this.  Look at the way

19    this invention is described in the specification and then

20    construct the claims accordingly so that this invention is

21    adequately conveyed and adequately described to this jury so

22    they know what they're doing ultimately in 13 months -- five

23    months.

24              THE COURT:  We don't have a trial date yet.

25              MR. DULIN:  We don't.  I was just being a little
```

1     optimistic.

2               THE COURT:  You're optimistic.

3               MR. DULIN:  The five months or the 13?

4               THE COURT:  Probably both, but go ahead.

5               MR. DULIN:  Well, 13 months -- all right.  So

6     let's talk a little bit about -- let's talk a little bit

7     about the data-processing structure which includes an

8     appropriate computer processor.  I think the main criticism I

9     heard about this is it's a long construction, and I don't

10    know of any case law that says constructions can't be long.

11    I -- I get all the constructions that Courts construe around

12    the country every day in a report and some of those are

13    pretty long and so I think that somewhere somebody thinks

14    long constructions are appropriate in certain circumstances,

15    but here it's a pretty simple construction.  It's a computer

16    containing an algorithm designed to output a real-time

17    pre-computer processed visual correlation that simultaneously

18    provides a pictorial representation of the first-category

19    data and a pictorial representation of the second-category

20    data.  It's essentially what that says.

21              So if we look at this, we go through this, the

22    first requirement is that it has a computer containing an

23    algorithm.  And I'll direct your attention to column 7, line

24    47 through 61.  Now, this is something that we've seen

25    before.  I don't want to bore you by laboring over this

1      again, but, again, this limitation for this requirement in

2      this --

3              THE COURT:  I'm sorry.  Where is -- where am I

4      looking?  Oh, column 7.  Thank you.  Never mind.

5              MR. DULIN:  Yeah.  Column 7.

6              THE COURT:  Okay.

7              MR. DULIN:  And I'm really looking at -- around

8      lines 57 --

9              THE COURT:  Right.  Right.

10             MR. DULIN:  -- 58.  And it says that the first and

11     second-category data is supplied to, and processible by, an

12     appropriate control algorithm structure in the computer

13     processor.  So -- and, again, that's the system of the

14     present invention as it's described in the description of the

15     invention portion of this -- or section of this patent.

16             If we also look back at Figure 1 along with a

17     description of Figure 1 that we find on column 10, line 47

18     through 50 -- I one time -- sometimes it's unclear exactly

19     where the line -- the column line number lines up and I don't

20     -- I had a case in front of Judge Jackson once and he got

21     upset and he said why aren't these darn numbers lining up

22     with, you know, the actual column.

23             THE COURT:  Blame the printer.

24             MR. DULIN:  (Inaudible) and I thought it was very,

25     very -- I shout out frustrations sometimes.

 1              But, anyway, so we go -- if we go to line 47,

 2      column 10 it says also included in the system is an

 3      appropriate algorithm-equipped digital computer, you see as

 4      Number 20, which is attached to the person and the device.

 5      So clearly it's something that this inventor thinks is

 6      important.  It's part of this invention.  It's something that

 7      the jury needs to understand and be communicated to that it's

 8      part of this invention.

 9              Let's talk a pictorial representation -- a

10      pictorial representation.  A pictorial representation is

11      something that -- it's pretty fundamental.  In the abstract

12      -- the very beginning of this patent, the first page, this

13      invention, not Claim 1, but this invention talks about

14      pictorial representation.  So the highlighting on this

15      version here, actually I took it from a different slide in

16      response to the arguments of Mr. Getzoff, but it talks about

17      the items collected relating to such orientation and activity

18      along with certain subject-induced reaction data in certain

19      instances and video camera data, and fed to a computer which

20      cooperates in presenting an intuitive visual and pictorial

21      correlation that enables physician diagnosis, treatment, and

22      rehabilitation.  We see this notion of pictorial correlation

23      all over this patent.  We see it in the prosecution history.

24      We see it all over and I think it's a very important notion,

25      and it's something we see -- let's look at column 8, line 63.

1      Again, this is part of the description of this invention.

2      Such data is employed variously to generate an easily viewed,

3      pictorial, sophisticated visual correlation between certain

4      components of the data, which correlate -- which correlation

5      plays an important role in informing an attending physician

6      about the problematic characteristics of induced vestibular

7      activity.

8              Now, Claim 2 talks about these two data streams,

9      spatial orientation and the -- and the vestibular activity.

10     This pictorial component of this is something that's

11     important to that as part of the novelty of this invention as

12     it was described by Mr. Epley.  Now, it's been suggested that

13     the prosecution history, the arguments of Epley, and the

14     notice of allowance strikes against the notion that this

15     pictorial representation is something that has to be in not

16     only Claim 1, but also Claim 2 and -- and this concept of

17     claim differentiation.  I think claim differentiation is

18     certainly misplaced here.  Claim differentiation is a concept

19     where if you use one word or maybe a phrase in a dependent

20     claim then in the independent claim -- I mean, I'm sorry, in

21     the independent claim, and then in the dependent claim you

22     use some other words it's intended for it to have a different

23     meaning.  That's why you have the independent claim.  Now,

24     claim differentiation isn't limited just to dependent,

25     independent claims.

          1          Professor Lemley in California keeps track of this

          2     information.  He's at Stanford.  And -- and he looked at

          3     every single case that talked about claim differentiation and

          4     the vast majority of them related to that relationship, but

