IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 13-cv-01471-CMA-BNB

BRAIN SYNERGY INSTITUTE, LLC, d/b/a Carrick Brain Centers,

Plaintiff,

v.

ULTRATHERA TECHNOLOGIES, INC., and
KEVIN MAHER,

Defendants.

_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
REGARDING CLAIM CONSTRUCTION**

_____

The parties stipulated and requested that the district judge "designate Magistrate Judge

Boyd N. Boland to hear the parties' respective arguments on claim construction and to issue to

this Court [the district judge] his proposed findings of fact and recommendation for the

construction of the disputed terms of the '062 Patent." Stipulation [Doc. # 51] at p. 2.

Subsequently, the district judge entered a minute order referring the matter "for purposes of

conducting all proceedings relating to claims construction, including but not limited to a

*Markman* hearing." Minute Order [Doc. # 52].

**I.**

The law of the Federal Circuit guides courts on issues of claim construction. See

SunTiger, Inc. v. Scientific Research Funding Group, 189 F.3d 1327, 1333 (Fed. Cir. 1999).

That court has said that "[p]atent infringement is a two step inquiry. First, the court must

construe the asserted claim[s]. . . . Second, the court must determine whether the accused

product or process contains each limitation of the properly construed claims." Freedman Seating

Co. v. Am. Seating Co., 420 F.3d 1350, 1356-57 (Fed. Cir. 2005)(internal citations omitted).

The first step--claim construction--is a question of law for the court. Cybor Corp. v. FAS

Techs., Inc., 138 F.3d 1448, 1454 (Fed. Cir. 1998).

"[T]here is no magic formula or catechism for conducting claim construction." Phillips

v. AWH Corp., 415 F.3d 1303, 1324 (Fed. Cir. 2005).  However, the court in Phillips provided

guidance about claim construction, while making it clear that "[t]he sequence of steps used by

the judge in consulting various sources is not important; what matters is for the court to attach

the appropriate weight to be assigned to those sources in light of the statutes and policies that

inform patent law."  Id.

Claim construction begins with the "bedrock principle" that "the claims of the patent

define the invention to which the patentee is entitled the right to exclude."  Id. at 1312 (internal

quotation and citation omitted).  The words of the claims "are generally given their ordinary and

customary meaning," id., which is the "meaning that the term would have to a person of ordinary

skill in the art in question at the time of the invention."  Id. at 1314.  Generally, "[courts] indulge

a heavy presumption that a claim term carries its ordinary and customary meaning."  CCS

Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002)(internal quotation and

citations omitted).

When claim language "involves little more than the application of the widely accepted

meaning of commonly understood words," construction is relatively straightforward and the

"ordinary meaning . . . may be readily apparent even to lay judges."  Phillips, 415 F.3d at 1314.

However, when the claim terms have a particular meaning in the field, courts "look[]to those

2

sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." Id. (internal quotation and citation omitted). Those sources include the "words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." Id.

Claim terms are not read in a vacuum. Id. at 1313. The context in which a term is used can be valuable and instructive. Id. at 1314. In addition, the patent specification--the text and figures of the patent that precede the claims--"is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." Id. at 1315. However, the "claim requirement presupposes that a patent applicant defines his invention in the claims, not the specification." Johnson & Johnson Assocs., Inc. v. R.E. Serv. Co., Inc., 285 F.3d 1046, 1052 (Fed. Cir. 2002).

Courts may consult extrinsic evidence such as "expert and inventor testimony, dictionaries, and learned treatises." Phillips, 415 F.3d at 1317. However, extrinsic evidence is "less significant than the intrinsic record," id., and courts must be wary not to use extrinsic evidence to override the meaning of the claim terms demonstrated by the intrinsic evidence. Id. at 1318-19. "[E]xtrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." Id. at 1319. "In sum, a court's basic role is to construe the claim terms as they would be viewed by 'the ordinary artisan after reading the entire patent.'" Two Moms and a Toy, LLC v. Int'l Playthings, LLC, 2012 WL 5249524 *3 (D. Colo. Oct. 24, 2012)(quoting Phillips, 415 F.3d at 1321).

