1               IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLORADO

3   Case No. 13-cv-01471-CMA-BNB

4   _____

5   BRAIN SYNERGY INSTITUTE, LLC,

6       Plaintiff,

7   vs.

8   ULTRATHERA TECHNOLOGIES, INC., KEVIN MAHER,

9       Defendants.

10  _____

11        Proceedings before BOYD N. BOLAND, United States

12  Magistrate Judge, United States District Court for the

13  District of Colorado, commencing at 10:33 a.m., December 9,

14  2014, in the United States Courthouse, Denver, Colorado.

15  _____

16        WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

17  ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

18  _____

19               APPEARANCES

20        MHER HARTOONIAN, Attorney at Law, appearing for

21  the plaintiff.

22        MICHAEL P. DULIN, Attorney at Law, appearing for

23  the defendants.

24  _____

25              MOTION HEARING

P R O C E E D I N G S

1

2          (Whereupon, the within electronically recorded

3     proceedings are herein transcribed, pursuant to order of

4     counsel.)

5               THE CLERK:  All rise.  Court is in session.

6               THE COURT:  Thank you.  Please be seated.  We're

7     here this morning in case 13-cv-1471, Brain Synergy Institute

8     against UltraThera Technologies on the defendants' motion to

9     compel discovery.  May I have appearances, please, for the

10    plaintiff?

11              MR. HARTOONIAN:  Good morning, Your Honor.  Mher

12    Hartoonian for Brain Synergy.

13              THE COURT:  Thank you.

14              MR. DULIN:  Good morning, Your Honor.  Michael

15    Dulin on behalf of UltraThera Technologies and Kevin Maher.

16              THE COURT:  Thank you.  I've been through the

17    motion and the response.  Mr. Dulin, I'll let you group the

18    matters in dispute as you see fit, but once you group them

19    make your argument on that group, then I'll allow

20    Mr. Hartoonian to make a response and I'll allow you to

21    reply, then I'll rule on that group and then we can move to

22    the next group if that makes sense to you.

23              MR. DULIN:  It does, Your Honor.

24              THE COURT:  All right.  Mr. Dulin.

25              MR. DULIN:  If I may suggest, Your Honor, I'd like

1     to just make a general statement that would apply to the

2     entire realm of documents that we're asking for just to kind

3     of give some general background if that would be helpful.

4             THE COURT:  Sure.

5             MR. DULIN:  And I won't bore you with reciting

6     case law and so forth.  I think that's certainly well

7     articulated in our briefs, but I will say that since we filed

8     this brief plaintiffs and I have had numerous conversations.

9     We've gone back and forth, of course, on it, some of which

10    was attached to the briefing, some of it occurred after we

11    filed that briefing, and we have made some progress.  Since

12    the time of filing this motion -- prior to the time of filing

13    the motion there was some supplementation.  After filing this

14    motion the plaintiffs have supplemented their responses six

15    -- five times -- four times, rather, four new productions of

16    documents.  And I understand there's a fifth one coming.  And

17    I think that's important.  It shows that this motion, in

18    fact, was necessary.  And the documents that we're seeking

19    are important documents and they're important to the case at

20    issue.  There are I think some methodologies we've talked

21    about in order to produce -- or for us to work together to

22    help the plaintiffs produce even more documents.  And I'll

23    get into that a little bit when we get into the specific

24    requests.

25             I'll say in general though there's a couple of

1    sort of categories of documents and information that we're

2    looking for, one of which relates to things like -- and I'll

3    go into the specifics, but things that relate to damages and

4    our general theory of this case.

5          A couple of years ago Brain Synergy Institute

6    contacted our client, Kevin Maher, and talked about acquiring

7    his company and they talked about an acquisition, and -- and

8    then going into last year they had discussions and ultimately

9    those discussions fell by the way side.  But soon thereafter

10   there was -- a patent was acquired by BSI and then there was

11   a lawsuit that was filed.  And we believe that BSI did not

12   practice the -- this technology in any way, shape or form

13   prior to the time that they acquired the Epley patent.  But

14   they acquired the Epley patent because talks of acquiring our

15   client fell apart and they bought it for the purpose of suing

16   UltraThera and not for the purposes of -- of any other

17   reason.  And I think that's an important background and

18   something important to consider here because there's a number

19   of things that they've alleged in this case, one of which is

20   that they're entitled to an injunction.  And according to the

21   ebay v. Mercexchange case which is at 547 US 388, they have

22   to show, among other things, irreparable injury.  And in

23   their Complaint they have discussed that and they've talked

24   about the fact that they've received a negative impact to

25   their competitive position.  They've incurred a loss of

1    exclusivity.  They've experienced price erosion.  They have a

2    loss of business opportunity.  The problem is is that they

3    acquired a patent when they didn't do anything and then they

4    bought the patent.  They sued my clients.  And then they

5    started to build a business from nothing.  And we believe

6    that that business now is flourishing and that they project

7    in the future that it will -- that it will flourish even

8    more.  They have filed three --

9            THE COURT:  Let me -- let me -- let me stop you

10   there.  That doesn't matter, does it?  If you infringe the

11   patent isn't that irreparable harm because a patentee always

12   has the right to stop someone from -- from practicing the

13   patent.

14           MR. DULIN:  No.  That's not true.

15           THE COURT:  Okay.

16           MR. DULIN:  I don't believe that's true.  And I

17   think that the ebay case -- somebody argued that that was

18   true in the ebay case and that the Court said no.  If you

19   have a finding of infringement that finding is not sufficient

20   for an injunction, rather, there's factors that have to be

21   taken into consideration.  One is the market impact of the

22   infringement to the plaintiff.  Another is the practice of

23   the invention by the patent holder.  Another is the business

24   importance of the invention to the patent holder.  So in this

25   case we have somebody --

1          THE COURT:   Let me -- let me interrupt you one

2     more time just to make sure I understand.   At one time I'm

3     pretty sure the law was that a patent holder could prevent

4     the practice of his or her or its patent even if that meant

5     no one was in the market.   If I invented a corkscrew, but I

6     was a prohibitionist I could say nobody gets to practice the

7     patent of my corkscrew in (inaudible) and that was the end of

8     the story.   It didn't matter whether there was monetary

9     damages available or not.   I could stop the practice of my

10    patent.   Am I -- am I historically wrong?   And then if I'm

11    not historically wrong, am I wrong as we sit here today?

12          MR. DULIN:   Well, I think that historically there

13    was -- you know, certainly that's something that Courts

14    believed.   I think that in 2006 the ebay case changed that so

15    you don't automatically get an injunction.   You have to show

16    something beyond just the infringement.   There is -- there

17    was actually an analysis that relates specifically to getting

18    an injunction that's apart and separate from just a finding

19    of infringement.   So if you fail to meet that test or if you

20    fail to qualify for an injunction then three years later you

21    can sue them for the infringing that occurs after that.   But

22    there is certainly additional requirements.   And in this case

23    the plaintiffs recognized that and they've pled and they've

24    made allegations in their Complaint which we want to debunk.

25    And those allegations, as I just mention, include the

1    negative impact to their competitive position, their loss of

2    exclusivity, the price erosion, and the loss of business

3    opportunity.  These are things that they're going to talk

4    about.  They've talked about it in their Complaint and I

5    anticipate they'll talk about it in response to motions and

6    potentially in front of a jury, but yet I can't debunk those

7    theories and those allegations because I don't have

8    information sufficient to do so.

9         THE COURT:  One of the arguments -- I'm -- maybe

10   I'm jumping too far in front, but one of the arguments is

11   okay, you get the information -- well, maybe you get the

12   information about the '062 patent and that part of our

13   business, but we have other parts of our business that don't

14   have anything to do with this patent and you shouldn't get

15   that.

16        MR. DULIN:  Yeah.  Again, this is a company that

17   was created I believe for the commercialization of this

18   patent and to create a brain -- a brain therapy institute,

19   for lack of a better -- I'm sure Mr. Hartoonian could put

20   that a little bit more articulately, but they provide

21   services to people who have certain brain injuries.  We

22   talked about those during the Markman hearing.  And so a big

23   way of doing that is using these machines.  And I think these

24   machines are going all the time.  They're providing

25   therapeutic benefit for that and that's it.  We're not

```
 1     talking about a company with all kinds of different
 2     divisions, all kinds of different products, you know,
 3     subsidiaries, you know, different business units.  That's not
 4     the situation here.  We have a company who's generating
 5     revenue.  Now, some of this revenue may come from therapies
 6     that don't use this device.  It's possible.  And certainly if
 7     you look online and if you look at the things that they
 8     promote, this multiaxial rotational device is a big selling
 9     point and they probably get customers because of that.  And
10     certainly that's something -- and I'd like to just walk
11     through some of the other aspects of information on damages,
12     but that's something to consider.  That's something that
13     provides us with an opportunity to explore what other sales
14     are they making potentially because of this?  So there is
15     this irreparable harm matter.  There are allegations specific
16     in the Complaint that relate to that, but there's other
17     aspects of damages that we want to explore, too.  There's
18     potentially lost profits.  There's potentially no less than a
19     reasonable royalty under Section 284.
20             So if we look at lost profits one thing we want to
21     look at is what the demand is for this product.  And are
22     there any -- what is the manufacturing and marketing capacity
23     to exploit the demand of this product, the capacity of the
24     plaintiffs?  What is the amount of profit that the patent
25     holder would have made absent an infringing conduct?  And
```

1       these are the Panduit v. Stahlin Brothers factors, 575 F.2d

2       1152, and that's a Sixth Circuit case.  So a lot of this

3       information goes to determining what is their profit?  What

4       is their marketing and manufacturing capabilities?  What is

5       the demand for that patented product?

6            The other thing that we can look at is the Georgia

7       Pacific factors.  This is for reasonable royalty.  This is

8       the baseline damages.  And I'm sure you're familiar with what

9       those factors are, but there are some here that in particular

10      I'd like to be able to explore but can't because information

11      hasn't been provided, and that relates to this hypothetical

12      negotiation at the time of the first alleged infringement.