          5     he also said well, there's actually circumstances where it

          6     can be dependent claim to dependent claim, however, it is

          7     when one term is used in one claim, in another claim there's

          8     another term used, it's presumably something different.  In

          9     this case we don't have different terms.  We have in Claim 1

         10     this description of -- of this pictorial representation

         11     detail, but it doesn't mean that it's not part of 2.  It's

         12     not here's a term that means pictorial representation in one,

         13     and that same term used here or maybe a different term used

         14     here.  Because it's a different term they must mean something

         15     else.  We're not constructing one term in Claim 1 to mean

         16     pictorial representation and try to construct a different

         17     term to have that same exact definition in Claim 2.  I think

         18     it's a doctrine that's misplaced here.  In addition -- in

         19     addition, I think it's pervasive through this patent, and I

         20     can tell you in the abstract they talked about the fact that

         21     the data is fed and so what this inventor did is said what am

         22     I trying to solve?  What does this invention that I have do?

         23     And he's not limiting it to Claim 1, but, rather, these two

         24     data streams that produce medically-informative data that a

         25     physician can use to treat and diagnose vestibular problems.

 1          So, for instance, we looked at the language in the

 2     abstract and the summary in the background, column 3, lines 5

 3     through 10.  They talk about the need for thoughtful computer

 4     processing and intuitive and quickly graspable situation

 5     presenting preferably in clear visual and especially

 6     pictorial form to aid the investigating, treating, and

 7     rehabilitating physicians.  So this is the problem that he

 8     saw and what he thought the need would be with this

 9     invention.

10          Claim -- or column 3, line 17 through 22 he also

11     talks about, you know, this -- this notion, although, you

12     know, Figure 4 has a preferred embodiment of what a pictorial

13     representation could be and it has both data streams

14     represented here.  You have a nystagmus.  You have the

15     rotation.  You have the outward manifestation of vestibular

16     activity here and then you have the rotation of the person

17     here.  And these two data streams can be correlated.  Now,

18     I'm not saying it's limited to this embodiment, but this is

19     certainly something that this inventor talked about.  Lines

20     14 -- or column 14, lines 29 through 37 also talk about an

21     important feature of this invention is the -- is this visual

22     and pictorial information that correlates different

23     components of data.  And I think as you read this patent,

24     Your Honor, you're going to see that that's a concept that's

25     pervasive.  And I'll submit to you that if we look at the

1    prosecution history it's something that helped differentiate

2    this alleged invention from what the Watt reference was or

3    Ledley or any of these other prior references.

4            THE COURT:  Well, let me go to basics I guess.

5    When you say that it must provide a pictorial representation

6    of something are you saying that there must be a videotape

7    which shows in screen one the motion of the apparatus and in

8    screen two the conduct of the eyes or what would these

9    pictorial representations be?  And the reason it -- it seems

10   to me to be important is because maybe that data wouldn't

11   appear pictorial -- wouldn't be very important pictorially.

12   It would be important with charts or something that reduced

13   it more to like an equation than to actually observing the

14   pictures.

15           MR. DULIN:  Yeah.  And if you look at -- if you

16   look at the -- where is -- look at Watt they talk about a

17   representation and sort of this figure here which is like a

18   plot of data.  And we see different -- different kinds of

19   data that's plotted this way.  Now, this isn't a pictorial

20   representation.  This is just -- this is just a plot.  So

21   what is a pictorial representation?  I think there's a few

22   different things it could be.  It's more than this, and it's

23   something that distinguished -- that Mr. Epley thought

24   distinguished this.  We do more than just plot this.  There's

25   a pictorial representation of this.  And I think it could

1    take different forms.  Figure 3 shows a preferred embodiment.

2    And it's kind of like what you described.  It's got, you

3    know, these different pictures of what's happening, but I

4    think it could take different forms and I think that is clear

5    in the specification.

6         So if we look back at the prosecution history --

7    so we just looked at Watt.  We looked at the kind of data

8    Watt is producing and then in response to -- or rejection

9    based on in part Watt, Mr. Epley states that according --

10   accordingly not only does Watt by itself, therefore, fail to

11   anticipate applicant's claimed invention, but it also fails

12   to provide a system and methodology which presents a system

13   with -- user with pictorial visually-correlatable data or

14   events such as those set forth in the applicant's claims.

15        Okay.  That's the vestibular data.  That's the

16   first and second-category data.  So let's say that you buy

17   the argument of Mr. Getzoff and say well, it's in Claim 1,

18   but not Claim 2.  That means what's going to go to this jury

19   isn't Claim 1 because it's not at issue, but, rather, Claim

20   2.  It doesn't have a pictorial representation and now we're

21   putting something in front of the jury that he represented

22   isn't part of this invention.  He's saying here well, we're

23   not -- we're not like Watt.  We're not like these other

24   references because I have a pictorial representation.  And

25   then if you take that in combination with all the

1    descriptions throughout the entire 28 columns of this

2    specification I think it becomes clear that the pictorial

3    representation is a very important part of this invention and

4    the appropriate place for that to be defined -- or to be part

5    of this construction is in the data-processing structure

6    because it's what generates this pictorial representation.

7    Our definition also includes this visual correlation that

8    happens in real-time.

9         Now, we've talked about real-time a lot.  I --

10   unless you have any questions as it relates specifically to

11   this data-processing -- processing structure I can rely on