3

## II.

At issue here is the '062 Patent by Epley.  According to the Abstract, the patent concerns:

> A comprehensive vertigo management system and methodology . . . which employs a spatial maneuvering device, preferably under computer control, to orient a subject selectively differently in space, thus to create vestibular activity which is directly related to spatial motion (including acceleration) and/or orientation.  Data is collected relating to such orientation and activity, along with certain subject-introduced reaction data in certain instances and video-camera data, and fed to a computer which cooperates in presenting an intuitive visual and pictorial correlation that enables physician diagnosis, treatment and rehabilitation regarding elements of dysfunction of the subject's vestibular system.

Ex. A,  [Doc. # 54-1] at p. 1.  In simpler terms, the invention consists of:

> [A] computer-controlled, rotating chair [which produces] carefully controlled rotations and movements along multiple axes, which subjects the patient to different motions and positions, thereby stimulating the patient's vestibular system.  Data is collected relating to the patient's spatial orientation and vestibular response, which enables a physician to diagnose, treat, and rehabilitate elements of the patient's vestibular system.

Plaintiff's Opening Claim Construction Brief [Doc. # 50] (the "Opening Brief") at pp. 1-2.

The parties identified 15 claim terms that require construction.  Id. at pp. 2-4.  The terms are contained in Claims 2, 13, 14, and 16.[1]

Claim 2 describes:

> 2.  A method employable in relation to a chosen human subject, and during a period of position-related vestibular activity, for acquiring medically informative data, including computer-processible data, regarding the nature of a selected component of such activity, said method comprising

---

[1]The disputed claim terms are highlighted in bold in the quoted claims.

utilizing [1] **a sensor device which introduces a data-stream that relates to spatial orientation**, acquiring, during such a period, [2] **first-category data** which contains [3] **information that effectively describes the de facto pattern and current condition of the chosen subject's spatial orientation**,

additionally, during that same period, and employing [4] **another device which produces a data-stream** that related to subject behavior, acquiring [5] **second-category data** which contains information that effectively describes the pattern and current condition of at least one selected type of the chosen subject's outwardly expressed behavior which is linked to the selected component of vestibular activity, and

supplying the first and second acquired data categories to the [6] **data processing structure which includes an appropriate computer processor.**

Claim 13 describes:

13.  Apparatus usable in relation to a chosen human subject for acquiring medically informative data, including computer-processable data, regarding the nature of a selected component of position-related vestibular activity which exists during a pre-selected time period, said apparatus, comprising

chosen-subject manipulation structure for establishing different spatial orientations (positions) for a chosen subject,

[7] **first data-stream structure operatively associated with said manipulation structure**, operable, during [8] **the mentioned pre-selected time period**, to provide [9] **computer employable first-category data** which contains [10] **information that effectively describes the then de facto pattern and current state of the chosen subject's spatial orientation**, and

[11] **second data-stream structure operatively associated with the chosen subject**, operable, also during the mentioned pre-selected time period, to provide [12] **second-category data** which contains information that effectively describes the pattern and current state of at least one selected type of the chosen subject's outwardly expressed behavior which is linked to the selected component of vestibular activity.

5

Claim 14 describes:

> 14.  The apparatus of claim 13 which further comprises [13] **a computer processor operatively connected to said first and second data stream structures** operable to receive and process such first and second category data, and wherein said computer processor is operatively connected to, and [14] **capable of operating, said chosen subject manipulation structure through the use of control algorithm structure at least in part in relation to data received by the processor from said first and second data-stream structures**.

Finally, Claim 16 describes:

> 16.  The apparatus of claim 15 which further includes [15] **structure employable selectively to denormalize at least a portion of the chosen subject's sensory perception capabilities** as related to at least one of the two, specifically mentioned (a) and (b) categories of vestibular activity.

## III.

The first six terms to be construed are found in Claim 2:

## 1. "A Sensor Device Which Introduces a Data-Stream That Relates to Spatial Orientation"

The plaintiff proposes the following construction:

> [A] device that senses and produces data relating to disposition in three-dimensional space and/or dynamic movement in any direction or plane of motion.

Joint Claim Construction Statement [Doc. # 47-1] at p. 2.