13      And certainly some of our requests go to when was that, you

14      know, alleged first infringement or when did you know about

15      it?

16           But, anyway, some of that information relates to

17      royalties received for licensing.  We received an affidavit

18      from an executive of BSI that said that they didn't have any

19      evidence of royalties with other accused infringers, but that

20      doesn't leave out the possibility that there could be other

21      discussions or actual licensing agreements that relate to

22      royalties to people who wanted it for other reasons other

23      than just having been accused of patent infringement.

24      There's the commercial relationships between a licensor and

25      licensee.  That's an interesting one in this case because the

1     licensee and the -- or the, you know, the hypothetical

2     licensee and the hypothetical licensor, or the plaintiff and

3     the defendant, had talked about a business relationship.  And

4     certainly there were documents produced in the way of draft

5     agreements and so forth relating to this business agreement

6     that went right up close to the time when this case was filed

7     and then they dropped off, and then there was evidence of

8     another acquisition and that was of the Epley patent.  Then

9     this case was filed.  And while we have draft documents and

10    while we have e-mails that we may have exchanged with BSI,

11    what we don't know is what was happening on the other side,

12    what the communications were within the company and from the

13    company to those on the outside.  Now, when I talk about

14    communications in this case -- and a lot of the things that

15    I'm talking about are things that plaintiff doesn't object to

16    producing, but yet they haven't seen.  And I had a

17    conversation yet again with the plaintiff's counsel yesterday

18    and we talked about ways we could come up with common search

19    terms and do things to work together to try to find those

20    e-mails and to produce them, but we can get into that when we

21    get to the specifics.

22          Other things that are relevant to this

23    hypothetical negotiation are the established profitability of

24    the patented product, its commercial success, its current

25    popularity, the advantages of the patented invention over

1     previous products, the nature of the patented invention, the

2     portion of realized profit that should be credited to the

3     invention as distinguished from other factors such as factors

4     that are affected by that patent.  And so these are things

5     that I think can be broken up into a set of documents that

6     would fall into manufacturing capacity, sales, the finances,

7     the products.  And if we're able to explore those and

8     understand it would help build our theory and our defense

9     that these guys really didn't have a plan.  They acquired

10    this patent to sue us.  After they acquired the patent they

11    started to build the business.  And then when they started to

12    build that business it was really successful.  And they

13    haven't been irreparably harmed by the -- by the alleged

14    infringement of our client.

15          I think if we want to jump into the specific

16    requests this would be an appropriate time to do so.

17          THE COURT:  Okay.

18          MR. DULIN:  I think the first grouping that would

19    make sense is document request 1 through 5, 7 through 10, and

20    we could probably put 32 in there, too.  And really what

21    these relate to is information relating to the conception,

22    purpose, reduction to practice, design, development,

23    prototyping, testing, evaluation or prior public use of the

24    '062 patent.

25          We've gone back and forth a lot and plaintiff's

```
 1      counsel has represented to me that they -- they didn't
 2      prosecute this patent.  They didn't -- they merely acquired
 3      it.  And I think during the time when they were -- it would
 4      seem to me intuitively that if you spent over $2 million to
 5      acquire a patent that you would do due diligence.  You would
 6      look for prior art.  You would do things to test the patent
 7      when -- and research these things, however, plaintiff's
 8      counsel has told me those documents don't exist.  To the
 9      extent that these documents don't exist and they aren't
10      within the control of their client then I can't compel them
11      to produce those or I can't ask you to produce those -- to
12      compel them.  So I have to rely on their word that they have
13      no responsive documents and I think that's supported by the
14      affidavit of their executive.  And so if they're willing to
15      make that representation then I don't think that needs to be
16      part of this order.
17              THE COURT:  Let's hear from Mr. Hartoonian on that
18      one and then we can move on.
19              MR. DULIN:  Okay.
20              THE COURT:  If you're ready, unless you have more
21      on that.
22              MR. DULIN:  I'm sorry?
23              THE COURT:  Unless you have more on that.
24              MR. DULIN:  No.  And, again, I don't think those
25      are things that plaintiff is -- in fact, all of these
```

```
 1    documents I don't think plaintiff is saying we're not going
 2    to give you.  They've made standard objections, but they
 3    haven't objected to giving it with an exception of certain
 4    financial documents and -- and there are some documents where
 5    they say we are not producing it which I think they
 6    articulated in their brief.  Okay.  Document request Number
 7    13 --
 8            THE COURT:  Well, do you want -- do you want --
 9    let me hear from Mr. Hartoonian to make sure that there's
10    nothing about 1 through 5, 7 through 10 or 32.  So --
11            MR. HARTOONIAN:  Thank you, Your Honor.
12            THE COURT:  -- you have no responsive documents?
13            MR. HARTOONIAN:  We don't.  If I may, can I also
14    give just a little bit of an introduction on the background?
15    I think it's important to keep in mind what this case is
16    really about.  And Brain Synergy owns the '062 patent which
17    we're asserting against the defendants.  At trial the issue
18    will be whether their accused Gyro -- GyroStim product meets
19    all of the limitations of the asserted patent claims.
20    Defense -- that defendants have also argued that the '062
21    patent is invalid, so that's another question that will have
22    to be answered.
23            Keeping in mind those issues and looking at
24    defendants' complaints about our discovery responses, a lot
25    of what they're asking for has nothing to do with the case,
```

1    and the discovery requests that are pertinent to the case

2    we've answered.  We've looked for documents.  We've collected

3    those documents and we produced the ones that are responsive.

4    We have produced nearly 6,000 pages of documents so far over

5    the past six months which is actually more than the

6    defendants produced and it's their product that's at issue.

7    We've produced generally documents on development and

8    commercialization including lots of technical documents

9    describing how our product works, marketing documents,

10   business and strategy documents.  We've collected a few

11   hundred e-mails from a number of custodians at BSI.

12          I'd like to just briefly touch on e-mails.  As is

13   customary in patent cases, we can't look at every single

14   e-mail that our client has ever sent within the company so we

15   use search terms, targeted search terms that will hopefully

16   bring back the responsive documents.  And as defendants'

17   counsel alluded to, yesterday we had a conversation and I

18   explained that we used a number of search terms to get back

19   responsive documents.  In addition, we're open to having a

20   conversation about potentially using additional search terms

21   to find other responsive documents provided that those search

22   terms are targeted and likely to bring back responsive

23   documents.  Some of the search terms we've used include Epley

24   which is the inventor on the patent, UltraThera, Marr

25   (phonetics), Besticon (phonetics), GyroStim, patent,

 1     intellectual property, lawsuit, infringe.  These are actually

 2     quite broad.  When we got back a couple thousand e-mails we

 3     reviewed those e-mails and provided what was responsive to

 4     Mr. Dulin.  And like I said, we're happy to entertain

 5     additional search terms so long as they're targeted.

 6           With respect to commercialization which Mr. Dulin

 7     touched upon in his opening, we have produced documents that

 8     show how we're commercializing our product, technical

 9     documents describing how our product is made.  As far as

10     communications within BSI between employees talking about

11     commercialization, we think our search terms would have

12     captured those.  But setting that aside I don't see how

13     conversations within BSI among employees talking about

14     commercialization, how those communications are relevant to

15     the infringement issues or the validity issues.  On the other

16     hand, communications within defendants' company talking about

17     our patent, their commercialization, those types of things go

18     to notice of the patent and willful infringement.  So I

19     really don't see what those internal e-mails have anything to

20     do with the issues in the case.

21           As far as financial information which Mr. Dulin

22     talked about, we think that arguably our financial

23     information is relevant so long as it's directed to patient

24     treatment.  We run a business where patients come in.  They

25     pay for services.  At times those treatments include using a

1    device which is covered by the '062 patent.  Sometimes those

2    treatments do not include using that device.  But having to

3    produce company wide financial statements that show investor

4    information, capital contributions, bank information, our

5    liabilities, our debt, our benefit programs for our

6    employees, their salaries, travel expenses, all those things

7    that companies put down on their balance sheets and income

8    statements, as the patentee I don't see how any of that is

9    relevant.  And we're willing to produce patient treatment

10   financial information which will show how many patients are

11   being treated, how much revenue that is generating, but aside

12   from that financial information that does not have anything

13   to do with the actual product that practices the '062 patent

14   I think is irrelevant.  BSI does generate revenue on a few

15   other minor things such as laboratory tests.  When a patient

16   comes in there may be labs.  There may be supplements they're

17   given.  Again, those are on our income statements and we

18   don't think that defendants are entitled to that information.

19   It just has nothing to do with damages.

20        Now, going to the first grouping which is requests

21   Numbers 1 through 5, 7 through 10, and 32, I agree with

22   Mr. Dulin here.  We have provided an affidavit from an

23   executive in response to the motion to compel where that

24   executive swears that they did not receive any documents when

25   acquiring this patent which relate to conception, reduction

1     to practice, all of that.  We have the patent.  We have

2     produced the agreement relating to the purchase.  Other than

3     that we don't have anything.  And an executive has sworn to

4     that.

5          As far as due diligence in acquiring that patent,

6     we have provided a privilege log which shows communications

7     among the attorneys and BSI.  An opinion was, of course,

8     rendered on the patent before it was purchased, but we're not

9     going to waive that privilege and we intend to supplement our

10    privilege log shortly to include some other communications

11    talking about due diligence.  But as far as responsive

12    non-privileged documents on these first group of topics,

13    we've provided what we have.

14          THE COURT:  Sometimes in an agreement like the one

15    that you probably entered into to acquire this patent the

16    seller is required to make all his files available on the

17    request of the purchaser as may be necessary in connection

18    with litigation.  Is there such a provision in your contract?

19          MR. HARTOONIAN:  I would have to look at the

20    contract, Your Honor, but I'm not aware of any documents that

21    were provided to our client other than the patent, the

22    agreement, the publicly available filed history of the patent

23    which we provided to defendants.  We did not receive anything

24    else.