12   our arguments in our brief and what we've made in respect to

13   real-time.  Yeah.  That's -- Your Honor, I just have a note

14   from my cocounsel that he would like me to put on the record

15   formally that we are not waiving our Section 112 arguments.

16   And what that means --

17        THE COURT:  Oh, indefiniteness.  Yeah.

18        MR. DULIN:  -- is -- yeah, we do believe this

19   patent is invalid.

20        THE COURT:  But that will be raised in --

21        MR. DULIN:  Right.  We believe that not only the

22   prior art here, but there's a lot of other prior art and some

23   very good prior art that will invalidate this patent.  So we

24   do want to make it clear for the record that this patent --

25   and I refer to an invention because as of right now it is a

1    pending -- I mean, it is a patent that's been issued, but we

2    believe this isn't really an invention.  It's not inventive

3    in light of prior art and we will make those arguments at a

4    later time.

5            THE COURT:  Okay.

6            MR. DULIN:  Yeah.  And it's indefinite, too,

7    especially in light of the new Nautilus (phonetics) case.  So

8    we also talk about the fact that this has to be a

9    pre-computer process data and it has to be visual correlate

10   -- yeah, pre-computer process.  And I think -- I don't need

11   to cite to you those portions of this that relate to

12   pre-computer process because I think that the prior citations

13   and the citations in our brief adequately describe -- discuss

14   that.

15           I guess the only other thing I'd mention is that

16   paragraph 5 of Epley affidavit -- Epley's affidavit which we

17   saw in Exhibit D does talk about -- describes his invention,

18   and that's what he's doing in this affidavit.  It's during

19   the prosecution period.  To describe his invention he says it

20   includes -- the picture display screen shows two correlatable

21   categories of pre-processed, but not yet computer-interpreted

22   information.  This -- this concept of pre-computer process I

23   think is something that's mentioned in his affidavit.  It's

24   something that's important to him to be part of this

25   invention.  And if you look at the specification -- I mean,

1   even the claims, it's data that's not processed by a computer

2   yet.  It goes to a computer.  The last limitation of Claim 2

3   talks about it going to this computer.  It's not processed

4   yet.  So it is important to the inventor this concept of

5   pre-process and, therefore, I think that it's appropriate in

6   this construction.

7           I don't have anything further on that limitation.

8           THE COURT:  Thank you.  Mr. Getzoff?

9           MR. GETZOFF:  Your Honor, if Mr. Dulin's position

10  was correct then every limitation of every claim would be

11  glossed into every other independent claim because the

12  specification -- of course this argument that it was

13  important to the inventor, well, sure, it's in Claim 1, so,

14  of course, it's in the specification.  But that doesn't even

15  begin to answer the question of whether you should read a

16  limitation from the specification in the Claim 2 when that

17  specific language is absent.  I mean, this is -- this is

18  going so far beyond any -- any reasonable claim

19  interpretation process to say you've got an explicit

20  limitation in Claim 1 that's not at issue, then point to all

21  the places in the specification that talks about it and then

22  say so you have to read it into Claim 2.  That's -- that

23  happens in every patent.  Every patent that has different

24  independent claims there's -- the specification has to cover

25  all of the claims.  So, of course, there's going to be

1   specific language in the specification on a specific

2   embodiment that supports independent Claim 1, but that --

3   that's true of every patent.  That -- that tells us nothing

4   as to whether you should read that separate limitation into a

5   claim that doesn't have that limitation.  And that's the only

6   support Mr. Dulin has.

7        If that wasn't enough, claim differentiation does

8   close the door on this argument.  You cannot read a specific

9   language that was set out in detail in Claim 1 about

10  pictorial representation and say well, the inventors must

11  have meant to say that for Claim 2, but they didn't write it.

12  That -- that runs smack dab in the face of what claim

13  differentiation is all about which is when the inventors

14  choose a different scope of claim as -- as indicated by the

15  explicit words that they chose we're going to give that

16  meaning and we're not going to read limitations that are

17  explicit in one claim as implicit in another.  That's the

18  doctrine of claim differentiation.  And this is not a close

19  case.  I kind of want to move on, but I think this one is not

20  even -- some of Mr. Dulin's arguments today have been -- have

21  been closer.  I don't mean to suggest that none of these are

22  close calls.

23       Okay.  So we're done with Claim 2 which was the

24  method claim.  We're moving to Claim 13 which is the

25  apparatus claim.  As I mentioned earlier, Claim 13 is written

1    in very similar kinds of language.  It's basically analog to

2    Claim 2.  And I think and hope that this will shortcut a lot

3    of this discussion because they -- they flow directly from

4    the arguments already made earlier today.

5            The first disputed limitation from Claim 13 is a

6    first data stream structure operatively associated with said

7    manipulation structure.  So you've got -- and this is -- this

8    is where it comes up in the claim.  This -- this is the same.

9    The parties' dispute over this issue is essentially the same

10   dispute over the sense or device.  In Claim 2 the structure

11   that produced the first-category data was defined as a sensor

12   device in Claim 2.  In Claim 13 it's defined as simply a

13   first data stream structure.  We've -- we -- our proposed

14   construction is simply a structure for generating

15   first-category data streams.  It really needs no special

16   construction.  The construction comes later when we talk

17   about what needs to be in the data stream.  The defendants'

18   proposed construction mirrors their proposed construction for

19   sensor device.  They want it to mean an accelerometer

20   producing a continuous flow of computer-processible data that

21   moves orientationally with the subject and is connected by a

22   computer, I'm sorry, a communication line.  So they've loaded

23   in five I think separate limitations, some from the

24   specification like accelerometer.  We covered that, don't

25   need to deal with that anymore; some of which are not in the