The defendant, by contrast, proposes:

> [A]n accelerometer that moves orientationally with the subject and is connected by a communication line to a computer, and which produces a continuous flow of computer-processible data responsive to the subject's static disposition in three-dimensional space.

Id.

I agree with the plaintiff that the defendant's construction, which substitutes an accelerometer for a sensor device, "violates the cardinal rule of reading a limitation from the preferred embodiment into the claim." Plaintiff's Opening Brief [Doc. # 50] at p. 10. See SciMed Life Sys., Inc. v. Adv. Cardiovascular Sys., Inc., 242 F.3d 1337, 1340 (Fed. Cir. 2001)(stating that it is a "cardinal sin to import extraneous limitations from the specification into the claims); Conoco, Inc. v. Energy & Environmental Int'l, L.C., 460 F.3d 1349, 1357-58 (Fed. Cir. 2006)(stating that courts must avoid importing limitations disclosed in the preferred embodiment into broader patent claims"). The claim is not limited to an accelerometer and, instead, contains the broader description of a "sensor device." Nor does the specification require that the sensor device be an accelerometer. The specification indicates only that the sensor device may "[p]referably" take the form of an accelerometer, Ex. A [Doc. 54-1] at 10:9; or that an accelerometer is specified "[f]or example" and "in the system arrangement and setup now being described," id. at 11:4-5; or that the "appropriate sensors" may take a form "such as linear and angular accelerometers." Id. at 28:15-16.

The defendant's reliance on SciMed for a contrary result is unavailing. In the SciMed case, by contrast, the specification stated that the "intermediate sleeve structure defined above is the basic sleeve structure for *all embodiments of the present invention as contemplated and disclosed herein. . . .*" SciMed, 242 F.3d at 1343 (original emphasis). Based on this, which the Federal Circuit described as "[t]he most compelling portion of the specification," the court held that "[t]his language defines SciMed's invention in a way that excludes" any other construction. Id. No similar limiting language is found in the '062 Patent.

The defendant also relies on Microsoft Corp. v. Multi-Tech Systems, Inc., 357 F.3d 1340

(Fed. Cir. 2004).  There, the Summary of the Invention portion of the patent described the claimed communications system as "through" and "over" "a standard telephone line."  Id. at 1348.  In addition, the specification described "various preferred embodiments of the invention, in all of which the hardware components of the local system 'communicat[e] over a standard telephone line. . . .'"  Id.  Based on these facts, the Federal Circuit held:

> Those statements, some of which are found in the "Summary of the Invention" portion of the specification, are not limited to describing a preferred embodiment, but more broadly describe the overall inventions of all three patents. . . .

Id.  Again, no similar limiting language exists in the '062 patent.

Also disputed is the construction of "spatial orientation."  The plaintiff argues that the term means "in any direction or plane of motion,"[2] Joint Claim Construction Statement [Doc. # 47-1], while the defendant urges that it means the subject's "static disposition in three-dimensional space."  Id.

In this instance, the patentee acted as his own lexicographer.  The specifications state:

> Incidentally, where references are made herein to positions, positionings, orientations, and **spatial orientations**, those references are intended to involve either a subject's static disposition in three-dimensional space, and/or a subject's dynamic movement, in any direction or plane of motion, toward, through, and/or beyond one, or several, of such dispositions.

Ex. A [Doc. # 54-1] at 3:28-34 (emphasis added).  See Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc., 214 F.3d 1302, 1307 (Fed. Cir. 2000) (noting that a patentee may act as his

_____

[2]The plaintiff's counsel clarified during the claim construction hearing that the plaintiff does not intend to "carve out static"; "would be fine with adding static to the definition"; and that "the meaning of this . . . phrase that the inventor put in there to define spatial orientation is spatial orientation includes where are you in space . . . [b]ut it also includes motion."  Transcript of Proceedings, August 8, 2014 [Doc. # 63] ("Trans.") at p. 62 lines 12-24.

own lexicographer provided "the written description in such a case must clearly redefine a claim term so as to put a reasonable competitor or one reasonably skilled in the art on notice that the patentee intended to so redefine that claim term'").  The language used here--"where references are made herein . . . those references are intended to involve"-- expresses the inventor's clear intention for the claim term to take on the specified meaning.  Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) (holding that "[t]he specification acts as a dictionary when it expressly defines terms used in the claims").