25          THE COURT:  I understand that, but documents in

1    the possession, custody or control of Epley which you may

2    demand are in your possession, custody or control and so

3    Mr. Dulin would not be required to go to Epley by Rule 30(b)

4    -- by Rule 45, subpoena to produce.  That's the point I'm

5    trying to get at.

6              MR. HARTOONIAN:  Understood, Your Honor.  I would

7    say that we do not have control over Epley because Epley is a

8    third-party we purchased the patent from.  So we don't have

9    the ability to force Epley to provide these documents that

10   Mr. Dulin is asking for.

11             THE COURT:  Have you provided to Mr. Dulin the

12   contract by which Brain Synergy purchased the patent?

13             MR. HARTOONIAN:  Yes.  Thank you.

14             THE COURT:  Thank you.  Anything more on 1 through

15   5, 7 through 10, and 32?

16             MR. DULIN:  No, Your Honor.

17             THE COURT:  Have you seen the patent under your

18   review of -- I'm sorry.  Have you seen the purchase agreement

19   under your review of the purchase agreement?  Are you

20   satisfied that Brain Synergy is not in the possession,

21   custody or control of the documents that Epley is in the

22   possession, custody or control of?

23             MR. DULIN:  No, Your Honor.  I don't have

24   information to verify that other than the representations of

25   counsel.

1           THE COURT:  Well, you have the contract by which

2       the patent was purchased.

3           MR. DULIN:  Yeah.  And I think I understood your

4       argument that if the contract specifically provides that they

5       can ask for information then it may be within the realm of

6       what would be within their control or custody.

7           THE COURT:  And this contract doesn't have such a

8       provision?

9           MR. DULIN:  I don't know if it does or not.  I do

10      have the contract with me here in a binder if you -- and we

11      can certainly pull that out.  In fact, I have all the

12      documents that were produced with an exception of some

13      technical drawings and photographs.

14          THE COURT:  Well, if you want to look you can,

15      otherwise I'm prepared to rule.

16          MR. DULIN:  All right.

17          THE COURT:  Do you want to look before I do?

18          MR. DULIN:  Yes, Your Honor.

19          THE COURT:  Okay.

20          MR. DULIN:  There's one provision that may apply.

21      Let me continue to look, Your Honor.  Okay.  Your Honor,

22      there's two -- two paragraphs that could potentially bear on

23      this question.  One is under subheading -- or under heading

24      3, deliverables at closing on Page 2 of the agreement, Roman

25      Numeral XIII, other documents.  All other documents required

1    to be executed and or delivered by seller to purchaser at

2    closing pursuant to this agreement or as may be reasonably

3    requested by purchaser from time to time.  So that's

4    something that had to be delivered.  I think that's probably

5    less applicable, but could conceivably include some

6    information that was requested.  Then there's another section

7    under heading 5, representatives and warranties of seller,

8    subheading O, intellectual property, and then sub subheading

9    9, documents.  Patent documents delivered by seller to

10   purchaser hereunder represent all material records and files

11   of seller, its counsel and agents of which seller is or

12   should be aware related to the assigned patents which would

13   include the Epley patent, with respect to the acquisition,

14   prosecution, registration, continuation, reassume, issuance,

15   enforcement, defense, and maintenance of the assigned

16   patents.  And seller has not retained copies of any material

17   patent document.  I didn't see any other provisions that

18   touched on this question, Your Honor.

19          THE COURT:  Okay.  Thank you.  The motion to

20   compel is denied with respect to para -- to production

21   requests 1 through 5, 7 through 10, and 32 on the strength of

22   the affidavit of Ethan Joubran that no such documents are in

23   the possession, custody or control of Brain Synergy and

24   without any countervailing evidence to the contrary the

25   contract provisions which Mr. Dulin read to me could go --

 1    particularly the paragraph 5 could go to the issue of what

 2    documents are in the possession, custody and control of Brain

 3    Synergy and would seem to indicate that the prosecution

 4    documents -- or, I'm sorry, conception, reduction to

 5    practice, design documents were transferred to Brain Synergy,

 6    but perhaps they were not.  Apparently they were not in view

 7    of the sworn testimony of Mr. Joubran.  So with respect to 1

 8    through 5, 7 through 10, and 32 the motion to compel is

 9    denied because the plaintiff does not have any additional

10    responsive non-privileged documents.

11            Mr. Dulin.

12            MR. DULIN:  Thank you, Your Honor.  The next

13    document request is Number 13.  And I think document request,

14    I'm sorry, Number 12, 11 and 12 relate to studies, analysis,

15    and opinions concerning the scope and interpretation of the

16    '062 patent, and studies, analysis, and opinions regarding

17    the validity or enforceability of the '062 patent.  Again, on

18    these two points these are points that counsel for plaintiff

19    has said either don't exist or are privileged.  I don't have

20    any evidence to suggest that that's an untrue statement.

21            THE COURT:  You did get a privilege log filing?

22            MR. DULIN:  I have a privilege log with about one

23    pages of -- one page of entries, and then I understand we're

24    going to get another privilege log that has a more exhaustive

25    list of entries.  We haven't received that one yet.

1          THE COURT:  On request for production 11 and 12 I

2     will deny the motion to compel because there's no indication

3     that there are responsive non-privileged documents which have

4     not been produced.  I will, however, require that the

5     plaintiff produce a full and complete privilege log as

6     contemplate -- contemplated by the Tenth Circuit's decision

7     in the Peat, Marwick, Mitchell case and we can talk about the

8     date by which that should be completed at the end.  Don't let

9     me forget, Mr. Dulin.  But I will require a full and complete

10    privilege log.

11         MR. DULIN:  Thank you, Your Honor.  Number 13,

12    document request Number 13 relates to documents relating to

13    the development and commercialization of the invention.  This

14    is something that, again, relates to a variety of the issues

15    that I touched on before.  I think that at the time they

16    acquired this patent and at the time that we alleged to have

17    started to infringe they didn't have any -- any

18    commercialization had occurred.  They bought this patent in

19    order to sue us and then at some point in the future they

20    started to commercialize that invention and they did so in a

21    way that was very successful and is projected to be

22    successful in the future, therefore, I don't think they've

23    suffered irreparable harm.  And I also think that plays into

24    the Georgia Pacific factors.  I don't think they had any

25    intent to commercialize or develop this product at the time

1    that the hypothetical negotiation was to occur, the time that

2    the first infringement supposedly happened.  These documents

3    also would bear upon the demand for the product under the

4    first Panduit factor.  I think it relates to the commercial

5    success of the product which is the eighth Georgia Pacific

6    factor.

7            Now, in response to this document request we

8    received -- and I will say that plaintiff's counsel has been

9    very cooperative in our quest for documents.  We've --

10   they've been responsive to my letters, my phone calls, and

11   hopefully we've been responsive to them.  And, in fact, on

12   Sunday night I received an e-mail that has all of these

13   requests that we're fighting over along with documents that

14   were produced to respond to those.  And I have a copy of that

15   if you'd like to see that, Your Honor, or I can tell you

16   essentially what it says.  But with respect to document

17   Number 13 -- and not only has -- do we have the benefit of

18   that, but I've also looked at all of these documents.  Every

19   single document that's been produced I've put my eyes on

20   personally so I have a pretty good sense of what has been

21   produced.  There have been very, very few e-mails produced

22   and by very few custodians.  You know, we have probably a

23   pile of e-mails that big (indicating) in a case where you

24   have a company that's built from nothing through complex

25   corporate transactions in the millions of dollars to acquire

1    patents and then commercialize on a national basis.  For

2    there only to be a few responsive e-mails is just

3    disingenuous, although I am -- I am hopeful that our last

4    conversations will bear some fruit and that we can work

5    together on search terms in order -- and custodians in order

6    to help identify documents.  One thing I don't want to do is

7    I don't want to burden the plaintiffs unduly so to the extent

8    we can work together to produce e-mails that are responsive

9    to these I invite that cooperation and would certainly

10   volunteer to assist in that.

11            In regard to commercialization, what -- what's

12   been produced is a whole number of technical drawings and

13   photographs of new products that they've been developing or

14   at least a new product.  I'm not sure exactly what it is.

15   I'll fetter that out during depositions.  I think that's

16   helpful and I think that's on point.  And then three e-mails,

17   one Bates -- Bates Number BSI 5926 and then one at 6018 and

18   one at 6039.  For a company that has been progressing towards

19   commercialization of a product and hoping from what I

20   understand and from what I hear to dominate globally in this

21   area, three e-mails and some technical drawings and

22   photographs isn't enough.  They've had business plans.  They

23   filed three form D's with the Securities and Exchange

24   Commission which I have copies of if you'd like to see

25   showing that they're raising in excess of $7 million in three

 1     different raise -- capital raises.  Investors are coming in.

 2     They're giving money.  They're building momentum.  They're

 3     building a company around this product and this service.  And

 4     so that's really important to understand that and to be able

 5     to explore that and see have they been irreparably harmed by

 6     the infringement or are they flourishing in light of the

 7     infringement?