```
 1    specification like moves orientationally with the subject.

 2    That's not even in the specification, but regardless, this

 3    particular issue does not need -- this particular claim

 4    element either needs no construction or the straightforward

 5    construction like we did is fine.  You know, frankly, Your

 6    Honor, I'm not going to argue strenuously for our

 7    construction as a replacement for the language that's in the

 8    claim already.  I think it's fairly clear on its -- on its

 9    face.  We just changed the wording around a little bit so it

10    reads a little more plain English is all.

11              THE COURT:  So the patent uses the word -- the

12    claim uses the word structure.  What do you suppose a

13    structure is?

14              MR. GETZOFF:  Well, in this case it's a structure

15    that has to provide -- that has to satisfy the claim element.

16              THE COURT:  So when it -- when it said a sensor

17    that made some sort of sense to me because I know about

18    sensors --

19              MR. GETZOFF:  Right.

20              THE COURT:  -- but when you say a structure that's

21    alien to me.

22              MR. GETZOFF:  Technically it's -- it's broader.

23    So Claim 2 is actually more narrow because it uses the word

24    sensor.  That sensor still has to do the same thing that

25    Claim 13 is because the rest of the language is pretty much
```

1    the same in terms of what that structure needs to send.

2    Claim 2 called it a sensor.  So Claim 2 is actually a more

3    narrow claim.  Claim 13 -- it certainly could be a sensor.

4    Is there something that's not a sensor that could still

5    collect first-category data?  I can't think of -- of one.

6    And I don't think -- I don't -- I don't think it's proper

7    claim construction to construe a broader claim is coterminous

8    with the more narrower claim that uses sensor instead of

9    structure, but conceptually and for purposes of this case I

10   don't think it makes a difference.  The first data stream

11   structures at issue in this case, they're sensors.  They're

12   not accelerometers.  So that's -- that's the issue here.  But

13   they are sensors.  So I don't -- I don't think it makes a

14   difference.

15            THE COURT:  Okay.

16            MR. GETZOFF:  I'm trying to think if I -- if

17   there's anything else I can cover that is simply a piggyback

18   on prior arguments.  The next --

19            Yeah, do you want me to cover Claim 13?

20            MR. DULIN:  Yeah.

21            MR. GETZOFF:  Is that what you just -- okay.  With

22   Mr. Dulin's and the Court's permission I'll just run through

23   Claim 13 in its entirety.

24            The next claim term is the mentioned preselected

25   time period.  This issue -- this doved -- this refers back to

1     the preamble which talks -- which first introduces the

2     preselected time period.  And it actually defines the

3     preselected time period as the time period during which

4     position-related vestibular activity exists.  That's --

5     that's the time period.  If the Court wants to define the

6     element that uses the mentioned preselected time period as

7     the time period during which position-related vestibular

8     activity exists that just circles back to the preamble.  I

9     don't think it's necessary, but it wouldn't be improper

10    because that's the way the claim reads.  That's just a circle

11    back.  Does that make sense?

12            THE COURT:  Yeah.

13            MR. GETZOFF:  Okay.  The next -- next claim -- I

14    think I don't have a slide for it so I'll wing it.

15    Computer-employable first-category data.  We don't think that

16    needs any -- any construction.  That's the same issue as

17    first-category data in Claim 2.  They want it to mean

18    absolute positional data.  We think that's redundant.  We

19    think that the claim later says that it has to describe the

20    de facto pattern and current state of the chosen subject's

21    spatial orientation.  So that -- that phrase is part of this

22    claim element and defines first-category data.  This is the

23    same argument that we made earlier this morning.  There's no

24    need to separately define first-category data with the phrase

25    absolute positional data.  This is absolute positional data.

1        But it's also spatial.  When you use positional as column 3

2     says, positional, spatial orientation, the inventor meant

3     that explanation of both static disposition and motion.

4     Again, this is the same argument we made earlier so Your

5     Honor's ruling on Claim 2 on this issue I think would drive

6     the outcome on this one as well.

7             Next item, the second data stream structure

8     operatively associated with the chosen subject.  So now we're

9     into the -- the structure that generates the second-category

10    data -- data stream.  Again, we don't think this needs any

11    construction.  We think that the -- the language -- all the

12    language that comes after this introductory clause says

13    exactly what kinds of information it needs to -- to be.

14    Defendants -- so we don't think there needs to be a special

15    definition for second data stream structure.  Defendants'

16    argument on this mirrors their argument for Claim 2 and

17    they've loaded in the familiar cast that we've seen so far,

18    continuous flow, computer-processible, real-time -- actually

19    strike that.  Real-time is not part of this.  Communication

20    lines.  So this, again, mirrors the same issue that we did

21    earlier on Claim 2.

22            And then -- and then finally second-category data,

23    I don't think I have a slide for that either which is fine.

24    This is the same issue that I -- I think I just said.

25    Second-category data is defined in the claim element itself.

1    It has to contain information that effectively describes the

2    pattern and current state of at least one selected type of

3    the -- of the chosen subject's outwardly (inaudible),

4    etcetera.  So the claim says what the out -- what the

5    second-category data needs to be and there's -- there's no

6    reason, nor is there a sufficient basis to read into the

7    items that defendant wants to read into.  And, again, this

8    mirrors the earlier argument with respect to Claim 2.  They

9    want it to say real-time computer-processible, subject to

10   vestibular response data, and then there's that other place,

11   relating to the first-category data.  It doesn't really

12   relate to the first-category data except in time, but they're

13   showing two different things.  So there's a whole issue of

14   what does relation mean and the claim already relates to them

15   in time.  It says they have to be during the preselected time

16   period so that relation is already set forth and is

17   sufficient to explain what the claim requires.  That's Claim

18   13.

19             THE COURT:  So I had suggested to Mr. Dulin and he

20   disagreed with me and you didn't jump up right away and say

21   oh, you're -- you're really right this time.  Let me -- let

22   me see if you do agree with what I said.  The business about

23   the requirement of a communication line, would you say that

24   that's an improper importation because it could be wireless?

25             MR. GETZOFF:  Absolutely.  And, in fact, if I