I construe the term as follows: "A device that senses and produces data relating to a subject's static disposition in three-dimensional space and/or the subject's dynamic movement in any direction or plane of motion."

## 2.  "First-Category Data"

The plaintiff argues that no construction is necessary because the "phrase is defined within the claim."  Joint Claim Construction Statement [Doc. # 47-1] at p. 2.  The defendant proposes that the term be construed to mean "absolute positional data."  Id.

I agree with the plaintiff that the term "first-category data" is defined by the language which immediately follows it in the claim--"which contains information that effectively describes the de facto pattern and current condition of the chosen subject's spatial orientation."  Construction of this subsequent phrase eliminates the need to separately define "first-category data."

3. **"Information That Effectively Describes the De Facto Pattern and Current Condition of the Chosen Subject's Spatial Orientation"**

      The plaintiff proposes the following construction:

> [I]nformation that effectively describes the pattern and current condition of the subject's disposition in three-dimensional space and/or dynamic movement in any direction or plane of motion.

Joint Claim Construction Statement [Doc. # 47-1] at p. 2.

      The defendant, by contrast, proposes:

> [R]eal-time computer-processible information describing the subject's absolute pattern of dynamic movement and current static disposition in three-dimensional space.

Id.

      I reject the defendant's effort to insert the requirement that the information be "computer-processible" because to do so would import limitations from the specification into the broader claim language.  See Conoco, Inc., 460 F.3d at 1357-58.  It is true, and the plaintiff does not dispute, that Claim 2 ultimately requires that the "first and second acquired data categories" be supplied "to data processing structure which includes an appropriate computer processor."  Ex. A [Doc. # 54-1] at 29:13-15.  As plaintiff's counsel noted, however:

> So, sure, the data--the first and second-category data need to be computer processible. . . .  Are they going to come up--along and say oh, well, our sensor data isn't computer processible because it has to go through a conversion step before the computer can really make sense of it?  You know, is there something like that lying in the weeds that hasn't been brought to the table?  But on its own, yes, the last element requires the data to be both supplied to a computer processor.  That's a requirement.  That has to happen for infringement.

Trans. [Doc. # 63] at p. 106 lines 2-24.

      The defendant's proposed requirement for "real-time . . . information" is derived from the

specification.  In particular, the Background and Summary of the Invention reports that "[w]hat is needed . . . is a method of carrying out the indicated screening and definitive tests, that can be automated and programmed to carry out and report intuitively on all tests and positionings in exactly the same manner and with the same timing each time employed," Ex. A [Doc. # 54-1] at 3:22-27; "it is also very desireable [sic] to implement tests and positionings . . . in a setting . . . that can acquire data in a continuum throughout a procedure session," id. at 3:36-43; "the nystagmus patterns that subjects display in relation to introduced maneuvers are sometimes so complex that interpretation in real time is very difficult using present methods" because "the observing party's attention is divided and scattered, rather than being condensed to enable clearer interpretation focus," id. at 5:39-47; "nystagmus patterns that subjects may display in response to various maneuvers may be complex, and rapidly changing, and this may occur in situations where immediate interpretation is often required," id. at 6:14-18; "[i]t is difficult to replicate exactly or to standardize manual maneuvers," id. at 6:41-42; and "it would be advantageous to have an automated system capable of positioning subjects through 360° in all three degrees of angular freedom (pitch, roll and yaw), combined with a 3-D orientation and tracking system capable of simultaneously generating data regarding the actual orientation. . . ." Id. at 6:67 through 7:7.  To achieve these goals, the specification describes a preferred embodiment where "the attending physician, or other party conducting an examination or treatment can in a single glance at the screen observe the actual three-dimensional position of the subject as a whole in space, along with the condition of eye activity of the subject at the same moment in time," id. at 12:40-44; and "[v]ery specifically, it is a feature of the present invention to provide such visually correlative data which will give a system user an intuitive and quick

grasp of the specific vestibular behavioral situation which is underway in real time, and at any given moment, with respect to a subject whose vestibular system is being explored and/or treated." Id. at 14:29-34.