 8             Number 16 requests information that embodies

 9     evidence that relate to advertising, marketing and promotion

10     of any products embodying or using the subject matter of the

11     '062 patent.  Initially there were just a few brochures that

12     were produced.  Since that time there has been -- some

13     additional documents have been produced.  There are a couple

14     of e-mails from my client, Kevin Maher, relating to some

15     customers that were interested in the GyroStim.  There is a

16     patient financial form.  There is a flier from the Carrick

17     Brain Centers, then some brochures and two different

18     advertisements.  In addition to that there is some links to

19     videos and the web site, or maybe it's YouTube, and some

20     different social media platforms that the plaintiff's counsel

21     has given me.  And one thing we talked about last night is I

22     don't think that we'd require an order compelling them to

23     take 60 videos that are publicly available on YouTube and

24     download them and produce them to us.  If we're able to get

25     that information on our own then that's okay.  I don't mind

```
 1    having my office do that as long as we understand where they
 2    are and we're able to get them.  But it seems as though there
 3    are -- there is more marketing materials and promotional
 4    materials that are out there, and advertising --
 5    advertisements and brochures and those types of things.  And
 6    we just would like to have the benefit of those to be able to
 7    see what their promotional activities are.  And I think that
 8    those are probably two that are appropriately grouped.
 9              THE COURT:  Okay.  Mr. Hartoonian.
10              MR. HARTOONIAN:  Thank you, Your Honor.  On Number
11    13 which is directed to development and commercialization, as
12    Mr. Dulin mentioned, we've produced quite a bit of technical
13    information related to the chairs we are now making.  I
14    believe it's around 2,000 pages of technical documents.  And
15    that's generally what this request is directed to, including
16    but not limited to sketches, prints, images, written
17    disclosures, test data, notebooks.  I believe we've satisfied
18    our burden on this request by producing those development
19    technical documents.
20              As far as commercialization and e-mails between
21    employees at BSI, again, I'd just like to emphasize that I
22    don't see how that's relevant to infringement or validity or
23    even damages.  We have searched for e-mails using those terms
24    that I recited earlier.  And as I explained to Mr. Dulin last
25    night, we think that's a sufficient search.  If he disagrees
```

1    we're open to discussing additional e-mail search terms so

2    long as they're targeted and will bring back responsive

3    information that is relevant to the issues in this case.

4         I don't have anything else on -- on development

5    and commercialization so I can move onto Number 16 if you'd

6    like.

7         THE COURT:  Okay.

8         MR. HARTOONIAN:  Number 16 is directed to

9    marketing.  We have produced, as Mr. Dulin acknowledged,

10   fliers, brochures.  We've provided links to our Facebook

11   page, Twitter page, YouTube page and the like.  We have

12   provided e-mails that are relevant to marketing that came

13   back using those search terms.  He says that there are other

14   things out there when it comes to marketing.  I'm not sure

15   what he's referencing because if there's something out there

16   that he's seen that we have not produced I'd like to hear it

17   and we will follow-up with the client and find out why we

18   didn't get those marketing materials.  But I'm confident that

19   the marketing director at Brain Synergy has conducted a

20   diligent search, has provided at least one copy of each

21   marketing document because it's possible that Brain Synergy

22   has a stack of brochures in their offices.  They're all the

23   same.  And as I mentioned to Mr. Dulin maybe a month ago

24   during a meet and confer, we would agree to produce one copy

25   of each brochure.

1          Nothing further, Your Honor, on Number 16.

2          THE COURT:  Thank you.  So, Mr. Dulin, how are

3     internal e-mails on the issue of commercialization relevant

4     to infringement, validity, damages or anything else that's at

5     issue in this case?

6          MR. DULIN:  At some point BSI made the decision to

7     commercialize this product on their own.  They acquired a

8     patent.  They sued my client and then they decided to

9     commercialize.  To the extent of commercialization, I don't

10    know what that is, what hurdles they've overcome to

11    commercialize it.  I don't know when they commercialized it.

12    I don't know.  But these are things that e-mails may bear

13    upon.  And as far as what is the -- what is the relevance of

14    it, again, I think they're to dispel their claims in relating

15    -- in relation to irreparable harm that they've lost business

16    opportunities.  They've been negatively impact -- that they

17    have a negative impact to their competitive position.

18    They're commercializing a product.  And I think there's a

19    couple different categories of documents that bear upon that.

20    But, you know, commercialization is something that may bear

21    success and it may not.  If they're attempting to

22    commercialize this really, really hard and yet they're having

23    very little success then that may bear upon Georgia Pacific

24    factor Number 8, commercial success.  Then again if they are

25    not promoting it much at all, but yet they're having a

1    tremendous amount of success that may bear, you know, we

2    would argue Georgia Pacific factor Number 8 differently.

3    There's a demand for the patented product.  Maybe that demand

4    is something that they're servicing without having to

5    commercialize it under the first Panduit factor.  Maybe on

6    the other hand they're creating that demand by

7    commercializing really, really hard.  I think

8    commercialization is something that -- to be able to

9    understand what their efforts are and what the fruits of

10   those efforts are assist in determining what that reasonable

11   royalty would be.  And it also I think can bear upon whether

12   or not they've been irreparably harmed.  If they're harmed

13   and that commercialization is not bearing the fruit that it

14   normally would considering what the efforts are an expert may

15   opine, okay, well, you know, that could bear upon irreparable

16   harm.  And it's amazing what you see in e-mails when

17   companies are starting and they're going from nothing to

18   something big, and there's e-mails that oftentimes bear fruit

19   in that regard.  One e-mail that was produced talked about

20   UltraThera and their commercialization of that -- I'm sorry.

21   I'm wrong.  Life University, who's another party they

22   litigated with down in Georgia very briefly, and what their

23   commercial success has been and what they want to do in

24   response to that.  It was a very short one paragraph e-mail,

25   but nonetheless, it was something that beared (sic) upon that

1     and it was an e-mail.

2             Your Honor, have I adequately answered your

3     question?

4             THE COURT:  You have.  I'm going to grant the

5     motion to compel with respect to production requests 13 and

6     16.  With respect to Number 13 I will require the parties to

7     confer.  First of all, the argument goes to e-mails, not

8     technical drawings and photographs.  Focusing on that on the

9     e-mail portion I will require the parties to confer and agree

10    upon any additional search terms for e-mails and either the

11    identity or number of reason -- of reasonable number of

12    custodians so that a search can be made to satisfy within

13    reason the plaintiff's -- I'm sorry, the defendants' e-mail

14    request.

15            On Number 16 I will require -- it has not even

16    been done and there's an argument at least, although I didn't

17    see any evidence to that effect, but I will require that a

18    complete search be completed by the director of marketing or

19    his or her designee and at least one copy of all marketing or

20    promotional data be made available for inspection and copying

21    by the defense or where it's appropriate the plaintiff

22    identify where electronic information such as web pages,

23    Twitter, Facebook, YouTube videos, that sort of thing can be

24    located by the defense.

25            MR. DULIN:  Thank you, Your Honor.  Can we proceed

1     to the next grouping?

2                THE COURT:  Yes.

3                MR. DULIN:  I think the next appropriate grouping

4     would be document request Number 18, 19, 20, and 21.  And

5     those generally relate to business marketing and strategic

6     plans, studies and sales forecasts, sales projections, profit

7     and loss statements, financial documents including financial

8     statements, balance sheets, income statements, and budgets,

9     forecasts, revenues, business plans, strategic plans, and

10    things like that.  And I don't want to rehash the things that

11    I've said before, but I think these types of things are

12    really important to be able to understand what the

13    irreparable harm is here.  One of the -- one of the things

14    they allege is that there's been a negative impact to the

15    competitive position of the company so the financial

16    statements will bear upon that.  And these are things that

17    we'll look at and we intend to produce to an expert which

18    there's a provision for that under the protective order.  And

19    these are documents that are protected by a protective order.

20    And so we've got a two-tiered protective order which

21    inclusion an attorney's eyes only designation.  And so to the

22    extent that there's any alleged harm from this is something

23    we can mitigate by use of mechanisms that this Court has

24    already put into place.  But -- but these things are, again,

25    necessary I believe in understanding whether or not there is

1    a loss of exclusivity.  Is there price erosion?  Do we know

2    what the pricing was?  Do we know what they anticipate that

3    the pricing will be?  What admissions are there in that

4    regard?  Do they have a loss of business opportunity?  Are

5    they, in fact, seizing that business opportunity?  Is there

6    -- you know, what is the demand for this product?  What is

7    the profit the patent owner would have made absent the

8    infringing conduct?  So one thing that we received is a

9    spreadsheet.  And I think the only document that relates to

10   any of this was a single document and it was a spreadsheet

11   identified by Bates Numbers 5621, and then there was a

12   patient financial form, like a form you give to the patient

13   to fill out.  I don't know how that bears on things.

14            But, anyway, so this spreadsheet talks about the

15   patient treatments and the costs that were associated with --

16   or the revenue that was generated from that.  But it doesn't

17   give us the baseline to understand what the profits are that

18   were generated and how this could have, in fact, affected

19   profitability.  And I think certainly an expert in order to

20   make a reasoned decision is going to need to have appropriate

21   financial documentation to do so.  I think there's -- what we

22   have, I don't even know how it was generated, but it doesn't

23   have much information at all for us to derive anything.  It

24   certainly has no information to derive what the profits are.

25   Things like working capital and financial capacity is

```
 1       important to understand, you know, what the marketing and
 2       manufacturing and other abilities are of BSI to commercially
 3       exploit this product.  The audited and an unedited financial
 4       statements including profit and loss statements would assist
 5       in this in understanding what profit may have been made
 6       absent infringing conduct.  We can be able to understand how
 7       that profit has changed over time.  We could understand what
 8       the costs are including incremental costs.  What is -- you
 9       know, what are the incremental profits?  What is the
10       potential to raise profits in the absence of infringement?
11       Derivative and collateral sales I believe are something
12       that's important to this and to be able to understand.  And I
13       don't know that there is much in that way because, again,
14       this is a company that was created to -- to commercialize the
15       patented invention.  But, regardless, I think an argument
16       that you want financials for the whole company, well, this
17       isn't IBM or some huge far-flung Fortune 500 company.  This
18       is a small company that just started by acquiring this patent
19       to sue our client and then to build a business practice from.
20       And they have, and I think they've had a lot of success in
21       doing that.  And that's something that we're going to talk
22       to.
23              You know, as far as lost profits are concerned, we
24       can look at the lost sales minus the manufacturing costs,
25       minus the variable operating costs.  We can challenge those
```

1      things, but in order to do so we have to have the

2      information.  We have to have the financial information in

3      order to do that.  The -- the projections, there's sales

4      projections, there's business projections, things like that

5      that I think are very helpful in this case.  Ebay would talk

6      about irreparable harm and -- and things that are important

7      and I think cases that come from that.  The market impact of

8      the infringement is something we can look at and maybe that's

9      in their business plans.  Maybe the forecasts take that into

10     consideration.  And certainly I'd like to discuss that in

11     depositions, but I need to have the documents in order to do

12     so.  How -- the business importance of that invention.  So

13     here we look at that invention and we look at the other

14     things that they're doing and the other revenue sources that

15     they have.  So to the extent that there are other things

16     there it is important because if the invention is some small

17     little part of that then certainly that bears upon whether or

18     not there's irreparable harm.