```
 1     didn't jump up I was jumping up in my head.  Last night I
 2     thought of that same issue and I have it in my outline and I
 3     (inaudible) could show the Court that I said what about --
 4     what about wireless?  The claim requires -- so let me go back
 5     to Claim 2.  The claim required that the first and second
 6     data stream structures have to be supplied to -- I'm not sure
 7     if I have -- no, I don't have the last element of Claim 2.
 8     Claim 2 requires that the -- that the data streams be
 9     supplied to the computer -- to the structure that has the
10     computer processor, but how they're supplied is -- is not
11     limited.  So wirelessly communication lines could certainly
12     be one and that's the preferred embodiment in the Epley
13     patent.  But I absolutely agree.  That's a good example of
14     some other way to satisfy the claim that's not foreclosed by
15     the specification.  Just because the specification uses a
16     hard wire it would be improper to foreclose other types so
17     long as they satisfy the language of the claim and not the
18     specification.
19              THE COURT:  Okay.  Thank you.
20              MR. GETZOFF:  Thank you.
21              THE COURT:  Mr. Dulin?
22              MR. DULIN:  Your Honor, the only thing I would say
23     in addition in regard to this wireless issue is I think
24     that's what they're trying to argue -- the argument was in
25     the Microsoft case.  Right.  We communicate wirelessly or
```

1    over the internet these packet switch networks or does there

2    have to be a communication line that's a telephone line?

3    Well, the claim doesn't say telephone line.  It's not limited

4    to a telephone line.  But when you read -- when the Court in

5    Microsoft read the specification the only thing that was

6    talked about is a telephone line and so the Court construed

7    that claim as requiring a telephone line.  Here the only

8    thing that's ever talked about is a -- is a -- you know, this

9    line from the person or the device to the computer.  So I

10   would submit that if there would have been something else

11   that could have done that then when this inventor talked

12   about this data line, this communication line, it could also

13   -- or a wireless line or it could have said something else or

14   some other way of communicating it.  That wasn't left open.

15          Turning to Claim 13, the first construction, the

16   first data stream structure operatively associated with said

17   manipulation structure.  The thing that's slightly puzzling

18   and I think I'm going to connect my Elmo here.  I've just got

19   a (inaudible).

20          THE COURT:  I'll get it next time.

21          MR. DULIN:  And I wrote all over this.  But what's

22   interesting about their definition is okay -- and, again,

23   it's first data stream structure operatively associated with

24   said manipulation structure.  So the plaintiff's proposed

25   construction is structure for generating first-category data

1       streams.  But where did the operatively associated with

2       manipulation structure go?  It kind of just dropped off of

3       theirs.  So even if -- even if you want to adopt theirs it

4       really modifies what this is in a way that's impermissible

5       per the language of the claim not even looking at anything

6       else.  But other than that my only other comment with claim

7       -- with that limitation of Claim 13 is that it -- our -- our

8       construction does mimic the same construction in Claim 2.  So

9       we've already argued about that.  I won't rehash those

10      arguments.

11              There's been mentioned preselected time period.

12      That's the next limitation.  Our definition of that is the

13      preselected time period for acquiring medically-informative

14      data regarding the nature of a selected component of

15      position-related vestibular activity.  That is right out of

16      the preamble.  That language is -- in fact, let's take a look

17      at the preamble.  It's the preamble of Claim 13.  And so what

18      I've highlighted here in the first paragraph of Claim 13 are

19      the wordings, although they're in a little bit different

20      order than we have in our construction.

21              So we have the preselected time period.  So

22      there's the preselected time period for acquiring

23      medically-informative data if -- for acquiring

24      medically-informative data regarding the nature of selected

25      component and position-related vestibular activity.  That's

1    this line right there.  So everything we have is just right

2    out of the preamble.  It's the most straightforward

3    construction here.  But what's interesting about their

4    construction is they propose the mentioned preselected time

5    window.  That's the plaintiff's proposed construction.  So if

6    we look at where this -- we find this.  It's right here.

7    Also during the mentioned preselected time period.  Well,

8    there's no mention of a time window.  It's time period and

9    time period and throughout the claim there's this talk about

10   time period.  So to say that, preselected time window doesn't

11   make sense.  There was no mentioned window.  There's a

12   mention of a window in response -- in the specification that

13   relates to a specific type of test, but it's -- it's not

14   within the context of this claim, nor used in this manner

15   and, therefore, it's kind of misleading.

16            The definition of information in effect -- well,

17   let me back up.  There's also computer-employable

18   first-category data.  That's the next limitation we want

19   constructed in Claim 13, but that's the same construction

20   that we have in Claim 2.  The only difference is that there's

21   this added language, computer-employable in Claim 13.  So if

22   you look at the brief I think it's clear.  It's just we took

23   the same definition, but because there's added words,

24   computer-employable are included in the definition -- I mean,

25   in the limitation in Claim 13, we just added that to our

1    definition.

2            Information that effectively describes the then de

3    facto -- or the then de facto pattern and current state of

4    the chosen subject's spatial orientation.  This is sort of

5    similar to Claim 2, but it requires things like the

6    continuous flow of data.  We've talked about that before.  I

7    don't think we need to address that again.

8            Computer-processable information.  The preamble of

9    Claim 13 talks about the need for computer-processable

10   information or processable.  So I think that's pretty clear.

11   And it has to be attached to the subject.  Again, I'll just

12   make reference to the fact that there is -- you know, we've

13   made these arguments.  I don't need to belabor the point.

14   But I think that we've got Figure 2, a description which

15   talks about line 22 extending from the subject to the

16   computer and it represents that data flow line.  And it's

17   connected by a communication line to the same computer

18   receiving the first-category data.  So I think again -- I

19   think a lot of the other arguments apply.  If we look at

20   this, this is line 10 -- or column 10, lines 47 through 50.

21   It says also included in the system is an appropriate

22   algorithm-equipped digital computer, and there's the

23   computer, which is illustrated effectively interconnected to

24   the subject 12 and device 18 through two communication lines

25   or paths shown generally as 22 and 24.  So that's included in

1    this system.  And, again, the system of the present invention

2    includes -- includes a digital computer which is the -- right

3    here, and various transducers for generating electronic data

4    streams, the first and second data streams that are supplied

5    to and processible by the appropriate control algorithm

6    structures in the computer processor.  I'm not going to

7    belabor that point anymore, Your Honor.  Then the definition

8    of -- the last one is second-category data.  But

9    second-category data in the context of 13 is supported by the

10   same record as -- and is the same definition as in 2.  So I'm