These references to "visually correlative data" observable in "real-time" are required in Claim 1 of the '062 patent, which claims a method for observing abnormal human vestibular activity by "creating a viewable, pre-computer-processed, and pictorially representational visual correlation . . . which simultaneously pictures current subject spatial orientation along with at least one visually observable motion component or current subject vestibular activity." Ex. A [Doc. # 54-1] at 28:44-60. No similar limitation is found in Claim 2, however, which expressly describes "supplying . . . first and second acquired data categories to data processing structure which includes an appropriate computer processor." Id. at 29:13-15. The computer processing of data requires time, although perhaps only a minute amount, and arguably is not available in real-time.

I previously construed "spatial orientation" to involve a subject's static disposition in three-dimensional space and/or the subject's dynamic movement in any direction or plane of motion.

I construe the term as follows: "Information that effectively describes a subject's pattern of dynamic movement in any direction or plane of motion and/or current static disposition in three-dimensional space."

### 4. "Another Device Which Produces a Data-Stream"

The plaintiff argues that "no construction is necessary" and the "claim phrase is straight forward and simple to understand." Opening Claim Construction Brief [Doc. # 50] at p. 13. The

defendant, by contrast, proposes the following construction:

> [A] device attached to the subject, other than the sensor, that is
> connected by a communication line to the computer producing a
> continuous flow of computer-processible data."

Joint Claim Construction Statement [Doc. # 47-1] at p. 2.

I agree with the plaintiff that the defendant's proposed construction improperly injects limitations from the specification into the claim.  In particular, there is no requirement in the claim that the device be "attached to the subject" or that it be "connected by a communication line to the computer producing a continuous flow of computer-processible data."  These are merely preferred embodiments.

In its Opening Claim Construction Brief [Doc. # 50] the defendant argued that the claim does not "require the device to exist separately from the previously described sensor."  Id. at 13. At the claim construction hearing, however, plaintiff's counsel conceded:

> [T]his particular phrase, another device which produces a data
> stream, . . . we agree it has to be a different device than the device
> that collected the first-category data.  I mean, the claim says
> another device.  So it can't be the same device that's collecting
> first-category data that's now collecting second-category data.

Trans. [Doc. # 63] at p. 87 lines 16-22.

I construe the term to mean "a device, other than the device that senses first-category data, which produces a data stream."

**5. "Second -Category Data"**

The plaintiff argues that no construction is necessary because the "phrase is defined within the claim."  Joint Claim Construction Statement [Doc. # 47-1] at p. 2.  The defendant proposes that the term be construed to mean "real-time computer-processible subject vestibular

response data relating to the first-category data." Id.

I agree with the plaintiff that the term "second-category data" is defined by the language which immediately follows it--"which contains information that effectively describes the pattern and current condition of at least one selected type of the chosen subject's outwardly expressed behavior which is linked to the selected component of vestibular activity." Ex. A [Doc. # 54-1] at 29:8-12.

For reasons stated earlier, I reject the defendant's effort to insert the requirement that the second-category data be "computer processible" because to do so would import limitations from the specification into the broader claim language. See Part III.3, supra.

Also as stated earlier, the requirement for "real-time . . . data" applies to Claim 1 but is not applicable to independent Claim 2. See id.

The term "second-category data" is defined by the language which immediately follows it--"which contains information that effectively describes the pattern and current condition of at least one selected type of the chosen subject's outwardly expressed behavior which is linked to the selected component of vestibular activity"--and needs no construction.

## 6. "Data Processing Structure Which Includes an Appropriate Computer Processor"

The plaintiff proposes the following construction: "a device with a computer processor capable of processing data." Joint Claim Construction Statement [Doc. # 47-1] at p. 2.

The defendant proposes instead:

> [A] computer containing an algorithm designed to output a real-time pre-computer-processed visual correlation that simultaneously provides (i) a pictorial representation of the subject's absolute pattern of dynamic movement and current static disposition in three-dimensional space and (ii) a pictorial representation of the pattern and current condition of the visually

14

observable component of the subject's vestibular activity.