19            Now, one thing that was produced was a business

20     plan in draft form on March 13 -- dated March of 2013.  And

21     this talks about the existence of financial projections of an

22     annual financial summary, of projected income statements and

23     projected balance sheets, projected cash flow statements,

24     your annual income statements and balance sheets and cash

25     flows.  And these are documents that haven't been produced,

1     but according to this a business plan seemed to exist.

2     Certainly there would be profit and loss statements, balance

3     sheets, general ledgers and things as such.  And so, again,

4     we think that's important.  Presumably this business plan,

5     along with the forecasts, was provided to -- and, Your Honor,

6     would you like a copy of this?

7              THE COURT:  No.  That's fine.

8              MR. DULIN:  Presumably they were raising money.

9     They were telling these investors something, right?  These

10    are sophisticated investors we see referenced in three form D

11    filings, notice of exempt offering of securities with the

12    FCC.  One is for $5 million and then the others are also well

13    under the millions of dollars.  And so they're going out and

14    raising money.  And it would be helpful to understand -- the

15    information that they're providing to these investors are

16    things that would be helpful for us to have to be able to

17    understand a lot these issues that we're going to have to

18    fetter through both in proving or debunking that theory of

19    irreparable harm, but in also establishing -- or debunking

20    theories of damages for lost profits under Panduit as well as

21    the Georgia Pacific factors for reasonable royalty.

22              There is some federal circuit case law that

23    describes that some of these things aren't important.  And I

24    didn't do an exhaustive search, but certainly there are a lot

25    of cases I could cite.  In particular there's the case of Eye

1    for Eye Limited v. Microsoft Corporation at 598 F.3d 831 on

2    Page 861.  It's a 2010 federal circuit opinion that says past

3    harm to a patentee's market share revenues and brand

4    recognition is relevant for determining whether the patentee

5    has suffered irreparable harm.

6            In regard to the financial statements there's a

7    case called Mars, Incorporated v. Coin Acceptors.  It's a

8    2008 federal circuit case found at 527 F. 3d 1359 on Page

9    1365.  And what it says is that in patent cases, as in other

10   commercial torts, damages are measured by inquiring that the

11   tortfeasor -- that had the tortfeasor not committed the wrong

12   what would have been the financial position of the wronged

13   person?  So clearly this financial picture is something that

14   we want to be able to provide an expert or even ourselves,

15   the absence of an expert, with the ammunition to be able to

16   understand what the financial background is, what their

17   projections are, what they perceive their business to be in,

18   what actually was realized as they went forward in building

19   this business from nothing to what seems to be a really good

20   business.

21           THE COURT:  Thank you.  Mr. Hartoonian?

22           MR. HARTOONIAN:  Your Honor, with respect to the

23   first category of documents, business strategy, as Mr. Dulin

24   mentioned, we produced the draft business strategy document

25   from BSI.  There was no additional business plan that was put

1      together after that draft.  We do not have the formal

2      projections and strategy documents that defendants are

3      looking for.  We are a small company and we've produced what

4      we have on strategy and we've produced e-mails among

5      employees on the business.  But as far as any additional

6      formal -- formal business plans, we don't have any.

7           On the financial information, I think this is an

8      important category.  Defendants' counsel mentioned the

9      protective order.  And I think that puts the cart before the

10     horse.  The more important -- the first question to ask is

11     whether all of those things that are itemized within BSI's

12     financial statements have any bearing on the patented product

13     and the revenues generated by that product.  And as I

14     mentioned at the very beginning, our financial statements

15     include a lot of irrelevant information.  I don't see how the

16     amount of money we're getting from outside investors is

17     relevant to our harm when it comes to damages and our lost

18     sales.

19          THE COURT:  But it doesn't take too much

20     imagination for me sitting here to think that it's possible

21     at trial, some witness takes the stand and says but for this

22     infringing product Carl Icahn was prepared to invest

23     $12 million, but he saw this infringing product and he said I

24     just don't know if the market is going to hold up so he

25     didn't invest.  I don't know that that's going to happen, but

1    at this stage of the litigation it's -- the question is is it

2    relevant or reasonably calculated to lead to the discovery of

3    admissible evidence?  And that's -- that's something that

4    might happen, right?

5            MR. HARTOONIAN:  Sure that is, but an investor's

6    decision whether to invest in a company or not I don't think

7    has bearing on lost profits or reasonable royalty.  And as

8    far as the other itemized expenses on our balance sheets and

9    statements, I mentioned we generate some revenue for

10   laboratory tests, for supplements.  Our employee information

11   is all on our -- on our balance sheets which includes

12   salaries paid to the employees, the benefits that they gain

13   from -- from those salaries, bank information, how much debt

14   we have, what banks we use, how much money we have in

15   checking, how much money we have in savings.  I -- I think

16   what's important here is for defendants to know how much

17   money we're making off of a product that's covered by a

18   patent and how much it costs us to build that product and

19   potentially to market that product.  All of that is tied to

20   patient treatment at BSI.  This --

21           THE COURT:  Let me ask you a question.  If I allow

22   -- if I require you to produce financial statements, balance

23   sheets, profits and losses, and allow you to redact the

24   numbers -- you have to have the entry, but redact the numbers

25   on things like labs, laboratory profits, supplemental --

1    supplement profits, the employee information, does that

2    satisfy your concern?  Now, I know -- I know you've got it

3    groggier than that.  You've said banking information, stuff

4    like that.  But if I have you put the -- what the category

5    is, but redact the financial information, do you have -- see

6    any harm in that?

7            MR. HARTOONIAN:  No, I do not, Your Honor.  I

8    think that's fair as long as the numbers that are shown

9    relate to patient treatment and expenses relating to the

10   actual chair.  Nothing further, Your Honor.

11           THE COURT:  Mr. Dulin.

12           MR. DULIN:  I think that there may be some privacy

13   concern and some concerns about that information, and, again,

14   that's why we have a two-tiered protective order, one that

15   includes an attorney's eyes only designation.  I think that

16   would provide sufficient protections as opposed to

17   redactions.  My concern with redactions is that there's

18   information -- you were talking about employee names and

19   things.  And certainly some of that information -- you know,

20   these -- these financial statements are not unique.

21   Companies produce these all the time in litigation, you know,

22   and sometimes they produce them pursuant to a protective

23   order if there is sensitive information.  But if there is

24   something that that's sensitive that even with an attorney's

25   eyes only designation that can't be produced then I think the

1    redaction shouldn't be so extensive that they would prevent

2    us from obtaining information that could be calculated to

3    bear upon other reasonable -- or reasonably calculated to

4    lead to the discovery of admissible information.  For

5    instance, do they have the ability to exploit the demand?  If

6    their costs are way above what they're making then it may

7    mean no.  And certainly there's a lot of financial

8    information that relate to not just this product, but the

9    company as a whole.  And, again, this company -- I believe

10   that every service has some relation to this product, but I

11   don't know that for sure partially because I don't have the

12   information to understand that yet.  But, again, that

13   information is still -- bears upon the Panduit factors and

14   the Georgia Pacific factors and the irreparable harm

15   analysis.  Thank you, Your Honor.

16            THE COURT:  Thank you.

17            MR. HARTOONIAN:  May I respond real briefly, Your

18   Honor?

19            THE COURT:  Sure.

20            MR. HARTOONIAN:  I think it's important to keep in

21   mind that BSI is the patentee in this case and Mr. Dulin

22   earlier said companies produce their financial information

23   all the time in patent cases.  I would disagree.  As the

24   patentee -- he mentioned IBM.  I don't think IBM when they

25   sue on one particular component of a computer is then going

1     to disclose financial information that's sensitive about the

2     entire company.  They're -- they're not going to give up all

3     that information.  Maybe Microsoft is a bad -- or IBM is a

4     bad example because they're publicly traded and they have to

5     disclose that information, but patentees as a whole I do not

6     think are generally required to produce company wide

7     information.  Financial information relevant to a product

8     practicing the patent, I completely agree.  That's fair.  And

9     we've produced some of that information and we're willing to

10    supplement that information.

11           THE COURT:  Thank you.  The motion to compel is

12    granted with respect to production request 18, 19, 20, and

13    21.  First, I find that the information responsive to these

14    production requests is relevant to -- or reasonably

15    calculated to lead to the discovery of admissible evidence

16    concerning issues including, among others, damages,

17    irreparable harm, lost profits, and a reasonable royalty.  I

18    heard Mr. Hartoonian's last argument about not having to

19    produce documents not relevant to the particular device or

20    technology, but here he's admitted in argument today and it

21    is I think undisputed that the vast bulk of the plaintiff's

22    financial information relates in one manner or another to the

23    patented technology at issue here, and so this case is

24    factually distinguishable from a case involving a much larger

25    corporation which has many products which are not related to

1    the technology at issue.

2           Finally, I agree with Mr. Dulin that there is that

3    protective order in place with two tiers of production

4    including attorney's eyes only and that provides sufficient

5    protection for the kind of financial information which is at

6    issue here.  We are dealing with confidential, proprietary

7    business information which needs to be protected.  I

8    understand that.  But we are not dealing with the Coca-Cola

9    formula, the single disclosure of which would destroy a

10   company.  So I will grant the motion subject to the

11   protective order, the ability of the client to designate the

12   information under the protective order.