11   not going to discuss that because we already have.  It's the

12   same definition.

13        THE COURT:  So I'd like to go back.  I'm still

14   struggling with the then de facto pattern and current state

15   of the chosen subject's spatial orientation.  Are you -- are

16   you a physicist, Mr. Dulin?  No?

17        MR. DULIN:  Not other than taking physics in

18   architecture school.

19        THE COURT:  All right.  Well, then you probably --

20   you probably are well enough -- you're better -- you're

21   better equipped in physics than I am.

22        MR. DULIN:  I don't know about that.

23        THE COURT:  So what this reminds me of is how

24   Isaac Newton cracked gravity.  He figured out that things

25   were falling in a de facto pattern, but that didn't tell him

1    very much, and so the way he cracked it was he took that ball

2    at specific moments in time and that seems to me to be the

3    current state of spatial orientation.  Is that consistent

4    with what you think that -- that the terms de facto pattern

5    would be, the motion, whether it is to the yaw or to the

6    whatever?

7              MR. DULIN:  The subject's dynamic movement as we

8    saw in claim -- or column 3.

9              THE COURT:  Right.  But the current state of

10   spatial orientation would be where the person is in that

11   snapshot of time?

12             MR. DULIN:  Yeah.  Yeah, the subject's static

13   disposition.

14             THE COURT:  Static disposition.

15             MR. DULIN:  Yeah.  Yeah.  So you have -- so you

16   have -- again, if we go back to these, you know,

17   orthogonally-situated semicircular canals, this person is

18   moving through time and there's fluid that's being displaced

19   in any one of those canals depending on whether or not

20   they're in the yaw -- pitch or yaw motion of angular motion.

21   And so if they go into a pitch then there's, you know, the --

22   there's the fluid displacement and then there's information

23   that goes through the neuro pathways of the brain to the

24   sense -- you know, that ultimately causes a vestibular -- you

25   know, a vestibular oculatory reflex.  And we know that when

1    they go into a pitch at any time, you know, and then they go

2    into a yaw and there's -- you know, they move orthogonally

3    through space and there's always this pattern that happens of

4    -- you know, of a nystagmus that occurs.  Every time you go

5    into a pitch, every time in a yaw, but not in a roll.  Now --

6    now there's medically-informative data that suggests that the

7    semicircular canal oriented in the yaw position or that's

8    simulated when the person goes into the yaw position is --

9    has some sort of abnormality.  Now, this data is taken in

10   real-time and you can take it and process this data and look

11   and see where this person is when this happens at any

12   snapshot in time.  But it is a continuous flow and this

13   person is moving spatially and this information is being

14   gathered as they go through the sequence of events.  It's not

15   -- a person -- a person doesn't stop.

16            THE COURT:  No, but you can capture the data.

17            MR. DULIN:  Yes.  I mean, the data is being

18   captured as the person is moving --

19            THE COURT:  Right.

20            MR. DULIN:  -- and -- both the nystagmus or

21   whatever the other vestibular data is that's being gathered

22   and also the spatial orientation data.  And so there is this

23   concept that there is this static disposition because at any

24   particular time that person and their semicircular canals are

25   oriented a certain way.  And at that point in time something

1    is happening with the eye.  There's either a nystagmus or

2    there's not.  Something is happening.  And -- and that

3    person's motion in combination with what's happening at that

4    snapshot in time is helpful to know.  But it also -- and part

5    of this invention is that this person moves through time and

6    there's a series of these motions.  So you go through a

7    series of dynamic movement.  And the patent -- the claims

8    require that it's not just the snapshot, but it's also the de

9    facto pattern --

10             THE COURT:  Right.

11             MR. DULIN:   -- the dynamic movement.

12             THE COURT:  Right.

13             MR. DULIN:  And so that dynamic movement and the

14   snapshot in time is something that is -- constitutes these

15   data -- this data stream.  And that's why I had a problem

16   with the plaintiff's definition that has subject's -- you

17   know, that describes the pattern and current condition of the

18   subject's disposition in three-dimensional space and/or

19   dynamic movement in any plane of motion.  It is -- it is

20   improperly eliminating -- limiting the scope of this claim by

21   saying it can be a snapshot in time or it can be dynamic

22   movement.  It has to be both.  It requires the current

23   condition of the subject, so the subject's static

24   disposition, and the de facto pattern, the subject's dynamic

25   movement.  That's what the data stream is.

1           THE COURT:   Thank you.

2           MR. DULIN:   Does that clarify things?

3           THE COURT:   Mm-hmm.

4           MR. DULIN:   I know that you know more about

5    physics just because of the authority that you talked about,

6    these -- Newton and whatnot.

7           THE COURT:   Sometimes when I talk about physics

8    people think I'm a spherical idiot.  A sphere looks the same

9    no matter how you look at it so I'm an idiot no matter how

10   you look at me, but -- but you don't have to agree.

11          MR. DULIN:   All right.  Did you have any other

12   questions?

13          MR. GETZOFF:   I disagree with you, Your Honor.

14          THE COURT:   I have -- I have a question of

15   Mr. Getzoff and then we'll take our 3:00 o'clock break.

16          MR. DULIN:   Oh, I can -- I can answer that for

17   you.

18          THE COURT:   So I don't -- so I think you

19   understand how I have visualized current state of -- well, I

20   mean de facto pattern of spatial orientation, and that's the

21   overall pattern of what's been going on.  That's the falling

22   apple.  And then the current state -- current state of

23   spatial orientation I perceive as the snapshot, but you

24   disagreed with that.

25          MR. GETZOFF:   No.  I was thinking about this as

1    you were asking Mr. Dulin.  I was thinking about Newton as

2    well.  So I think -- I agree that current state is a snapshot

3    and I agree that de facto pattern is something broader than a

4    snapshot.  It encompasses some history of where the movement

5    has been.  But to harmonize that with spatial orientation

6    which clearly says it can be static or it can be motion, why

7    isn't the answer -- so current state is a snapshot, but that

8    snapshot can be expressed as motion.  So for Newton's apple

9    at a snapshot in time that apple is falling at three feet per

10   second.  That's the snapshot.  He's not defining it as it's

11   three feet above the ground or 10 feet from, but he's -- it's

12   still a snapshot, but the snapshot can be motion like feet

13   per second or something or it can be 15 degrees off, you

14   know, horizontal access.  It could be both because column 3

15   says it can be both.  But it's still a snapshot.  It's still

16   -- at that -- at that point in time we need data that either

17   tells us what the current motion is or what the positional --

18   the static disposition data is.  It can be either, but it's

19   still at that -- that snapshot.  The pattern -- the pattern

20   would take into account things like acceleration or

21   deceleration or history of -- of static disposition.  So a

22   pattern of motion might be what's the acceleration over time

23   because you now have different speeds and each snapshot is

24   three feet per second, then four feet per second, five feet

25   per second.  The pattern is that acceleration which is a

1    different way of expressing that, but the current state of

2    each is three or four or five as -- as motion.  The pattern

3    though can refer to the -- so the -- the pattern is a longer

4    view whereas the current state is -- so I agree with you, but