Id. at pp. 2-3.

The defendant's complex definition finds no support in the claim language, attempts to borrow limitations from independent Claim 1 not found in Claim 2, and improperly imports limitations from the specification into the broader claim language.  Consequently, I adopt the plaintiff's construction.

The defendant points to the prosecution history and argues that in order to distinguish the '062 patent from Watt and other potentially invalidating pieces of prior art, "the inventor narrowed the invention to include a visual correlation on a display screen of both the first-category data and the second-category data," citing Shire Development, LLC v. Watson Pharmaceuticals, Inc., 746 F.3d 1326, 1330 (Fed. Cir. 2014), for the doctrine of prosecution disclaimer.  Defendant's Opening Brief [Doc. # 54] at pp. 25-26.  Shire requires, however, that "the doctrine of prosecution disclaimer only applies to unambiguous disavowals."  746 F.3d at 1330 (internal quotation and citations omitted).  The defendant overstates the scope of the inventor's concession.  Specifically, the prosecution history shows that the inventor distinguished Watt as "completely ignor[ing] the matter of spatial orientation.  Because of this, the Watt et al. system is simply incapable of producing the kind of data which applicant's claimed invention utilizes, wherein the following of a subject's spatial orientation is important."  Ex. D [Doc. # 54-4] at pp. 16-17.  The prosecution history does not support the argument that Claim 2 requires a visual correlation on a display screen of first and second-category data.

And, contrary to the defendant's argument, Defendant's Opening Brief [Doc. # 54] at pp. 26-27, the Notice of Allowability [Doc. # 54-3] does not require, in connection with Claim 2,

that the invention include a visual correlation on a display screen.  To the contrary, the Notice of

Allowability distinguishes Ledley, with respect to Claim 2, because Ledley fails to require

"information that effectively describes the pattern and current condition of at least one selected

type of the chosen subject's outwardly expressed behavior which is linked to the selected

component of vestibular activity."  The examiner noted only:

> Prior art, in particular, Ledley et al (4,474,186) discloses the
> measurement of the eye activity of a person undergoing a test in a
> spinning chair, but fail to disclose acquiring data that also
> describes the current condition or state of the subject's outwardly
> expressed behavior which is linked to the selected component of
> vestibular activity.

Notice of Allowability [Doc. # 54-3] at p. 2.

Finally, the defendant argues that the claim term should be construed to require "a

computer containing an algorithm designed to output a real time **pre-computer processed**

**visual correlation**. . . ."  Joint Claim Construction Statement [Doc. # 47-1 at p. 2 (emphasis

added).  In support, the defendant argues:

> Claim 2 recites a method for acquiring medically informative
> "computer-processible data" regarding the nature of a selected
> component of position-related vestibular activity.  Because the
> data acquired through the method of Claim 2 is "computer
> processible" (*i.e.*, capable of being processed), such data is "pre-
> computer processed."  Claim 2 further recites that this data is
> supplied to a "data processing structure which includes an
> appropriate computer processor."  As described in the
> specification, this information is "supplied to, and are processable
> by, appropriate control algorithm structure(s) in the computer."
> Thus, the pre-computer processed data is provided to the data
> processing structure for processing.  It is therefore inherent that the
> data obtained in Claim 2 is pre-computer processed, and is
> appropriately included in this definition.

Claim 1 of the '062 patent claims a method for observing abnormal human vestibular

16

activity by "creating a viewable, pre-computer-processed, and pictorially representational visual correlation . . . which simultaneously pictures current subject spatial orientation along with at least one visually observable motion component or current subject vestibular activity."  Ex. A [Doc. # 54-1] at 28:44-60.  Claim 2, which is an independent claim, contains no such limitations. In particular, nothing in Claim 2 speaks to "a viewable, pre-computer-processed" pictorial representation.

I agree with the plaintiff that the defendant's attempt to carry limitations from Claim 1 to Claim 2 violates the doctrine of claim differentiation.  Nystrom v. TREX Co., Inc., 424 F.3d 1136, 1143 (Fed. Cir. 2005)(noting that "[w]hen different words or phrases are used in separate claims, a difference in meaning is presumed").