13          Mr. Dulin.

14          MR. DULIN:  Thank you, Your Honor.  I think that

15   brings us to document request Number 23 and this requested

16   information relating to when the plaintiff first knew of

17   defendants' allegations -- alleged infringement.  That is

18   something that -- again, I think there may be e-mails out

19   there that bear upon this.  Appropriate search terms and

20   appropriate custodians -- with appropriate search terms and

21   identified custodians we can probably get that information.

22   I would anticipate that the information responsive to that

23   request is in the form of electronic information.

24          Document request Numbers 24 and 25 request

25   documents regarding defendants' alleged infringement and

1      plaintiff's knowledge, analysis, and communications regarding

2      the same.  I -- I think that the right response to that is

3      the same as Number 23.

4              Number 26 asks for information regarding other

5      third parties that plaintiff believes have infringed the '062

6      patent.  Plaintiffs supplemented their discovery responses

7      saying that nothing exists in response to this.  They've

8      searched and haven't found anything.  If that is indeed the

9      case and the representation of Mr. Hartoonian then I will

10     accept that.

11             Document request Number 27 requests any and all

12     documents relating to the damages sought by the plaintiff.

13     We have -- we have no damages calculation here.  I think a

14     lot of the information that has been compelled so far will

15     help bear upon the damages.  And it's probably subsumed

16     within the other documents that we've -- were going to

17     receive pursuant to the already granted motion to compel, but

18     to the extent there's any other documents that bear upon

19     their damages or any other calculations or anything like that

20     we request that those be produced.  The only thing that we

21     have in response to that is the one single spreadsheet that,

22     as I understand it from my conversation with Mr. Hartoonian,

23     doesn't actually articulate damages.  It's something

24     different.  And then a financial patient form which I think

25     may have been in error.

1          This document request Number 29 seeks information

2     regarding the validity and enforcement of the patent.   I

3     think we've covered that.   To the extent that there's

4     anything that's not privileged -- or it's privileged, it will

5     be on the privilege log.   To the extent there's any other

6     non-privileged information responsive to that I would assume

7     it would be in e-mails and I'll assume that's something that

8     we can gather through our search terms with our custodians.

9          And then Number 31 I think falls under that same

10    category, information relating to the allegations in the

11    pleadings.

12          THE COURT:   Thank you.   Mr. Hartoonian?

13          MR. HARTOONIAN:   Thank you, Your Honor.   As far as

14    first knowledge infringement and the defendants, we've

15    searched for UltraThera as a search term in the e-mails.

16    We've searched for Kevin Maher's name in our e-mails.   We

17    believe that those are the types of terms that would generate

18    e-mails where we're discussing the defendants.   And as far as

19    the search results we got back, we've reviewed those e-mails

20    and produced whatever is responsive.   If they're trying to

21    pinpoint a date when we found out about their infringement I

22    think that type of information can come out through an

23    interrogatory or deposing our witnesses, but as far as

24    documents mentioning the defendants, we've searched for those

25    and we've provided them.   As far as other parties that may be

1    infringing our patent, for -- for the e-mails we searched for

2    words such as patent, lawsuit, infringe, and we've produced

3    responsive documents.

4           Number 27, damages sought by the plaintiffs.  I

5    think this was covered by your previous ruling.  We will

6    produce the financial information.  And I'd just like to

7    point out that a lot of the damages theories in this case

8    will also stem from what the defendants produce and how many

9    machines they've been making, how many machines they've been

10   selling.  So at this point in discovery we don't have our

11   hands on all of the damages documents.  And I think as

12   discovery continues and we identify additional financial

13   information that's relevant to damages we'll produce those,

14   of course.

15          Lastly, on validity and enforcement, I think I

16   briefly talked about this at the very beginning.  To the

17   extent we have non-privileged information we've produced it,

18   but all of our opinions from prior to the Complaint are on

19   our privilege log.  And if there are any other e-mails that

20   are privileged that are not on the log we intend to

21   supplement that privilege log.  Thank you.

22          THE COURT:  Thank you.  Anything more on this,

23   Mr. Dulin?

24          MR. DULIN:  No, Your Honor.

25          THE COURT:  I will grant the motion with respect

1    to production requests 23, 24, and 25.  As to these requests

2    I direct that the parties confer under Rule 7.1(a) and agree

3    on any additional search terms to be used and agree about the

4    custodians either by name or number to be searched to attempt

5    to identify any additional documents, if any, responsive to

6    these requests.

7          On 26 I deny the request.  I am informed that

8    there is nothing else.  There's no evidence to the contrary

9    and so I deny the motion to compel there.

10          On interrog -- on production request 27 for the

11   same reasons that I granted the motion to compel with respect

12   to 18 through 21 I grant the motion to compel here and the

13   plaintiff must produce those documents currently in its

14   possession, custody or control which go to its theory of

15   damages.  I acknowledge Mr. Hartoonian is right.  Some of the

16   documents which go to the issue of damages are not in its --

17   currently in its possession, custody and control.  They will

18   come from the defendant.  But to the extent there are such

19   documents they should be produced.

20          And on 29 I deny the motion on the representation

21   that the -- they are all privileged and there is no intention

22   to waive the privilege, but I will require that the plaintiff

23   provide a privilege log as required by Peat, Marwick,

24   Mitchell.

25          Mr. Hartoonian, what was your position on 31?

1           MR. HARTOONIAN:   Sure, Your Honor.   Number 31 is

2      more of a catchall request that asks for any document that's

3      related to the lawsuit, any allegations in the Complaint,

4      affirmative defendants -- defenses, sorry, counterclaims of

5      any party.   We think there's plenty of case law that says

6      this type of a catchall request is not appropriate because

7      it's not described with any particularity.   I don't

8      necessarily know how to decipher the scope of this request.

9      It's unreasonably broad.   Mr. Dulin and I had a conversation

10     about this request about a month and a half ago and my

11     understanding is we agreed that the defendants would narrow

12     the scope of this request to only cover infringement issues

13     and invalidity issues.   We've agreed to produce responsive

14     documents on those issues.

15           THE COURT:   I deny the motion to compel with

16     respect to production request 31.   It is an improper

17     blockbuster production request.   I've dealt with those in a

18     case called Grinberg.   It's simply not appropriate, however,

19     I do agree that the plaintiffs should produce those documents

20     relevant -- relevant to the issues of infringement and

21     invalidity.   They probably fall under other production

22     requests, but to the extent there are additional documents

23     which go to the issues of infringement and invalidity they

24     should be produced.

25           Mr. Dulin.

 1           MR. DULIN:   Thank you.   Document request Number 34

 2     seeks communications and other documents regarding the

 3     proposed or contemplated business relationship with either

 4     defendant.   Again, this goes to a point in time prior to --

 5     and potentially overlapping when BSI acquired the Epley

 6     patent.   And there are communications that our client had

 7     with BSI.   Hey, do you want to buy our company?   And, yes,

 8     but this is what I'll pay for it.   And so there are things

 9     that we know.   But then at some point we abruptly received an

10     e-mail that said we are going to sue you.   Here's a Complaint

11     -- or I guess we have sued you.   We haven't filed it yet.

12     Here's a Complaint.   And then our client's response was wow,

13     apparently this business had -- discussions have broken down.

14     And in the interim time they'd acquired the Epley patent and

15     obviously formulated a Complaint and sued our client.   And so

16     I think these communications are more than just

17     communications with our client, but internal communications

18     and potentially communications with third parties regarding

19     this whole circumstance.   And, again, this will play into our

20     theory at trial that they acquired this patent merely to sue

21     us and they didn't have a business interest in acquiring this

22     patent, but maybe they did, but that's only something we can

23     derive through these communications and exploring that

24     salient period of time, not just from our client's

25     perspective, but what was happening behind closed doors,

1    because clearly it was something different than what our

2    client perceived it to be at the time that the communications

3    that we do have were being generated.

4              THE COURT:   And why is that relevant?

5              MR. DULIN:   It's relevant to a variety of factors,

6    but in particular have they been irreparably harmed?  They

7    acquired this patent to sue us.  They were intending to -- to

8    buy our business and then at some point they changed, decided

9    to buy their -- to build their own business and then they

10   went forward.  So they were benefited by this business going

11   forward, but at the time -- at the time that we supposedly

12   started infringing which would have been during the time that

13   these communications were being had there was a negotiation

14   that was happening under Georgia Pacific.  A whole bunch of

15   factors relate to what would have happened in that room, but

16   certainly these types of communications could bear upon that.

17   What kind of communications related to -- what was in their

18   mind at this point in time?  What did they intend to do and

19   then what ultimately happened?  So I think it's not just

20   irreparable harm, but also damages under Georgia Pacific.

21             I think there -- there wasn't an agreement not to

22   produce these documents.  There was an objection and then a

23   statement that we will produce.  And then there were some

24   documents produced, but only just a few e-mails and a whole

25   bunch of manufacturing agreements and a whole bunch of

 1        documents that were produced in response and in response to

 2        an agreement to produce, but it was never produced.  So I

 3        think ultimately there's a whole lot of communications that

 4        certainly may lead to relevant information that we don't

 5        have.  And I'll just -- maybe I'll just go through the rest

 6        of these.

 7                    THE COURT:  Okay.

 8                    MR. DULIN:  Document Number -- request Number 36

 9        requests information regarding any product or method using

10        the invention.  I think that goes back to -- I think that

11        sort of ties into some of the other requests.  But there's

12        been information relating to the technical drawings and

13        photographs of some of the machine that apparently embodies

14        this invention, but there haven't been communications or any

15        other documents relating to any other products that they're

16        developing.  There was one e-mail that I saw and it was from

17        either the president or CEO of -- what's Mr. Budiker's

18        (phonetics) position at BSI?