5    I think there's a slightly different nuance as to what the

6    data is.  I still think the data can be motion or static

7    disposition, but whichever it is the device has to -- has to

8    provide both the pattern of that and the snapshot of -- of

9    that.  I do agree with that.

10         THE COURT:  Okay.  So now you -- I think then we

11   may be drawing closer to where Mr. Dulin is because he

12   doesn't like the and/or that you've used because he says the

13   disjunctive means it could be one or the other, but not both

14   and I think you just said it has to be both.

15         MR. GETZOFF:  No.  I think the and/or comes in,

16   motion or static disposition, but this has to be an and so

17   this is our proposal construction is it has to be the pattern

18   and the current condition.  Those both have to be in the data

19   stream.  But for each of those it can be a static disposition

20   or it can be movement.

21         THE COURT:  Oh, I see what you're saying.

22         MR. GETZOFF:  Does that make sense?

23         THE COURT:  I see.

24         MR. GETZOFF:  Yeah.

25         THE COURT:  Okay.

1          MR. GETZOFF:  Okay.  The only thing I want to -- I

2     want to touch on is operatively associated.  It comes up

3     twice.  We do not mean to delete operatively associated.  So

4     it comes up first in this limitation, first data stream

5     structure.  We agree it has to be operatively associated with

6     the manipulation structure.  I don't know that they covered

7     operatively associated either, and maybe they say that by the

8     moves orientationally with the subject, but the claim is that

9     it's -- it's not with the subject, it's with the structure.

10    So their proposal of moves orientationally with the subject

11    that's not operatively associated with the structure, but we

12    would agree that operatively associated with the structure

13    should -- should be part of this and we didn't mean to cut

14    that off.  Same with this, operatively associated with the

15    subject.  Now, this is with the subject.  What they've done

16    is they've changed operatively associated to the word

17    attached and that's just wrong.  It's clear that operatively

18    associated is something broader than attached.  If I'm

19    attached to you yes, I'm operatively associated.  But

20    operatively associated is a broader concept, and in this

21    context you're pulling vestibular response data from the

22    subject.  So the structure that you're using, if it's the VNG

23    goggles or something else to record the vestibular response,

24    in this case nystagmus, so long as the structure is

25    associated with the person so that it can operate that's what

1    operatively associated means, so that it can get the data

2    then it's operatively associated.  Certainly attachment would

3    be perhaps the easiest and more direct way to do that, but if

4    you had cameras that weren't physically attached to the head,

5    but were still looking at the eyes and getting the same data,

6    that's operatively associated, but not attached.  So attached

7    goes too far.  But we do agree that for both of these claim

8    terms operatively associated should be part of the -- should

9    remain in the definition.  And, yes, it's not in our proposed

10   and that's a mistake.

11            THE COURT:  It's 3:13.  Let's take a 15-minute

12   break and come back at 3:30.

13            THE CLERK:  All rise.

14            (Whereupon, a brief recess was taken from

15   3:12 p.m. to 3:28 p.m.)

16            THE CLERK:  Court is in session.

17            THE COURT:  Thank you.  Please be seated.

18            MR. DULIN:  Your Honor, Mr. Getzoff and I are

19   having a conversation about two of the limitations that we

20   still have remaining.  One of them we have resolved and

21   stipulated, the other one we're working on.

22            THE COURT:  I'll leave.

23            MR. DULIN:  Just give us a few minutes.

24            THE COURT:  Let me know when you're ready.

25            MR. DULIN:  Thank you.

1          (Whereupon, a brief recess was taken from

2     3:28 p.m. to 3:36 p.m.)

3          THE CLERK:  All rise.  Court is in session.

4          THE COURT:  Thank you.  Please be seated.

5     Mr. Getzoff?

6          MR. GETZOFF:  Your Honor, thanks in large part I

7     think to the late hour on a Friday afternoon we've stipulated

8     as to two out of the three remaining claim terms and let me

9     just read through these two stipulations.  I should -- are we

10    on the record?

11         THE COURT:  Yes.

12         MR. GETZOFF:  Okay.

13         THE COURT:  Do you want to be on the record?

14         MR. GETZOFF:  Yes.

15         THE COURT:  You weren't before I walked in.

16         MR. GETZOFF:  Understood.

17         THE COURT:  But when I walk in they turn on the

18    recorder.

19         MR. GETZOFF:  Got it.  So when I read these you

20    can pull what I read.  Okay.

21         THE COURT:  Correct.

22         MR. GETZOFF:  So the -- the claim term in

23    dispute -- that used to be in dispute was in Claim 14, the

24    language read from the claim, quote, "Capable of operating

25    said chosen subject manipulation structure through the use of

1       control algorithm structure at least in part in relation to

2       data received by the processor from said first and second

3       data stream structures."  The parties have agreed to

4       Ultrathera's proposed construction -- I should say

5       defendants' proposed construction with one modification.

6       I'll read the stipulated construction.  It is, quote, "The

7       same computer also contains an algorithm to allow the

8       manipulation structure to be controlled at least in part in

9       relation to the receipt of the first-category data and

10      second-category data."

11              THE COURT:  Okay.

12              MR. GETZOFF:  The next stipulation is on Claim 16.

13      It was the very last disputed claim term.  The claim phrase

14      read structured-employable selectively to denormalize at

15      least a portion of the chosen subject's sensory perception

16      capabilities.  And the parties have agreed to plaintiff's

17      proposed construction which reads, quote, "Structure that can

18      selectively apply conditions to alter the subject's sensory

19      perception capabilities."

20              THE COURT:  Excellent.  So was it the mention of

21      Newton that got you so worried that you better stipulate?

22              MR. GETZOFF:  Yes, as a matter of fact.

23              THE COURT:  All right.  So 13 remains -- the

24      thirteenth term remains which is part of Claim 14?

25              MR. GETZOFF:  Yeah.  So the first part of claim 14

1          it says further comprises a computer processor operatively

2     connected to said first and second data stream structures.

3     So this is -- Claim 14 is dependent on Claim 13.   It

4     introduces the computer processor operatively connected.

5     This is a duplicate dispute and duplicate argument of what

6     the parties argued earlier with respect to Claim 2 over the

7     computer processor there.   Claim 2 said a structure having a

8     computer processor.   We said that just means a structure

9     having a computer processor like a computer, and they have

10    their definition which they repeat for Claim 14.   It's the

11    whole pictorial representation issue.   They want the

12    limitation from Claim 1 about pictorial representations on

13    the two -- two different data streams to be read into Claim

14    14.   My response to that is the same as it was before.   I'll

15    just incorporate it by reference and I think that covers at

16    least what I need to say initially on that disputed claim

17    term.

18               THE COURT:   Thank you.   I forgot to confirm,

19    Mr. Dulin, the stipulation on the fourteenth and fifteenth

20    terms.

21               MR. DULIN:   Yes, Your Honor.   That does adequate

22    -- Mr. Getzoff adequately described our stipulation.

23               THE COURT:   Good.   Okay.

24               MR. DULIN:   And I think in relation to the one

25    non-stipulated term in Claim 13 I don't think I have anything