Terms seven through twelve to be construed are found in Claim 13:

**7. "First Data-Stream Structure Operatively Associated With Said Manipulation Structure"**

The plaintiff proposes that the term be construed as a "structure for generating first category data-streams."  Joint Claim Construction Statement [Doc. # 47-1] at p. 3.

The defendant proposes:

> [A]n accelerometer producing a continuous flow of computer-processible data that moves orientationally with the subject and is connected by a communication line to a computer.

Id.

I agree with the plaintiff that the defendant's additions of an "accelerometer," instead of a "structure," and "connected by a communication line to a computer" impermissibly import limitations from the preferred embodiment into the claim.  Conoco, Inc., 460 F.3d 1357-58.  In addition, the requirement that the accelerometer "moves orientationally with the subject" finds

no support in the specification or otherwise.

As the defendant noted during the claim construction hearing, however, in discussing the

plaintiff's proposed construction:

> But where did the operatively associated with manipulation
> structure go?  It kind of just dropped off of theirs.  So even if--even
> if you want to adopt theirs it really modifies what this is in a way
> that's impermissible per the language of the claim not even
> looking at anything else.

Trans. [Doc. # 63] at p. 135 lines 1-6.

Similarly, plaintiff's counsel acknowledged:

> [T]his particular claim element either needs no construction or the
> straightforward construction like we did is fine.  You know,
> frankly, Your Honor, I'm not going to argue strenuously for our
> construction as a replacement for the language that's in the claim
> already.  I think it's fairly clear on its--on its face.

Id. at p. 128 lines 3-9.

I agree that the plaintiff's proposed construction fails to include the requirement of

"operatively associated with said manipulation structure,"[3] but I also agree that the entire claim

term is readily understood by a person of ordinary skill in the art and requires no construction.

See Brown v. 3M, 265 F.3d 1349, 1352 (Fed. Cir. 2001)(stating that words which "are not

technical terms of art . . . do not require elaborate interpretation"); Two Moms and a Toy, 2012

WL 5249524 at *5 (D. Colo. Oct. 24, 2012)(finding that no claim construction is necessary

because "the construction is obvious from each claim").  Accordingly, I find no need to construe

this term.

---

[3]Plaintiff's counsel conceded this during the claim construction hearing.  Trans. [Doc. #
63] at p. 145 lines 1-14.

**8. "The Mentioned Pre-Selected Time Period"**

The defendant requests that the term be construed as "the pre-selected time period for acquiring medically informative data regarding the nature of a selected component of position-related vestibular activity."  Joint Claim Construction Statement [Doc. # 47-1] at p. 3.  Plaintiff's counsel expressed no opposition to the defendant's construction at the claim construction hearing, Trans. [Doc. # 63] at p. 129 line 24 through p. 130 line 10, and I adopt the defendant's proposed construction.

**9. "Computer Employable First-Category Data**

The plaintiff argues that no construction is necessary because "the phrase is defined within the claim."  Joint Claim Construction Statement [Doc. # 47-1] at p. 3.  The defendant urges that the term be construed as "computer employable absolute positional data."  Id.

I agree with the plaintiff that the term "first-category data" is defined by the language which immediately follows it in the claim--"which contains information that effectively describes the then de facto pattern and current state of the chosen subject's spatial orientation."  Construction of this subsequent phrase eliminates the need to separately define "first-category data."  I also agree with the plaintiff that the term "computer employable" is readily understood by a person of ordinary skill in the art and requires no construction.  See Brown, 265 F.3d at 1352; Two Moms and a Toy, 2012 WL 5249524 at *5.

**10. "Information That Effectively Describes the Then De Facto Pattern and Current State of the Chosen Subject's Spatial Orientation"**

The plaintiff proposes the following construction:

> [I]nformation that effectively describes the pattern and current condition of the chosen subject's disposition in three dimensional space and/or dynamic movement in any direction or plane of motion.

Joint Claim Construction Statement [Doc. # 47-1] at p. 3.

The defendant, by contrast, proposes:

> [R]eal-time computer-processable information describing the subject's absolute pattern of dynamic movement and current static disposition in three-dimensional space.