19                    MR. HARTOONIAN:  President --

20                    MR. DULIN:  Okay.

21                    MR. HARTOONIAN:  -- investor, founder.

22                    MR. DULIN:  From the investor, founder, and

23        president of BSI that -- and I believe it was him that talked

24        about the development of yet another new product, and that

25        may be another product that's coming out in the future, a

 1     three axis machine instead of two axis machine.  So there
 2     certainly are communications in house that relate -- you
 3     know, that's what appeared to be one piece of a whole bunch
 4     of different communications potentially relating to what
 5     they're doing in the future with this supposed patented
 6     technology, but we don't have the benefit of those
 7     communications, nor the communications relating to the
 8     current machines that they're using.  There's also a number
 9     of documents that I think we've -- we don't have a real
10     dispute on.  I just don't know that they've been exhaustively
11     produced -- the documents have been exhaustively produced in
12     response to.  One is document request Number 13, but, again,
13     that's relating to the development and commercialization.  I
14     think we've covered that before.  There's document request
15     Number 17 relating to our royalty rate.  To the extent that
16     there is information out there that would bear upon that
17     we're entitled to it.
18             Document request Number 28 is just information
19     relied on in response to the interrogatories.  This is one
20     that may need to be supplemented.  One of the requests that
21     we have is that this Court order -- enter an order compelling
22     the plaintiff to respond to certain interrogatories.  And as
23     the plaintiff does that there may be documents that are
24     generated pursuant to this one, Number 28.
25             Number 30 I think we've covered, documents

1    relating to the defendants' alleged infringement.

2            Number 33 is expert witness files.  I don't know

3    if those exist yet, but when they do and they're available we

4    would like supplemental -- a supplemental response to Number

5    33.

6            And Number 35, any documents indicating that Kevin

7    Maher should be held personally liable in this case.  I don't

8    think there's been any documents that are produced.  I don't

9    know that there are any documents that are produced, but to

10   the extent that they are we'd like to have those produced.

11   Thank you.

12           THE COURT:  Thank you.  Mr. Hartoonian.

13           MR. HARTOONIAN:  Your Honor, I'm pretty sure that

14   we previously agreed in our discovery responses to provide

15   documents with respect to -- to all of these topics that

16   Mr. Dulin has raised.  And we previously provided documents

17   before the motion to compel was filed and we continue to

18   supplement our document production so I really don't think

19   there are any disputes as to these.  I'll quickly go through

20   them just to make sure I haven't missed any.

21           Number 34, communications with the defendant about

22   a contemplated business relationship.  As I mentioned

23   earlier, we've searched our e-mails for a variety of terms

24   including the defendants' names.  We've been able to capture

25   a number of e-mails between the defendants and BSI.  We

1    produced those e-mails.  We've also produced draft terms of

2    the contemplated business relationship between the parties.

3    I believe at one point there was a draft agreement between

4    the parties that was never signed.  We produced that.  So as

5    far as Number 34, I believe we've fulfilled our burden to

6    produce documents and we've agreed to produce those

7    documents.

8            On Number 36, products or methods using the

9    invention, we've produced I think a couple of thousand pages

10   of documents on our chairs and how they work.  We're not

11   withholding anything on that.

12           28, of course as we supplement our interrogatories

13   we've agreed to provide additional documents.

14           Number 30, that's something we previously

15   addressed, infringement.

16           33, expert witnesses.  This is something down the

17   road we'll supplement.  We don't have any expert witness

18   files right now.

19           And 35, we've agreed to produce documents relevant

20   to our contention that Kevin Maher should be held personally

21   -- be personally held liable.  So as far as this last group

22   of document requests I don't think they should have been

23   raised in this motion to compel.  We've produced those

24   documents.  We've agreed to supplement.

25           THE COURT:  Anything more on this, Mr. Dulin?

1              MR. DULIN:  No.  The only thing I would add, Your

2      Honor, is in response to document request Number 34 there's

3      -- I think there's six e-mails that were produced.  And I

4      could give you those Bates numbers in response to that one.

5      And those are e-mails that my client also has because he was

6      a party to -- or somebody at UltraThera was a party to and,

7      therefore, didn't really provide us with any new information.

8      Certainly there were manufacturing agreements and so forth,

9      but most importantly we need communications in response to

10     Number 34.

11             THE COURT:  Thank you.

12             MR. HARTOONIAN:  May I respond briefly?

13             THE COURT:  Okay.

14             MR. HARTOONIAN:  I'm confident that when we

15     searched the parties' names, UltraThera and Kevin Maher, we

16     were able to retrieve documents from members of BSI where

17     they were discussing a proposed business relationship with

18     Kevin Maher.  So I'm confident that those searches would have

19     retrieved not only communications between the parties, but

20     also any other communications at BSI mentioning UltraThera or

21     Kevin Maher.  And we -- and we've provided those e-mails.

22             THE COURT:  With respect to production requests

23     34, 36, 17, 28, 30, 33, and 35 I deny the motion to compel as

24     moot.  The plaintiff has agreed to produce all responsive

25     documents in its possession, custody, and control, and is

1    under an obligation to produce them and then to reasonably

2    supplement.  So an order compelling is not required, but, of

3    course, the plaintiff has taken on the burden of meeting its

4    obligation on those requests.  Mr. Dulin.

5         MR. DULIN:  We move onto plaintiff's -- or

6    plaintiff's responses to defendants' interrogatories.

7    Interrogatory Numbers 3, 4, 12, 13, 14, 15, and 18 are the

8    ones at issue in this case.

9         THE COURT:  Say them again.  3, 4, 12.

10        MR. DULIN:  13, 14, 15, and 18.

11        THE COURT:  Okay.  Thank you.

12        MR. DULIN:  The responses to these interrogatories

13   were simply we'll produce documents.  You can derive the

14   answers to them.  And because we didn't believe the documents

15   sufficient to answer them were produced and we don't

16   otherwise have this information we move to compel.  Even if

17   documents were produced they weren't -- there was no

18   indication as to what documents were responsive to what

19   requests and, therefore, we just never got the information

20   responsive to these interrogatories.  The plaintiff in their

21   brief indicated that we'd failed to confer regarding these,

22   you know.  And there was a letter that we sent on

23   September 25th saying that because of these reasons that we

24   -- you know, relating to all these document requests and that

25   these are tied to document requests we believe it's

 1    appropriate to file a motion to compel on those, too.  And --

 2    and then it wasn't until almost a week later on October 1st

 3    that we filed our motion to compel.  So we provided a week in

 4    order to resolve these issues as well.  And so I think it's

 5    disingenuous to say that they did not have -- you know, we

 6    didn't confer or attempt to confer on those points.  The

 7    first interrog -- interrogatory Number 3 relates to the

 8    development of the Epley device.  Considering the documents

 9    that were produced it would be very helpful to understand in

10    a responsive format -- in an interrogatory response as to

11    what that development was and to put some sense to the

12    documents that have been provided.

13           Document -- or interrogatory Number 4, it just

14    asks for a description and for information regarding all

15    discussions referenced in paragraph 13 of the plaintiff's

16    complaint.  And that specifically was an allegation that

17    prior to initiating this action representatives of Carrick

18    Brain Centers have had multiple discussions with defendants

19    regarding their infringement of the '062 patent and the need

20    for the defendants to stop marketing, making, and selling

21    their infringing GyroStim devices.  Well, clearly this goes

22    to willfulness.  This is information that is critical in this

23    case.  And the specificity of who had those conversations and

24    when and what -- the subject of those conversations is

25    critical.  That hasn't been produced.  That question was

1     dodged.

2          Interrogatory Number 12 asks for information

3     relating to all people who contributed to the design,

4     development, manufacture, marketing, and sales of any device

5     embodying any claim of the '062 patent.  Again, this is

6     information we can use to corroborate the documents that they

7     will produce and to otherwise understand what their use of

8     this invention has been, their commercialization of that, and

9     perhaps even infringement issues.  These people may have

10    their own opinions on infringement in this case.  There have

11    been descriptions of who a person of ordinary skill in the

12    art is, and that was something that was responded to by the

13    plaintiffs in their -- in response to interrogatories, and

14    these people may be that and they may have information that's

15    helpful, not only on damages, but also on the infringement

16    side.

17         Number 14, interrogatory Number 14, the identity

18    of all of plaintiff's gross profit -- gross revenue and sales

19    of products embodying at least one claim of the '062 patent.

20    We've talked a lot about why this information is important

21    and I don't know what the financial documents will ultimately

22    show, but to the extent that this is information that isn't

23    derived from those financial statements then I would request

24    that there be a response to this interrogatory that states

25    it.  I mean, the worst harm that can happen is that the

1    response to this will be duplicative of something that's

2    provided in a financial document, but at least it provides us

3    with an understanding as to what they understand their gross

4    revenues to be and certainly that's relevant to damages.

5         Describe all attempts to negotiate a license

6    agreement.  This is important.  This goes to what a

7    reasonable royalty would be.  It's a Georgia Pacific factor.

8    I don't know if there's been any attempt to negotiate a

9    license agreement.  Certainly there -- we don't have

10   documents that show that, but there may be conversations that

11   BSI has had with some third-party about negotiating a license

12   agreement.  And to the extent that they haven't happened then

13   it should say that, but it doesn't.  To the extent that they

14   had happened then we request that those attempts be

15   described.

16        Number 18, interrogatory Number 18, describe the

17   circumstances surrounding the invention, conception,

18   creation, design, testing, and reduction to practice for each

19   claim of the '062 patent.  We've discussed that before.  To

20   the extent that they have information -- let me back up.  In

21   response to this interrogatory they stated -- BSI stated that

22   it would produce documents sufficient to obtain this

23   information, but we don't have that information.  So to the

24   extent that they have information regarding any of these

25   things that may not be in document format -- if it's in the

1     document then point us to the document, if it's not in the

2     document then we'd like a description of those circumstances.

3     Thank you, Your Honor.

4                 THE COURT:  Mr. Hartoonian.

5                 MR. HARTOONIAN:  Thank you, Your Honor.  I want to

6     back up just a little bit and discuss their duty to confer.