```
 1     to add because we talked about it in relation to Claim 2
 2     supported by the same -- the same record as Claim 2.  The
 3     only thing is is that the language operatively connected to
 4     said first and second data stream structures is included in
 5     Claim 14, so it's included in that definition.
 6               THE COURT:  Okay.  Anything more?
 7               MR. GETZOFF:  No, Your Honor.  We agree that
 8     operatively connected is part of our proposed construction.
 9     So that's -- the dispute is over the whole pictorial
10     representation issue.
11               THE COURT:  Okay.  I will order a transcript of
12     what's happened today because that will assist me in entering
13     -- in construing the claims.  That will take a week or maybe
14     two, I don't know, but at least a week.  It seemed to me you
15     moved closer together on some of these terms rather than
16     further apart today.  Maybe I misperceived things, but if
17     there are -- for example, the seventh term that needs to be
18     construed, first data stream structure operatively associated
19     with said manipulation structure.  At least as to the
20     operatively associated language Mr. Getzoff said well, no, we
21     mean to include that or something like it.  I don't know if
22     that helps at all in moving you closer to an agreed term.
23     Maybe you don't get to a completely agreed term because
24     Mr. Dulin says well, it's got to be an accelerometer and you
25     don't agree.  But if you can narrow the disagreement some
```

1    that would be great and you'll have some time to do that

2    while this transcript comes.  So if you want to make a

3    supplemental submission within two weeks of today, not

4    arguing new things, but saying that you've agreed to some

5    things that, of course, would be very welcome.

6              MR. GETZOFF:  Very good.

7              THE COURT:  Anything else we should talk about

8    this afternoon, Mr. Getzoff?

9              MR. GETZOFF:  Not from us, Your Honor.

10             THE COURT:  Mr. Dulin?

11             MR. DULIN:  No.  I don't think so.  Thank you,

12   Your Honor.  And I appreciate you listening to our arguments

13   today.  I know that it was originally suggested we have a

14   Specal Master do this.  Mr. Getzoff and I talked and thought

15   that you would be an appropriate person to do this so I hope

16   we weren't stepping out of line when we suggested that.

17             THE COURT:  Well, not at all.  I think it's fun.

18   I like this stuff.  I'm -- I studied science in college,

19   political science, but since then -- but since then I have

20   taken to reading Cosmology and so I've gotten a little bit

21   interested in science, and as long as it's not too

22   complicated like this I think it's kind of fun.  So I

23   appreciate it and I thought you did -- you both did an

24   excellent job of helping me understand.  So thank you very

25   much.

1          MR. DULIN:   Thank you.

2          MR. GETZOFF:   Thank you, Your Honor.

3          THE COURT:   Thank you.

4          THE CLERK:   All rise.

5

6          (Whereupon, the within hearing was then in

7    conclusion at 3:44 p.m.)

8

9          I certify that the foregoing is a correct

10   transcript, to the best of my knowledge and belief (pursuant

11   to the quality of the recording) from the record of

12   proceedings in the above-entitled matter.

13

14

15

16      /s/ Laurel Tubbs                    August 22, 2014

17   Signature of Transcriber               Date

18

19

20

21

22

23

24

25