Id.

Claim 2 contained analogous language, which I have construed.  For the reasons stated in connection with construing the analogous term, I construe this claim language as "information that effectively describes a subject's pattern of dynamic movement in any direction or plane of motion and/or current static disposition in three-dimensional space."  See Part III.4, supra.

**11. Second Data-Stream Structure Operatively Associated With the Chosen Subject"**

The plaintiff proposes that the term be construed as a "[s]tructure for generating second category data streams."  Joint Claim Construction Statement [Doc. # 47-1] at p. 3.

The defendant proposes:

> [A] device producing continuous a flow of computer-processable data that is attached to the subject and connected by a communication line to the same computer receiving the first category data.

Id.

Previously, I found that an analogous term concerning the "first data-stream" is readily

understood by a person of ordinary skill in the art and requires no construction.  See Part III.7,

supra.  For the same reasons, I find that no construction of this claim term is necessary.

**12.  "Second-Category Data"**

As I have done before, I find that the term "second-category data" is defined by the

language which immediately follows it--"which contains information that effectively describes

the pattern and current state of at least one selected type of the chosen subject's outwardly

expressed behavior which is linked to the selected component of vestibular activity"--and

requires no construction.  See Part III.2; Part III.5; and Part III.9, supra.

Terms thirteen and fourteen to be construed are found in Claim 14:

**13.  "[A] Computer Processor Operatively Connected to Said First and Second Data Stream Structures"**

The plaintiff proposes the following construction:

> [A] computer processor operatively connected to the structure for
> generating first electronic data streams and structure for generating
> second electronic data streams.

Joint Claim Construction Statement [Doc. # 47-1] at p. 3.

The defendant proposes:

> [A] computer operatively connected to said first and second data
> stream structures containing an algorithm designed to output a
> realtime visual correlation that simultaneously provides (i) a
> pictorial representation of the subject's absolute pattern of
> dynamic movement and current static disposition in three-
> dimensional space and (ii) a pictorial representation of the pattern
> and current condition of the visually observable component of the
> subject's current vestibular activity.

Id.

A similar dispute arose in connection with a term contained in Claim 2.  See Part III.6,

supra.  Here, as there, I find that the defendant's construction is not supported by the

specification, attempts to borrow limitations from independent Claim 1 not found in Claim 14,

and improperly imports limitations from the specification into the broader claim language.

Consequently, I adopt the plaintiff's construction.

## 14.  "Capable of Operating, Said Chosen Subject Manipulation Structure Through the Use of Control Algorithm Structure At Least In Part In Relation to Data Received By the Processor From Said First and Second Data-Stream Structures"

The parties have stipulated that this term should be construed as follows: "The same

computer also contains an algorithm to allow the manipulation structure to be controlled at least

in part in relation to the receipt of the first-category data and second-category data."  Trans.

[Doc. # 63] at p. 147 lines 6-10 and p. 148 lines 3-10.  I accept the stipulated construction.

The fifteenth term to be construed is found in Claim 16:

## 15.  "Structure Employable Selectively to Denormalize At Least a Portion of the Chosen Subject's Sensory Perception Capabilities"

The parties have stipulated that this term should be construed as follows: "Structure that

can selectively apply conditions to alter the subject's sensory perception capabilities."  Id. at p.

148 lines 12-19.  I accept the stipulated construction.

**IV.**

I respectfully RECOMMEND that the claim terms be construed as stated above.[4]

Dated December 5, 2014.

BY THE COURT:

 s/ Boyd N. Boland
United States Magistrate Judge

---

[4]Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have 14 days after service of this recommendation to serve and file specific, written objections.   A party's failure to serve and file specific, written objections waives *de novo* review of the recommendation by the district judge, Fed. R. Civ. P. 72(b); Thomas v. Arn, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions.  Makin v. Colorado Dept. of Corrections, 183 F.3d 1205, 1210 (10th Cir. 1999); Talley v. Hesse, 91 F.3d 1411, 1412-13 (10th Cir. 1996).  A party's objections to this recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review.  United States v. One Parcel of Real Property, 73 F.3d 1057, 1060 (10th Cir. 1996).