7     I was surprised to hear that Mr. Dulin said that our

8     characterization in the -- in our opposition was disingenuous

9     and that they never attempted to confer about the

10    interrogatories.  The first letter regarding this discovery

11    dispute was on August 5th.  We exchanged seven letters

12    between August 5th and September 25th on document requests,

13    so almost two months of discussions on document requests.  We

14    also had at least one meet and confer on the telephone about

15    document requests.  On September 25th we got a letter from

16    opposing counsel and in that letter it says we plan to file a

17    motion to compel on Wednesday, October 1st, 2014.  And in

18    that letter for the first time they also raised these

19    interrogatory responses, Numbers 3, 4, 12, 13, 14, 15, and

20    18.  We had never talked about those interrogatory responses

21    during those almost two months where we were trying to work

22    out the issues on the document requests.  Sure enough, six

23    days later they filed their motion and raised the

24    interrogatory issues.  We had no opportunity to confer on

25    interrogatory responses.

1          So in the first instance I would say that this

2     isn't something that can be raised in their motion now

3     because they failed to meet their duty to confer and we never

4     did.  I think it's very straightforward.  To the extent you'd

5     like to hear my arguments with respect to the interrogatories

6     I'm happy to provide them.

7          THE COURT:  Please.

8          MR. HARTOONIAN:  Numbers 3 and 18, I think they go

9     together.  They address the development, conception, creation

10    of the '062 patent.  We discussed this earlier on the

11    document requests.  We don't have that information and we

12    can't provide an interrogatory response characterizing how

13    the '062 patent was developed.  It's not something we have

14    knowledge about.

15         Number 4, discussions between BSI and the

16    defendants.  If I'm not mistaken, we provided a response to

17    this interrogatory and described those discussions with

18    defendants and what happened.  We also provided e-mails

19    between us and defendants which show what we discussed as far

20    as the contemplated business relationship.

21         Number 12, we responded to this interrogatory and

22    we identified and described the roles of Mr. John Epley and

23    Mr. Ethan Joubran and how they were involved in design and

24    development.

25         13 and 14, financial information.  I think that

 1     you've already addressed this with respect to the document

 2     request and we'll produce the financial documents for BSI.

 3     And our obligation to respond to that interrogatory and --

 4     those two interrogatories can be met by providing documents

 5     that are responsive.

 6             Number 15, as we have told defendants' counsel on

 7     numerous occasions we haven't licensed this technology to

 8     anybody.  We haven't engaged in any licensing conversations

 9     with any third-party so we don't have anything on that and we

10     don't intend to provide documents that we don't have.

11             And 18, as I said earlier, goes with Number 3.  It

12     deals with development and conception and creation.

13             Nothing further, Your Honor.

14             THE COURT:  So develop -- so creation, that's

15     limited to the patent or to the product that -- the

16     embodiment of the patent?

17             MR. HARTOONIAN:  To the extent it encompasses

18     embodiments of products covered by the '062 patent we've

19     provided the technical documents from BSI showing how our

20     machines work and how they were developed.  So I think that

21     by producing documents we've also responded adequately to

22     that interrogatory with respect to our own products.

23             THE COURT:  Thank you.

24             MR. HARTOONIAN:  Thank you.

25             THE COURT:  Anything more, Mr. Dulin?

1          MR. DULIN:  No, Your Honor.  It's -- one thing

2     that may not be in their possession is a description, and

3     they may have some of this information, but they may not have

4     information regarding what Mr. Epley did.  But to the extent

5     that they have produced products and performed services since

6     then that embodied the claims of the patent I'd just like to

7     know that and a description of those.

8          THE COURT:  Thank you.

9          MR. DULIN:  Thank you.

10          THE COURT:  I'm going to deny the motion to compel

11     with respect to interrogatories 3, 4, 12, 13, 14, 15, and 18

12     based upon the defendants' failure to confer under Rule

13     7.1(a) as I have described that duty in my opinion in Hozel

14     (phonetics).  However, what might happen next is there would

15     be some conference and then we might have a new motion to

16     compel.  So for purposes of guidance interrogatory 3 calls

17     for facts surrounding the creation of the device that came to

18     be the subject of the '062 patent, including individuals who

19     became familiar with the subject matter, commercial needs

20     sought, etcetera.  As to that the production of documents

21     alone which is what the plaintiff proposes to do might not

22     fully answer the request and so should that matter be a

23     matter for future conferences I would be inclined to grant

24     the motion to compel with respect to interrogatory 3.

25          Interrogatories 4 and 12 appear to be answered.

 1    The defendant may not like the answers, but they don't appear

 2    to be evasive.  They are what they are.  And I would be

 3    inclined, absent some further development of the argument, to

 4    deny the motion to compel with respect to 4 and 12 finding

 5    that those interrogatories have been answered.

 6         I would deny with respect to interrogatories 13

 7    and 14 finding that I've already compelled the production of

 8    the documents from which that information may be gleaned and

 9    to require an interrogatory answer would be duplicative and

10    unreasonably burdensome and would not benefit -- and would be

11    disproportionate to the case in view of the volume of

12    documents which I've ordered compelled.

13         On 15 and 18 I would be inclined to grant a motion

14    to compel.  Mr. Hartoonian says that there's been no effort

15    to license the technology, but the interrogatory doesn't say

16    that.  Instead the interrogatory poses objections and then

17    says documents will be produced, but he says there aren't any

18    so the appropriate answer to interrogatory 13 is to say we

19    haven't done that.

20         And interrogatory 18, as I say, I would be

21    inclined to compel because of -- the scope of the

22    interrogatory goes beyond the invention itself and talks

23    about the development of the technology and that sort of

24    thing.

25         So to the extent that guidance is helpful to you

```
 1    going forward there it is.  To the extent there's been any
 2    request for attorney's fees I have denied and granted the
 3    motion to compel in essentially equal parts.  I find that it
 4    would be improper under these circumstances and that justice
 5    does not -- does not dictate that I should grant any --
 6    either side any monetary or other sanction relief.
 7             We need to talk about when supplemental discovery
 8    can be made.  I just issued a recommendation on claim
 9    construction.  I suspect that there will be objections to
10    what I have done.  I suspect that there will be briefing on
11    that and Judge Arguello will have to take that up in due
12    course, but I don't think that the case is moving on any kind
13    of rapid pace.  You won't have an order on claim construction
14    for several months at least and it could be more than several
15    months, but I don't see any urgency in compelling the
16    information particularly in view of its substantial scope and
17    also in view of the fact that we are in the middle -- or
18    entering the middle of a busy holiday season where some
19    people like to live their lives.  So I wondered if I set a
20    deadline for supplemental discovery at about February 2
21    whether that is something that the plaintiff could meet and
22    that the defendant could be satisfied with.
23             Mr. Hartoonian?
24             MR. HARTOONIAN:  We can meet that deadline.  I
25    think that's fair.
```

1          THE COURT:  Mr. Dulin?

2          MR. DULIN:  I was hoping to set depositions

3    starting the end of January or early February in this case.

4    Mr. Hartoonian and I conferred about that just earlier today.

5    I -- I believe this case has been going on for a long time

6    and I'm eager to move this on.  My client needs to be

7    unencumbered by this case sooner than later.  I don't believe

8    that your order on Markman is going to materially stall the

9    case.  We know what your order is and I have an idea what the

10   District Court judge will do, therefore, I am comfortable

11   enough in proceeding with at least some depositions in late

12   January, early February.  And, therefore, to the -- so my

13   concern is more the holidays.  And I don't want to

14   inconvenience Mr. Hartoonian, although, you know, certainly

15   these matters have been coming on for sometime.  So I think

16   we have two things to determine, one is what are these search

17   terms going to be and how do we confer regarding that and --

18   and who the appropriate custodians are, and then what is the

19   production.  I guess if we can confer in a reasonable time,

20   two weeks, whatever is reasonable, then --

21          MR. HARTOONIAN:  I think that a conferral within

22   two weeks is reasonable.  And depending on the scope of the

23   new search terms and what opposing counsel is requesting I

24   would say that we would need about 30 days after that to

25   search our e-mails, collect them, give the attorney's time to

1    review them and then make that production.  So I'll request

2    at least 30 days, if not a little bit more, for us to get the

3    supplemental production to opposing counsel.

4              MR. DULIN:  And, Your Honor, if I may respond.

5    These discovery requests were submitted over seven months ago

6    so it's a long time owing for this information, however, with

7    that said, I think -- and I apologize for speaking out loud,

8    but I think the February 2nd deadline is appropriate as long

9    as we can confer within two weeks, and I understand that we

10   can, so that's fine, Your Honor, for the production of the

11   documents.

12             THE COURT:  All right.  Well, that's what I'll do.

13   I'll require that insofar as I have ordered the parties to

14   confer about search terms and the like that that conference

15   be conducted within two weeks of today and I will require

16   that supplemental discovery responses consistent with my

17   order be made by February 2nd, 2015.

18             MR. DULIN:  And then, Your Honor, if we have any

19   problems we'll make sure and have something filed forthwith

20   so we can get another hearing with you within two days.

21             THE COURT:  Good luck with that.

22             MR. DULIN:  I'm just kidding.

23             THE COURT:  I know you are.  Anything more,

24   Mr. Hartoonian?

25             MR. HARTOONIAN:  That's all, Your Honor.  Thank

1       you so much for your time.

2                   THE COURT:  Mr. Dulin?

3                   MR. DULIN:  Nothing, Your Honor.  Again, thank you

4       for your time.

5                   THE COURT:  Thank you very much.

6                   THE CLERK:  All rise.

7

8                   (Whereupon, the within hearing was then in

9       conclusion at 12:20 p.m.)

10

11                  I certify that the foregoing is a correct

12      transcript, to the best of my knowledge and belief (pursuant

13      to the quality of the recording) from the record of

14      proceedings in the above-entitled matter.

15

16

17

18       /s/ Laurel Tubbs              December 18, 2014

19      Signature of Transcriber                Date

20

21

22

23

24

25